# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **NBOA MARINE INSURANCE AGENCY, INC., COMPASS ROSE MARINERS CLUB INC. d/b/a NATIONAL BOAT OWNERS ASSOCIATION; and COMPASS MARINE SERVICES, INC.** | CASE NO. _____ |
| **Plaintiffs,** | *DOCUMENT ELECTRONICALLY FILED VIA CM/ECF* |
| **v.** | |
| **THRIVE OPERATIONS LLC d/b/a Thrive NextGen** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**PLAINTIFFS NBOA MARINE INSURANCEAGENCY, INC., COMPASS ROSE MARINERS CLUB, INC. d/b/a NATIONAL BOAT OWNERS ASSOCATION AND COMPASS MARINE SERVICES, INC.'S VERIFIED COMPLAINT AGAINST DEFENDANT THRIVE OPERATIONS, LLC**

1

Plaintiffs NBOA Marine Insurance Agency, Inc., Compass Rose Mariners Club, Inc. d/b/a National Boat Owners Association, and Compass Marine Services, Inc. (individually "NBOA" or "Plaintiff NBOA", "Compass Rose" or "Plaintiff Compass Rose", and "Compass" or "Plaintiff Compass", and collectively, "Plaintiffs"), by and through its undersigned counsel, Kiernan Trebach LLP and Mandelbaum Barrett PC, hereby aver the following by way of their Complaint for damages arising from Defendant's breach of contract, negligence, misrepresentation, unfair and deceptive business practice, and unjust enrichment, against Defendant Thrive Operations LLC d/b/a Thrive NextGen ("Thrive" or "Defendant").

## NATURE OF THE ACTION

1.      This Action arises out of, *inter alia*, Defendant's breach of contract and other acts, which have cause Plaintiffs injury, harm, and damages as described herein.

## PARTIES

2.      Plaintiff NBOA Marine Insurance Agency, Inc., is a corporation organized and existing under the laws of the State of Florida, having a principal place of business at 4404 North Tamiami Trail, Sarasota, Florida 34234. NBOA is a boat insurance agency operating nationwide that provides comprehensive and affordable coverage for a wide range of watercraft.

3.      Plaintiff Compass Rose Mariners Club, Inc. d/b/a National Boat Owners Association, is a corporation organized and existing under the laws of the State of Florida, having a principal place of business at 4404 North Tamiami Trail, Sarasota, Florida 34234. Compass Rose Mariners Club, Inc. is the sister entity of Plaintiff NBOA that manages the National Boat Owners Association membership club and operates on Plaintiff NBOA's IT systems and infrastructure.

4.      Plaintiff Compass Marine Services, Inc. is a corporation organized and existing under the laws of the State of Florida, having a principal place of business at 4404 North Tamiami Trail, Sarasota, Florida 34234. Compass works with marine insurance companies, boat and engine manufacturers, and membership associations worldwide to provide on-water towing programs, warranty claims processing, membership operations, and various forms of customer-facing support.

5.      On information and belief, Defendant is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 25 Forbes Boulevard Suite 3, Foxborough, Massachusetts 02035.

6.      According to its website, Defendant provides various services—including cybersecurity, cloud, Microsoft 365 Platform Services, disaster recovery, network management, managed IT, and consulting services—to a range of industries, which include financial, government, education, healthcare, life sciences, legal, professional, and retail. *See* https://thrivenextgen.com/services/ and https://thrivenextgen.com/industries/, Exhibit 1.

7.      In particular, Thrive touts its Managed Cybersecurity services, "Thrive delivers an unmatched portfolio of managed cybersecurity services," "Leveraging best-in-breed technologies, AI capabilities, and the power of automation, Thrive's cutting-edge security services preemptively mitigates threats, allowing you to prioritize crucial business objectives while our expert security team swiftly responds and addressed complex issues through effective remediation." *Id*.

## <u>JURISDICTION AND VENUE</u>

8.      This Court has jurisdiction over the Action as follows.

9.      This Court has original jurisdiction of "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Here, Plaintiffs base their

claims for relief on alleged violations of federal law, rules, regulations and/or guidelines, including the Declaratory Judgement Act, and Massachusetts law, including MA General Laws Chapter 93A.

10.     This Court also has jurisdiction over the Action pursuant to 28 U.S.C. § 1332, as the amount in controversy relating to Plaintiffs' claims easily exceed the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity between the parties with Plaintiffs being citizens of Florida and Defendant being, on information and belief, a Massachusetts citizen as determined by its principal place of business in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is in this District where as noted, Defendant resides, and where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## **INTRODUCTION**

12.     This Action arises out of Defendant's acts, omissions, and misrepresentations in connection with performing Core Information Technology and Cybersecurity Services ("IT Services") for Plaintiffs from 2022, culminating in a cybersecurity breach of Plaintiffs' IT infrastructure in June 2025.  These acts, omissions and misrepresentations form the basis for this Complaint, and accompanying Application for Temporary Restraining Order and Preliminary Injunction, and Motion for Expedited Discovery.

13.     Defendant Thrive succeeded SouthTech as Plaintiffs' IT vendor after purchasing SouthTech in 2022. Almost immediately after taking over provision of IT services from SouthTech, Defendants were unable to provide competent services and accurate billing, leading to a long string of unfulfilled requests, unauthorized actions and overbilling without correction.

14.     Thrive has been unable or unwilling to correctly complete tasks as simple as offboarding a former employee from the company's computer systems, to as critical as allowing

Plaintiffs' employees and contractors access to their companies' IT systems to carry out their daily duties.

15.    Finally, in December of 2024, after numerous attempts to reconcile these problems, including a change of account managers, Plaintiffs requested termination of the agreement due to breach of contract but have been delayed and otherwise thwarted by Defendant for over seven months.

16.    Then, in March 2025, Defendant appears to have suffered a Cybersecurity Breach (the "Breach") in March 2025, a fact that has never been disclosed to Plaintiffs. Thrive apparently paid a ransom to the threat actor and kept Plaintiffs in the dark.

17.    On information and belief, this Breach of Defendant's administrative systems directly led to a Cybersecurity Attack (the "Attack") on Plaintiffs' IT systems in June 2025.

18.    Following the Cybersecurity Attack, Plaintiffs are legally required to notify potential victims and report the Attack to authorities. This means Plaintiffs must investigate and determine the root cause of the Attack, which includes having full access to all relevant event logs and records related to or associated with it. These event logs and records are electronic and must be preserved, and Defendant has refused to provide a complete set of event logs and records in its custody, control, or possession, which includes data from third-party security providers.

19.    Plaintiffs' claims arise from (i) the cybersecurity breach affecting Plaintiffs' information technology systems and infrastructure, which was directly and proximately caused by the acts and omissions of Defendant Thrive as set forth herein; and (ii) Defendant Thrive's ongoing and systemic mismanagement of Plaintiffs' IT systems and infrastructure, complicated by Thrive's incompetent invoicing and accounting.

4899-1222-5369, v. 4

20.     Accordingly, Plaintiffs have suffered significant financial, property, and other damages in an amount to be determined at trial.

21.     Plaintiffs also respectfully request an order compelling Defendant to produce a complete set of event logs and records, and permitting Plaintiffs to engage in limited expedited discovery of third-party service providers as described herein.

## FACTUAL BACKGROUND

### A.  The Parties' Course of Dealing

22.     Plaintiffs outsourced managed IT services from SouthTech, one of Florida's leading managed technology solutions providers, since at least 2007, with collaborative success for many years based upon shared goals and prompt service. Never in that time did Plaintiffs suffer a cybersecurity breach or loss.

23.     In March 2022, Defendant acquired SouthTech, and the new company promised an overall improved technology experience. *See* https://thrivenextgen.com/thrive-acquires-southtech-to-continue-florida-expansion/, Exhibit 2. Defendant began transitioning Plaintiffs from SouthTech to Thrive a few months later, and began billing Plaintiffs as Thrive on or about October 1, 2022. Plaintiffs NBOA and Compass thereafter entered into two Master Service Agreements ("MSAs") as of March 31, 2023. *See* Exhibit 3. To date, the service experience has only declined, to the point of Plaintiffs being unable to access their systems on multiple occasions and experiencing a Cybersecurity Attack on the systems being protected by Thrive, discussed *infra*.

24.     The MSAs entered into by Plaintiffs NBOA and Compass are materially identical in form and substance, and govern all products and services provided or sold by Defendant Thrive or its affiliates to Plaintiffs. The general terms and conditions set forth in the MSAs are expressly incorporated by reference into all subsequent agreements between the Parties for such products

and services, including but not limited to information technology and cybersecurity services, each of which is memorialized in a corresponding service order ("Service Order").

25.     During the course of their business relationship, Plaintiffs entered into no fewer than seven (7) Service Orders each for products and services, including numerous IT Services, offered by Defendant, including server management and cybersecurity.

26.     For example, the April 28, 2023 Service Order between Defendant and Plaintiff NBOA provided that Defendant was to, among other things: (i) manage Plaintiff's IT servers and Fortinet firewalls; (ii) provide "Technical Advisory Services," which includes "strategic technical road mapping," "technology business review," and "advisement on new technology/solution environment readiness"; and (iii) provide end-user support. *See* Exhibit 4.

27.     As an additional example, the April 17, 2024 Service Order between Defendant and NBOA for NBOA's Azure server specifies "Premium Implementation" and "Premium Migration." It includes the Managed FortiGate firewall and the Thrive Managed Enterprise Endpoint Security and Response, described as providing "protection against malware, ransomware, and other fileless attacks utilizing machine learning, behavioral Artificial Intelligence and automated remediation." Exhibit 5.

28.     Pursuant to these Service Orders, Plaintiffs have collectively paid, and continue to pay, Defendant between fourteen and sixteen thousand dollars ($14,000–$16,000 USD) per month, with the expectation that Defendant will perform the contracted services, including managed cybersecurity services, in accordance with the standards of a reasonable IT MSSP.

**B.  Numerous Continuing Operational Failures**

29.    Defendant has continuously failed to carry out the services Plaintiffs have contracted for in their Service Orders in a manner consistent with the standards of a reasonable IT MSSP.



30.    As noted *supra*, for well over one year, Defendant had been unable or unwilling to complete the mundane task of removing a former employee from the ranks of authorized users. The screenshot excerpt below shows that Plaintiffs, at least as early as March 27, 2024, have requested for former employee Shawn Gladded to be offboarded, "Please offboard CMS Employee Shawn Gladden ASAP."

31.    Unfortunately, despite multiple requests by Plaintiffs, Defendant failed to complete this minor task in a timely manner, instead taking over a year to accomplish what should have been done in a single day. Even as recently as May 16, 2025, Plaintiffs have been opening service tickets to remove that employee from the rolls, as seen in the following screenshot excerpt of a recent ticket:



32.    One does not need to be an IT professional to understand that an IT vendor can, with a few keystrokes, end access for the employee and end billing for that employee. Instead of completing this task, the former employee continued to appear on the rolls, as observed by Plaintiffs, and billing for that employee—as well as for other offboarded or duplicate employee records—persisted. This failure, among others, has resulted in thousands of dollars in unwarranted charges and significant inconvenience for Plaintiffs and their employees.

33.    In addition to the many offboarding issues that Plaintiffs have experienced due to Defendant's inability or unwillingness to perform the contracted services competently, Plaintiffs have also encountered needless difficulties while onboarding their employees. For example, Defendant has repeatedly failed to bill newly onboarded employees in accordance with the entity by which they are employed, despite the fact that each employee's email address—provided by Plaintiffs in their onboarding checklists—explicitly identifies the associated entity. Indeed, as shown in the screenshot excerpt below, Defendant has repeatedly billed both Plaintiff NBOA and Plaintiff Compass for charges that should have been attributed to only one of Plaintiffs' entities:



From: Thrive <support@thrivenextgen.com>
Sent: Tuesday, March 11, 2025 11:45 AM
To: Candy Martorano <cmartorano@nboat.com>
Subject: CS2950870 - Please remove charges for Manny@compassmarineservices.com as an end user. He works at Compass Marine Services not NBOA.

Hi Candy,
Will look into it for credits.

However, so you are aware on the CMS side his email is inputted as

manuel@compassmarineservices.com

Let me know if that is correct or should be changed to how you have it in the case.

**Case Details**

**Case Description**

Description: Please remove charges for Manny@compassmarineservices.com as an end user. He works at Compass Marine Services not NBOA. He is also being charged on the CMS account. Please go back for as long as he is being charged on NBOA account.

**Case Link in Client Portal: CS2950870**

Regards,

Andrea Fahel

9

34.     As Plaintiffs noted in their response to the above email from Thrive's support staff—excerpted below—"EVERY SINGLE TIME [Thrive Employee] does an onboarding for us, she messes it up. She did not get his Log In Name correct either."

From: Candy Martorano
Sent: Tuesday, March 11, 2025 12:27 PM
To: Thrive <support@thrivenextgen.com>
Cc: Patrick Farrell (CMS) <patrick@compassmarineservices.com>; Iceseas Farrell (CMS) <iceseas@compassmarineservices.com>
Subject: RE: CS2950870 - Please remove charges for Manny@compassmarineservices.com as an end user. He works at Compass Marine Services not NBOA.

Hi, Andrea

Thank you for looking into this so quickly. I know it is no fault of yours, but here is his onboarding where the email address is requested. EVERY SINGLE TIME     Blondine does an onboarding for us, she messes it up. She did not get his Log In Name correct either.

Thank you,

Candy Martorano

35.     Further, as noted *supra*, Plaintiffs authorized the migration to a new Azure server for NBOA and explicitly prohibited any work to migrate Compass to a new server until the NBOA migration was complete. Instead of following its client's clear instructions, Defendant initiated the migration of Compass to a new Azure server. In doing so, Defendant locked out Compass' employees and contractors from accessing Compass' IT systems for over a month, severely impairing the company's ability to fulfill its mission. Even after numerous entreaties to remedy the situation, Thrive was unable to grant access to Compass' systems to a single Compass contractor to carry out his duties. Instead, after thirty-two (32) days of lockout and numerous follow-up emails sent by Plaintiffs, Thrive's solution was to grant a single individual global administrative rights over all of Plaintiffs' IT systems—both NBOA and Compass. This created a significant security risk that Plaintiffs were forced to accept in order for Compass to resume operations. This failure also resulted in thousands of dollars in unwarranted charges and required many hours of additional work by Plaintiffs' employees to implement workarounds and compensate for being locked out of their own systems.

36.     Defendant's mishandling of Plaintiff NBOA's server migration project not only caused the issues detailed above, but also forced Plaintiffs to incur additional, unnecessary expenses totaling thousands of dollars. During the migration, Defendant lost, misplaced, or was otherwise unable to recover Plaintiffs' printer driver—an essential component used to print and mail NBOA membership cards. To make matters worse, Defendant failed to address the missing driver for over two months after being notified, ultimately compelling Plaintiffs to purchase a new printer and software system at a cost of eight thousand dollars ($8,000 USD) in order to maintain business operations.

**C.  Incompetent Invoicing and Accounting**

37.     Moreover, since at least August 2023, Defendant has consistently failed to issue invoices to Plaintiffs NBOA and Compass that accurately reflect the services and pricing terms outlined in the applicable Service Orders for each entity. As demonstrated in the screenshot excerpt below, Defendant repeatedly issued invoices riddled with errors—ranging from charges billed to the wrong entity to charges that were plainly incorrect:



From: Michael Shimkat <mshimkat@thrivenextgen.com>
Sent: Thursday, September 5, 2024 10:34 AM
To: Candy Martorano <cmartorano@nboat.com>; Juan Sanchez <JSanchez@thrivenextgen.com>; Iceseas Farrell <ifarrell@nboat.com>; Patrick Farrell (CMS) <patrick@compassmarineservices.com>
Cc: Kevin Wilhelm <KWilhelm@thrivenextgen.com>; Edward Gries <EGries@thrivenextgen.com>; Andrea Fahel <afahel@thrivenextgen.com>; Tim Messing <TMessing@thrivenextgen.com>; Richie Richard <rrichard@thrivenextgen.com>; Joseph Kalil <jkalil@thrivenextgen.com>; Mike Blair <MBlair@thrivenextgen.com>; Michael Shimkat <mshimkat@thrivenextgen.com>
Subject: RE: National Boat Owners Association (NBOA) & Compass Marine Services (CMS) - CO - Cloud | Projects


Candy,


Unfortunately, we are unable to predict when personnel will have an emergency, but we have stopped billing for the on-premise hardware that is still in use. There is no longer any double billing. I did spot an error on the CMS invoice that was already sent out still including the Datto, but that is already being addressed for both entities.


In regard to the project, I am working with Andrea on sorting out what we can do.

38.     Section 3(a) of the MSAs governs fees and charges and provides that: "Client agrees to pay Thrive the fees, charges, expenses, and other amounts for the Products and each

Service specified in a Service Order during the Term of and as provided in such Service Order and in these General Terms and Conditions."

39.     Section 3(d) of the MSAs governs payment-related disputes and provides that: "If Client in good faith disputes any portion of an invoice, Client will promptly pay the undisputed portion of the invoice and submit to Thrive a written claim within thirty (30) days of the due date thereof . . . describing in reasonable detail the basis of the dispute and including any relevant supporting documentation. After receipt of such claim, Thrive will undertake an investigation of the disputed charges, and, subject to Thrive's rights under Section 9 [Termination] below, both Parties agree to make a good faith attempt to resolve the dispute promptly."

40.     Following each inaccurate invoice issued by Defendant, Plaintiffs complied with Section 3(d) of the MSAs by timely paying the undisputed portion and submitting a written claim to Defendant describing, in reasonable detail, the basis of the dispute. Only one example of unsuccessful offboarding is listed *supra*, but every instance of onboarding and offboarding employees has been rife with incompetence, both on the operational side as well as the accounting side. Furthermore, Defendant has consistently failed to correct the improper invoices until this past week, when Defendant began to attempt to correct the improper invoices, perhaps in anticipation of being named in this Complaint.

41.     Plaintiffs have consistently and promptly notified Defendant, pursuant to MSA Section 3(d), upon discovering each of Defendant's numerous errors related to invoicing and performance of tasks outlined in the Parties' Service Orders.

42.     Despite Plaintiffs' adherence to the dispute resolution procedure outlined in the MSA, Defendant has repeatedly failed to remedy the errors identified in Plaintiffs' notifications.

D.  **Plaintiffs Have Sought Termination of the MSAs Since December 2024**

43. Due to Defendant's repeated failures to comply with the payment-related terms of the Parties' MSAs and multiple Service Orders—as well as Defendant's many errors in implementing the services that Plaintiffs are paying for by virtue of the Service Orders—Plaintiffs have sought to terminate all agreements with Defendant since as early as December 13, 2024, under Section 9, the termination clause of the MSAs.

44. After receiving no response for ten days, Plaintiff reached out to the former owner of SouthTech and was able to secure a teleconference meeting for that day, December 23—which Defendant canceled without any explanation minutes before it was to begin. Finally, well into January of the New Year, and even in the face of the many documented failures, Thrive denied any breach of contract and demanded liquidated damages in the six figures.

45. Since that time, up to the present date, Plaintiffs have supplied emails and documents to prove the many accounting errors produced by Defendant, who continues to shirk responsibility and is either riddled with incompetency or rife with negligence, as they cannot present an accurate accounting of their services and billings for the duration since the MSAs were executed.

**E. Plaintiffs' June 2025 Cybersecurity Attack**

46. Plaintiff NBOA discovered that it had experienced the Cybersecurity Attack") on its IT network on June 6, 2025, which encrypted a number of endpoints within its system and affected a domain server and the workstations connected to that domain.

47. Through counsel, Plaintiff NBOA timely engaged a cyberforensic investigator (the "Investigator"). The Investigator's intensive and ongoing cyberforensic investigation into the Cybersecurity Attack makes clear that Defendant's breach of contract, acts, omissions, and misrepresentations, as set forth herein, was the root cause of Plaintiff NBOA's resulting damages,

and suggests that Plaintiffs' damages were the direct result of a compromise of Defendant's network that occurred in March 2025.

48.    On information and belief, the threat actor who perpetrated the Cybersecurity Attack exploited Defendant's network as a vector to access Plaintiff NBOA's network, following a cybersecurity breach of Defendant's systems on or about March 2025.

49.    To this day—and even after becoming aware of Plaintiffs' own Cybersecurity Attack—Defendant has never disclosed its March 2025 Breach to Plaintiffs.

50.    On information and belief, Defendant sought to contain the effects of its March 2025 Breach by paying a ransom to the threat actor, in an effort to prevent disclosure or misuse of exfiltrated data and to conceal the incident from Defendant's clients.

51.    Between May 7, 2025, and June 7, 2025, Plaintiff NBOA's cybersecurity Investigator discovered that a total of 287,343 login entries were recorded on Plaintiff NBOA's system under the "Thriveadmin" domain account. All 297,343 login entries occurred between 11:45 p.m. and 6:00 a.m. and originated from the same private IP address.

52.    Plaintiff NBOA's cybersecurity Investigator also revealed that between May 12, 2025, and June 6, 2025, two hundred and five (205) failed login attempts were recorded on the Local Administrator account of Plaintiff NBOA's domain server, the same server that was ultimately compromised during the Cybersecurity Attack. Event logs identifying these failed attempts as "EID 4625" entries further indicate that they were "brute force" attempts to gain access using a local account. All failed login attempts originated from the same private IP address as the login entries associated with the "Thriveadmin" domain account.

53.    Seven minutes after the final EID 4625 event was logged on June 6, 2025, an EID 4624 event was recorded. In the context of the preceding 205 failed EID 4625 entries—and the

14

absence of any further EID 4625 entries thereafter—Plaintiff NBOA's cyberforensic Investigator reports that this activity indicates that an actor likely succeeded in logging into the Local Administrator account.

54.     Based on the timing of the brute force activity relative to the date of the Cybersecurity Attack, and the IP addresses associated with that activity, Plaintiffs' cybersecurity Investigator's findings indicate that it is more likely than not that the login attempts carried out on Plaintiffs' system occurred as a direct result of Defendant's March 2025 Breach.

55.     In support of Plaintiffs' motion for Temporary Restraining Order, Plaintiffs also submits that, as part of its mitigation and recovery activities, Plaintiffs have a time-sensitive legal obligation to notify potential victims of the Cybersecurity Attack and report the event to the relevant governmental authorities.

56.     In order to comply with these obligations, Plaintiffs must investigate and determine the root cause of the Cybersecurity Attack, which includes having full access to all relevant event logs and records related to or associated with the Cybersecurity Attack. These event logs and records are ephemeral and, notwithstanding numerous demands to preserve and produce, Defendant has refused to provide a complete set of event logs and records in its custody, control, or possession. Plaintiffs request that this Court order the immediate production of all such event logs and records in Defendant's custody, control, and possession.

F.     **Defendant Thrive Failed to Protect Plaintiffs**

57.     Defendant is a managed security service provider ("MSSP"), offering cybersecurity services designed to detect and prevent cyberattacks. As a managed provider, an MSSP plays a critical role in identifying and mitigating threats, including the type of attack experienced by

Plaintiffs. Defendant has provided MSSP services to Plaintiffs since approximately October 1, 2022.

58.     In fact, Thrive claims, "Thrive's threat detection and response services provide our business with real-time detection of threats and rapid response by our security experts to investigate, contain and mitigate security incidents. Backed by our 24/7/365 Security Operations Center (SOC), Thrive's Managed Detection and Response (MDR) and Endpoint Detection and Response (EDR) services provide you with the confidence that your critical systems are monitored around the clock." *See* https://thrivenextgen.com/services/cybersecurity/, Exhibit 6.

59.     In its capacity as MSSP, Defendant remotely configures and manages two of Plaintiffs' critical cybersecurity hardware and software deployments: the Fortinet firewall appliance and service (the "Fortinet Service") and the SentinelOne endpoint protection system ("SentinelOne Service").

60.     Both the Fortinet Service and the SentinelOne Service generate extensive event logs and records in connection with real or suspected events that compromise network and system security. These logs and records are critical to any cybersecurity forensics investigation in that they provide highly detailed technical data that can point to the root cause of an attack.

61.     The Fortinet Service and SentinelOne event logs and records are retained by MSSPs for designated periods of time (typically 30 days or longer) before they are overwritten by newly generated information. If not retained or preserved, critical pre-cybersecurity incident data will be lost.

62.     Plaintiffs pay a monthly fee to Defendant for MSSP services. Accordingly, the logs and records generated by Defendant in the course of providing those services are the property of Plaintiffs.

63.    In the days following the Cybersecurity Attack, Plaintiffs made numerous unsuccessful requests to Defendant for all event logs and records related to or associated with the incident.

64.    On June 17, 2025, approximately eleven days after the Cybersecurity Attack, Plaintiffs engaged cybersecurity counsel. That day, Plaintiffs' counsel sent a detailed letter to Defendant via overnight mail and email, demanding the preservation and production of relevant event logs and records. The letter also objected to Defendant's prior non-responsiveness regarding these requests. *See* "June 17 Demand Letter", Exhibit 7.

65.    On June 20, 2025, Plaintiffs' counsel sent a second notice to Defendant to preserve and produce the event logs and records. *See* "June 20, 2025 Demand Letter", Exhibit 8.

66.    Defendant's counsel did not respond to Plaintiffs' counsel until June 24, 2025. In that response, counsel stated, in substance, that Defendant would review the relevant retention periods and invoice Plaintiffs accordingly. *See* "Thrive Response June 24, 2025", Exhibit 9.

67.    On June 25, 2025, Plaintiffs' counsel responded to Defendant's counsel, reiterating Plaintiffs' demands for the production of event logs and records. Counsel also proposed a meeting between Plaintiffs' cybersecurity Investigator and Defendant's staff to coordinate the transfer of the requested data. *See* "Plaintiffs' June 25, 2025 Email", Exhibit 10.

68.    One June 27, 2025, Defendant's counsel emailed Plaintiffs' counsel indicating, *inter alia*, Defendant's confusion about Plaintiffs' demands, a "reminder" of Defendant's "platform wide [Sentinel One] retention of 30 days," and further disclosing the existence of a "large amount of [SentinelOne] data." *See* "Thrive June 27, 2025 Email", Exhibit 11.

69.    Plaintiffs' counsel responded to the Thrive June 28, 2025 email, advising Defendant of its obligation to preserve NBOA related documents, records, and logs. *See* "Plaintiffs' June 28, 2025 Email", Exhibit 12.

70.    Defendant has failed, and continues to fail, to produce to Plaintiffs all event logs and records, which indisputably are, and remain, the property of Plaintiffs.

71.    As the ongoing investigation by Plaintiffs' cyberforensic Investigator increasingly points to a pre-existing and continuing cybersecurity breach of Defendant's own network as the root cause of the Cyber Attack, the need to obtain these logs and records has become even more critical.

72.    The impacts of a Cybersecurity Attack are many, including operational disruption, numerous financial losses, reputational damage and loss of credibility with present and future customers, remediation costs, and excessive downtime. In addition to the inability of employees and contractors to execute their duties, there are effects on employee confidence and morale, as well.

73.    Plaintiffs' claims arise from (i) the cybersecurity breach affecting Plaintiffs' information technology systems and infrastructure, which appears to be directly and proximately caused by the acts and omissions of Defendant Thrive as set forth herein; and (ii) Defendant Thrive's ongoing and systemic mismanagement of Plaintiffs' IT systems and infrastructure, which has further exacerbated Plaintiffs' damages.

74.    Based on Thrive's foregoing acts, omissions, breaches and other torts, Plaintiffs have suffered significant liabilities, loss, and damages in an amount to be determined at trial and is liable for the following causes of action.

## COUNT I
## <u>BREACH OF CONTRACT</u>

75.    Plaintiffs incorporates by reference each and all of the preceding paragraphs as if set forth fully herein.

76.    The Master Services Agreements and associated Service Orders constitute a valid, enforceable written contract between Plaintiffs and Thrive.

77.    Under both MSAs, Thrive was required to, *inter alia*, provide IT services to Plaintiffs as described *supra*, including IT security services to, among other things, sufficiently protect Plaintiffs' IT infrastructure from third-party malware attacks.

78.    Indeed, the April 28, 2023 Service Order between Defendant and Plaintiff NBOA describes Thrive's Endpoint Security and Response: "Thrive Endpoint Security and Response service provides Next Generation detection & protection for servers and workstations. With the advent of sophisticated malware such as fileless attacks and zero-day executables, a feature rich signature-less endpoint solution is needed in many organizations. Our solution offers all of the necessary features to combat advanced endpoint attacks while meeting multiple compliance guidelines that typically require traditional antivirus protection." Exhibit 4, at 13.

79.    The same SO continues to describe Thrive's FortiGate Firewall: "Thrive EBMS Managed FortiGate Firewall Service provides fully managed edge security utilizing the Fortinet FortiGate Unified Threat Management Platform. The service includes the physical or virtual FortiGate firewall with full monitoring and management of the firewall configuration, policies and rules." Exhibit 4, at 14.

80.    The SO also describes Thrive's Managed Microsoft 365 Backup for accidental deletion and security threats; Thrive's Managed Advanced Email Threat Security, which provides security against malicious attachments and URL's, malware, phishing and spear-phishing, and

social engineering attacks; and Thrive's O365/M365 Management and Security Monitoring, which "monitors for potentially malicious activity within the Client's Microsoft tenant and alerts Thrive's Security Operations Center;" among other services. *See* Exhibit 4, at 16–21.

81.    Thrive assumed, acquired, or otherwise took over all duties, obligations, and responsibilities thereunder as SouthTech's Successor, through March 30, 2023 and then, its continued performance under the March 31, 2023 MSA.

82.    Plaintiffs have fully performed and complied with all of its applicable obligations set forth in the MSAs, including payment of all uncontested service fees to Thrive due under those contracts and each Service Order.

83.    Thrive breached the MSAs by, *inter alia*, the acts and omissions described herein.

84.    For example, Thrive breached the MSA between it and NBOA by failing, in part or full, to "reduce software vulnerabilities," "combat advanced endpoint attacks," "perform investigation and analysis of all Malicious and Suspicious level alerts," and "provide fully managed edge security," among other failings, which gave rise to Defendant's March 2025 Breach, and directly led to Plaintiffs' June 2025 Attack.

85.    Thrive also breached the MSAs and Service Orders by numerous other acts or omissions set forth *infra*.

86.    By way of example, Plaintiffs authorized Direct Microsoft Azure charges solely for NBOA, yet Thrive set up Azure for both NBOA and Compass, resulting in unauthorized work and associated fees. Accompanying the unauthorized Compass Azure server work was the deletion of permissions for Compass' programmer and admin, who was locked out of the Compass server for over a month and was unable to perform his daily duties. Thrive's solution to this problem that it

had created was to compromise Plaintiffs' security by making the programmer a Global Admin for Plaintiffs' Microsoft account, which was not only inelegant, but raises various security issues.

87.    In addition, Thrive overcharged Plaintiffs for monthly services charges for eight months, nearly $1000 USD per month, and only partially reconciled these billing statements in the past week.

88.    Moreover, as Thrive was responsible for Plaintiffs' IT security and network maintenance prior to and during the Cybersecurity Attack, Thrive breached its MSA with NBOA and was both negligent and reckless in its foregoing acts, omissions, and corresponding failure to protect Plaintiff NBOA from the Cybersecurity Attack.

89.    Indeed, despite Thrive's (1) numerous claims, including "Next Generation detection and protection" and "fully managed edge security"; (2) despite the significant amount of service fees paid to Thrive under both MSAs; and (3) despite Thrive' purported expertise in providing IT security services, Plaintiff NBOA was nonetheless the target of a Cybersecurity Attack in June 2025—all on Thrive's watch.

90.    This Attack occurred as a direct and proximate result of Thrive's breach in failing to provide adequate IT Services in accordance with both MSAs, and its acts, omissions, and other negligent and reckless failings.

91.    Even more, Thrive further breached the MSAs by failing to cooperate with Plaintiffs' incident response to the Cybersecurity Attack, and failing to provide all documents, records, and audit logs generated by the various resources provided to or managed by Thrive on Plaintiffs' behalf that are associated with the Cybersecurity Attack, including all communications, logs, configurations, and other data related to Sentinel, Azure, Office 365, Kaseya agents, ServiceNow, FortiGate/FortiManager/FortiCloud, and any other systems or resources used to

collect data or to interact, interface, or otherwise communicate with Plaintiffs, its users, or its systems, including data from both Thrive's service teams as well as all third-party managed services.

92.     As a result of its breach, acts, and omissions, Thrive has caused Plaintiffs to suffer significant damages in an amount to be proven at trial.

## COUNT II
## NEGLIGENCE AND PROFESSIONAL NEGLIGENCE

93.     Plaintiffs incorporates by reference each and all of the preceding paragraphs as if set forth fully herein.

94.     Thrive markets and sells its IT related services, including IT security to clients throughout the country.

95.     Thrive touts its services in cybersecurity, "From upfront and ongoing governance and compliance to proactive monitoring and advanced threat detection, your business can benefit from seamless integration between Microsoft's security features and Thrive's 24×7 Security Operations Center, helping your team stay secure without disrupting productivity." *See* Exhibit 6.

96.     Thrive claims "Thrive's leading security platform integrates best in breed technologies, analyzing attack data with AI and certified security analysts to prevent the impacts from threats allowing you to focus on critical business outcomes." Thrive's purported knowledge, expertise, and experience with malware and ransomware attacks is intended to prevent, rather than facilitate attacks, which appears to have occurred in this case. *Id.*

97.     Plaintiffs thus trusted Thrive with providing sufficient IT security services with the understanding that Thrive would adequately and sufficiently protect Plaintiffs' IT infrastructure, including from third party threats and ransomware.

98.    Thrive owed a duty of care to Plaintiffs to safeguard Plaintiffs' IT infrastructure. In fact, Thrive owed a duty of care to exercise a reasonable degree of care and skill in performing these IT infrastructure duties. Plaintiffs relied upon Thrive's professional expertise in cybersecurity.

99.    This duty of care was separate and distinct from Thrive's contractual obligations under the MSAs, including, but not limited to, Thrive's general duty to Plaintiffs to avoid causing foreseeable harm.

100.    Thrive breached its duty of care by, *inter alia*, failing to adequately protect Plaintiffs' IT infrastructure.

101.    By way of example, Thrive breached its duty of care by allowing a Cybersecurity Attack to occur on June 6, 2025 despite its many "leading security platform" claims. Thrive was negligent, and indeed reckless, in failing to provide Plaintiffs adequate IT security protections.

102.    By way of further example, Thrive appears to have suffered its own breach in March of 2025, which appears to be the proximate cause of Plaintiffs' Cybersecurity Attack.

103.    In fact, the MSA specifically states "Thrive shall not be liable for damages arising from or in connection with loss of data or breach of privacy of information technology systems except to the extent that Thrive's gross negligence or fraud . . . is the direct and primary cause of such loss or breach." *See* Exhibit 3, at 5.  It appears that is exactly the case at hand, where Thrive's apparent March 2025 breach has caused Plaintiffs' Attack. Defendant's March 2025 Breach and subsequent ransom payment was never disclosed to Plaintiffs, and no remedial action was taken or recommended to Plaintiffs, including changing or improving user login processes.

104.    As Thrive was responsible for Plaintiffs' IT system and network maintenance prior to and during the Attack, Thrive's acts and omissions were both negligent and reckless in its corresponding failure to protect Plaintiffs from the Attack.

105.    As a direct and proximate result of Thrive' negligence and recklessness, as well as its professional negligence in providing services specific to IT professionals, Plaintiffs have suffered and will continue to suffer injury and damages in an amount to be proven at trial.

### COUNT III
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND DEALING

106.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

107.    Thrive owes Plaintiffs the duty and obligation of good faith and fair dealing that underlies its contractual obligations under the MSAs and has a corresponding legal obligation not to act in bad faith.

108.    The MSAs constitute valid, enforceable written contracts that bind Thrive as Successor to SouthTech and for the reasons described *supra*.

109.    Plaintiffs have complied with all applicable conditions of the MSAs, including timely payment of all uncontested service fees.

110.    Thrive has acted in bad faith, with the purpose of depriving Plaintiffs of their rights and benefits under the contract, including without limitation, providing insufficient and indeed— negligent and reckless—IT Services to Plaintiffs.

111.    Plaintiffs have suffered damages as the direct result of Thrive's breaches of its duty of good faith and fair dealing and corresponding bad faith, in an amount to be proven at trial.

4899-1222-5369, v. 4

## COUNT IV
## <u>UNJUST ENRICHMENT</u>

112.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

113.    Under the MSAs, Plaintiffs have made full and timely payments to Thrive for the uncontested IT Services under the agreements, including IT security.

114.    Thrive thus received a significant benefit from Plaintiffs' performance under the MSAs, including its receipt of significant amounts of service payments.

115.    Under the terms of the MSAs, and in exchange for Plaintiffs' contractual performance, Plaintiffs expected that the bargained-for IT Services, including sufficient IT security from Thrive, would prevent third-party influence on Plaintiffs' IT infrastructure.

116.    Despite these facts, Thrive did not provide the bargained-for IT Services including sufficient IT security services, to Plaintiffs as set forth *supra*.

117.    Indeed, Plaintiffs were targeted by a Cybersecurity Attack on June 6, 2025.

118.    Thrive has, therefore, been unjustly enriched through at least its receipt and retention of Plaintiffs' services payments under the MSA.

119.    As a result thereof, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT V
## <u>CONTRIBUTION</u>

120.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

121.    Plaintiffs seek contribution claim from Thrive for any and all loss and/or damages Plaintiffs have and will incur in this Action for at least the reasons set forth herein.

4899-1222-5369, v. 4

## COUNT VI
## <u>FRAUDULENT INDUCEMENT</u>

122.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

123.    As set forth above, Thrive made unfair and deceptive representations as to then-presently existing and/or past facts so as to attempt to induce Plaintiffs to enter into the Thrive MSAs.

124.    Thrive knew its representations were unfair and deceptive, and intended for such materials misrepresentations to induce Plaintiffs into entering into the Thrive MSAs.

125.    Plaintiffs reasonably relied on Thrive's material misrepresentations, resulting in damages to Plaintiffs.

126.    By way of example, Thrive warranted that its "Services, including without limitation, those provided by Third-Party Providers, will be performed in a professional manner conforming in all material respects to prevailing industry standards and practices, applicable law, and the specifications set forth in the Service Orders relating thereto." Clearly, the Attack, as well as Defendant's ongoing and systemic mismanagement of Plaintiffs' IT systems and infrastructure, reveal that this was unfair and deceptive.

127.    Thrive, at that time, knew or should have known that this material representation was false.

128.    However, Thrive still made those misrepresentations so that Plaintiffs would rely on same, and enter into the MSAs.

129.    Plaintiffs reasonably relied on Thrive's material misrepresentation to Plaintiffs' substantial detriment.

130.    As such, Plaintiffs have been and continue to be significantly damaged based upon being so induced including by the foregoing and were otherwise deprived the benefit-of-the-bargain.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

131.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

132.    As set forth above, Thrive made material misrepresentations as to then-presently existing or past facts that were untrue or misleading.

133.    Thrive lacked reasonable grounds to believe those statements were true.

134.    The misrepresentations were made carelessly or without due care, in that Thrive should have known or had reason to know the statements were false or misleading.

135.    Plaintiffs relied on Thrive's misrepresentations, and that reliance was reasonable under the circumstances.

136.    Thrive's misrepresentations and Plaintiffs' reliance on the same directly and proximately caused Plaintiffs to suffer damages.

137.    By way of example, Thrive materially misrepresented to Plaintiffs that Thrive had "Next Generation detection and protection for servers and workstations," that "Our solution offers all of the necessary features to combat advanced endpoint attacks," and the "Thrive EBMS Managed FortiGate Firewall Service provides fully managed edge security."  Even so, Thrive allowed itself to be apparently breached, and subsequently allowed the Attack suffered by Plaintiffs.

138.    Thrive, at that time, knew or should have known that this material representation was false.

139.     However, Thrive still made this misrepresentation.

140.     Plaintiffs reasonably relied on Thrive's material misrepresentations to Plaintiffs' substantial detriment.

141.     As such, Plaintiffs has been and continues to be significantly damaged based upon being so induced including by foregoing and was otherwise deprived the benefit-of-the-bargain.

**COUNT VIII**
**CONVERSION**

142.     Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

143.     Plaintiffs are the lawful owners of, or had a right to possess certain business records and electronic data, at all relevant times (the "Records"). The records include all documents, records and audit logs generated by the various resources provided to or managed by Thrive on Plaintiffs' behalf that are associated with the Cybersecurity Attack, including all communications, logs, configurations, and other data related to Sentinel, Azure, Office 365, Kaseya agents, ServiceNow, FortiGate/FortiManager/FortiCloud, and any other systems or resources used to collect data or to interact, interface, or otherwise communicate with Plaintiffs, its users, or its systems, including data from both Thrive service teams as well as all third-party managed services.

144.     Defendant has refused and continues to refuse to return the Records to Plaintiffs and have exercised control over them in contravention of Plaintiffs' rights. This conduct constitutes wrongful exercise of dominion and control over Plaintiffs' property.

145.     As such, Plaintiffs have been and continue to be significantly damaged, including but not limited to loss of access to critical business information and operations, disruption to its remediation efforts in response to the Attack, and damages in an amount to be proven at trial.

**COUNT IX**

## VIOLATION OF THE MASSACHUSETTS GENERAL LAWS CHAPTER 93A

146.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

147.    Defendant is engaged in trade or commerce as defined by and for the purposes of Massachusetts General Laws c. 93A.

148.    On information and belief, Defendant provides various services—including cybersecurity, cloud, Microsoft 365 Platform Services, disaster recovery, network management, managed IT, and consulting services—to a range of industries, which include financial, government, education, healthcare, life sciences, legal, professional, and retail, from its principal place of business in Foxborough, Massachusetts.

149.    As set forth above, Thrive made unfair and deceptive representations as to then-presently existing and/or past facts so as to attempt to induce Plaintiffs to enter into the Thrive MSAs.

150.    Thrive knew its representations were unfair and deceptive, and intended for such materials misrepresentations to induce Plaintiffs into entering into the Thrive MSAs.

151.    Plaintiffs reasonably relied on Thrive's material misrepresentations, resulting in damages to Plaintiffs.

152.    By way of example, Thrive warranted that its "Services, including without limitation, those provided by Third-Party Providers, will be performed in a professional manner conforming in all material respects to prevailing industry standards and practices, applicable law, and the specifications set forth in the Service Orders relating thereto." Clearly, the Attack, as well as Defendant's ongoing and systemic mismanagement of Plaintiffs' IT systems and infrastructure, reveal that this was unfair and deceptive.

153.    Thrive, at that time, knew or should have known that this material representation was false.

154.    However, Thrive still made those misrepresentations so that Plaintiffs would rely on same, and enter into the MSAs.

155.    Plaintiffs reasonably relied on Thrive's material misrepresentation to Plaintiffs' substantial detriment.

156.    The above actions and inactions of Defendant constitute unfair and/or deceptive acts or practices under Massachusetts General Laws. C. 93A.

157.    Plaintiffs have been and continue to be significantly damaged as a result of Defendants unfair and/or deceptive acts or practices under Massachusetts General Laws. C. 93A.

158.    Beyond all legal and/or equitable relief sought, Plaintiffs also seek reasonable attorneys' fees, filing fees, and that the damages sustained by Plaintiffs be doubled or trebled such that Plaintiffs are awarded twofold or threefold damages against Thrive under Massachusetts General Laws c. 93A.

## COUNT X
## DECLARATORY JUDGMENT

159.    Plaintiffs incorporate by reference each and all of the preceding paragraphs as if set forth fully herein.

160.    Plaintiffs seeks a declaratory judgment that the MSA is *void ab initio* pursuant to the Declaratory Judgment Act. 28 U.S.C. § 2201(a).

161.    The Declaratory Judgment Act ("Declaratory Judgment Act") provides: "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.*

30

162.    "The Declaratory Judgment Act permits a district court, '[i]n a case of actual controversy within its jurisdiction,' to 'declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.' 28 U.S.C. § 2201(a).

163.    "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III' of the Constitution." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

164.    An action seeking declaratory relief satisfies the case or controversy requirement, and thus permits the exercise of federal jurisdiction, if the dispute is definite and concrete, touching the legal relations of parties having adverse legal interests and is 'real and substantial, such that it admits of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

165.    The aforementioned facts demonstrate that there is a substantial controversy between Plaintiffs and the Thrive, who have adverse legal interests, and there is sufficient immediacy and reality to warrant the issuance of the declaratory judgment.

166.    Likewise, the facts set forth in the preceding paragraphs specifically demonstrate that Thrive knowingly, negligently, and/or recklessly made material misrepresentations to Plaintiffs in connection with the MSAs, which Plaintiffs reasonably relied on.

167.    By way of example, Thrive materially misrepresented to Plaintiffs that Thrive had "Next Generation detection and protection for servers and workstations," that "Our solution offers all of the necessary features to combat advanced endpoint attacks," and the "Thrive EBMS Managed FortiGate Firewall Service provides fully managed edge security."  Even so, Thrive

allowed itself to be apparently breached, and subsequently allowed the Attack suffered by Plaintiffs

168.    Thrive, at that time, knew or should have known that this material representation was false.

169.    However, Thrive still made this misrepresentation.

170.    The Master Service Agreements are therefore invalid, unenforceable and without force or effect.

171.    Accordingly, Plaintiffs is entitled to a declaratory judgment that the Master Service Agreements are *void ab initio*.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues including all claims against Thrive.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter judgment in favor of Plaintiffs and against Thrive as follows:

A.    Awarding damages in an amount to be determined at trial plus an award of costs and attorneys' fees;

B.    Awarding compensatory damages;

C.    Awarding consequential damages;

D.    Awarding double or treble damages in accordance with G.L. c. 93A;

E.    Awarding counsel fees and costs in accordance with G.L. c. 93A;

F.    Awarding pre-judgment and post-judgment interest at the maximum rate permitted under the law;

G.    A declaratory judgment that the Thrive MSAs are *void ab initio*.

H.    Ordering that Thrive fully indemnify Plaintiffs against all claims, loss, liabilities, and damages incurred in this Action, including attorneys' fees, costs, and expenses;

I.    Ordering that Thrive fully contribute to any and all liabilities and damages incurred by Plaintiffs in this Acton; and

J.    Granting such other, further, and different relief as the Court deems just and appropriate.

Dated: August 14, 2025

Respectfully submitted,

NBOA Marine Insurance Agency, Inc., et al.

By its attorneys,

*/s/Robert M. Stanton, Jr.*

Robert M. Stanton, Jr. (BBO #690734)
**KIERNAN TREBACH LLP**
40 Court Street, 3rd Floor
Boston, MA 02108
rstanton@kiernantrebach.com
Phone: 617-426-3900

Lucian C. Chen (*pro hac vice* to be filed)
**MANDELBAUM BARRETT P.C.**
570 Lexington Avenue, 21st Fl.
New York, NY 10022
lchen@mblawfirm.com
Phone: 212-776-1834

Steven Teppler (*pro hac vice* to be filed)
**MANDELBAUM BARRETT P.C.**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
steppler@mblawfirm.com
Phone: 973-736-4600

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

Iceseas Farrell, under penalty of perjury, verifies that she is the Vice President of NBOA

Marine Insurance, Inc. and that the facts in this Verified Complaint (except those facts based upon

information and belief) are true and accurate to the best of her knowledge.

<u>/s/ Iceseas Farrell</u>

Iceseas Farrell

35

# EXHIBIT 1



THRIVE

Cybersecurity    Cloud    Managed Services    Compliance    Industries    About    Blog    Contact    Q    Login

# Managed IT Services

Gain business advantage through standardization, scalability, and automation.

Thrive > Services

## Streamline and Strengthen Your Operations

As a trusted managed IT service provider, Thrive takes the burden of managing IT systems off your shoulders, ensuring all of your day-to-day IT needs are monitored and managed in one place. Our expert team of skilled professionals delivers proactive monitoring, maintenance, and mitigation, backed by top-notch support and our 24x7x365 Network Operations Center.

Our customizable managed services allow you to consolidate vendors while still leveraging cutting-edge technology across cybersecurity, Cloud and networking. It is an issue arises, it just takes one call to your proactive, global support team of technical account managers and technology experts to remediate the problem.



## Driving Better Business Outcomes

"Thrive continues to provide NextGen Managed Services that enable me and my team to focus on the unique elements and needs of a professional sports organization."

— Jay Wessland, CTO, Boston Celtics

Watch Video Case Study

## NextGen Managed Services

Through our flexible and powerful platform, Thrive offers NextGen managed IT services designed to optimize business performance, enable seamless scalability, and future-proof digital infrastructure operations.

Our comprehensive managed services allow businesses to focus on their goals, while feeling confident that their IT stack is secure and efficient.

Our customizable managed IT services leverage the Thrive5 Methodology, which ensures each customer receives a tailored strategy, access to the latest in on-premise and Cloud technologies, as well as advanced security, compliance, and governance.

## Managed Cybersecurity

Thrive delivers an unmatched portfolio of managed cybersecurity services along with the expertise, resources, and expertise needed to create a cybersecurity plan that covers network monitoring, vital data, Software as a Service (SaaS) applications, end users, and critical infrastructure.

Leveraging best-in-breed technologies, AI capabilities, and the power of automation, Thrive's cutting-edge security services preemptively mitigate threats, allowing you to prioritize your business objectives while our expert security team swiftly responds and addresses complex issues through effective remediation.

Managed Cybersecurity Services

## Managed Cloud

Thrive offers a broad portfolio of hybrid Cloud solutions and services backed by a proven track record of delivering managed Cloud services across private and public cloud platforms, ensuring high availability, rock containment, enhanced cybersecurity, and flexibility. While the options are endless, you're not in it alone. Our expert team of Cloud consultants will work with you to design the solution that best fits your business goals and budget.

Managed Cloud Services

## Managed Microsoft 365

Thrive's managed platform delivers proven Cloud-based collaboration and productivity solutions powered by Microsoft 365, SharePoint, Power Platform, and Microsoft Teams tailored to your businesses specific needs. As the world goes digital, your business will see improved communications, greater efficiency, and better decision-making.

Managed Microsoft 365 Services

## Disaster Recovery as a Service

In the face of unplanned disruptions due to cyber attacks, hardware failure, user error, or power outages Thrive provides managed Disaster Recovery as a Service (DRaaS) and IT business continuity solutions that minimize data loss and enable fast, automatic recovery of critical systems, ensuring full protection against events that can devastate normal business operations.

Disaster Recovery Services

## Global Network Management

Thrive offers top-tier managed networking services that empower businesses to run at maximum efficiency, gaining speed, security, and providing invaluable insight into network performance. Our seasoned team of experts ensures your business remains at the forefront of operational excellence, allowing you to stay fully focused on achieving your core business objectives.

Network Management Services

## Managed Services Resources

Don't Risk IT: Outsourcing as a Security Advantage    Thrive Managed Services    4+ Platform and Path to Control White Paper

## Maximize Efficiency and Reduce Costs with Thrive's Managed IT Services

Transform your business with the help of Thrive's expert-outsourced IT services. Our comprehensive managed services are tailored to help you optimize performance, reduce costs, and drive better business outcomes.

### Ready to Gain Our Experts?

| First name | Last name |
| Job title | Company email |
| Email | Phone number |
| Country/Region | Message |

These terms of data collection are provided to us to contact you about our products and services. You may unsubscribe from these communications at any time. For information on how to unsubscribe, as well as our privacy practices and commitment to protecting your privacy, please review our Privacy Policy.

Submit

Follow Us    X    f    in    ▶    ⊙

Newsletter Sign-up

Email*

### Services
Cybersecurity
Cloud
Managed Services
Compliance
Network Management

### Industries
Financial Services
Government
Healthcare
Legal
Life Sciences

### Locations
Team
Partners
Resources
Careers
Contact Us

### About Us

© 2025 Thrive.    Privacy Policy    Accessibility    Use    CCA Content



# THRIVE

Cybersecurity   Cloud   Managed Services   Compliance   Industries   About

# IT Service Management By Industry

Thrive helps organizations across a variety of industries to maximize their business performance through strategic implementation of their optimized IT infrastructure

Thrive  ›  Industries

## Industries We Serve

Thrive customers represent industry leaders in financial services, life sciences, healthcare, education, and more. We service some of the largest hedge fund and alternative investment companies in the world, as well as many of the top regional banks in the Northeast US.

Our approach to strategy, implementation and customer service, as well as our NextGen Thrive Platform, set us apart as the choice for businesses of all sizes. By combining detailed industry knowledge with expertise in cybersecurity, Cloud, collaboration, network management, disaster recovery, and business continuity, Thrive services each customer via a POD approach, which delivers a tailored, high-touch service that is unmatched in the industry.

Financial Services   Life Sciences   Legal   Healthcare   Education   Retail



### Financial Services

Backed by an expert team of professionals with decades of experience in the financial services industry, Thrive understands the unique complexities that organizations face each day from investors, regulators, and customers. From industry tailored Cloud and cybersecurity services, to world-class managed IT platform, Thrive is uniquely positioned to meet the demands of the financial industry.

Learn More

## Life Sciences

As with financial services and healthcare, the life science industry maintains strict privacy and security regulations related to end-user data along with intellectual property. To ensure organizations meet industry requirements, Thrive offers access to a group of experts from the field.

Learn More

### Education

The education industry continues to evolve and experience a digital transformation due to the changing needs of students today and tomorrow. As such, many education organizations and institutions are implementing hybrid or fully-online learning experiences, while also juggling the need to meet stringent security and privacy regulations and requirements. The Thrive team, composed of education industry experts, is available to help organizations maintain successful learning environments of all types and securely manage student information and data.

Learn More

## Healthcare

As the business of healthcare continues to evolve, organizations within the industry must transform as well to meet the growing demand for data privacy, security, and more. Thrive's team of experts in healthcare can provide customized solutions based on the specific needs of each healthcare organization, whether it is a secure Cloud that meets the privacy needs of HIPAA and other regulations, or cyber security solution that provides comprehensive protection around patient data.

Learn More

### Legal

Thrive's expert IT teams help law firms do the best work for their clients. Through modernization of architecture, Cloud solutions, and a forward-thinking cyber security plan, law firms can plan for the present and future. We seek to be a partner in technology, allowing you to focus on cases and clients.

Learn More

## Retail

Companies within the retail industry are continuously competing with one another to bring the most innovative and simple shopping experiences to their customers, while maintaining strict privacy and security practices that comply with regulations such as PCI DSS. Thrive's managed IT, technology, and regulatory experts and services enable retailers to deliver the best and most secure shopping experiences.

Learn More

### Other

From the food to logistics industries, Thrive offers a wide range of expertly managed services for a variety of industries based on each organization's particular areas of need. Thrive's team of technology, business, and compliance experts are able to quickly immerse themselves with any organization to deliver the best IT services and solutions.

## Trust Thrive to Take Your IT Service Management to the Next Level

Our solutions are tailored to meet the unique needs of your industry giving you a competitive edge in today's fast-paced business landscape. Talk with a Thrive expert today.

Contact Us

Follow Us   X   f   in   ▶   ⊙

Newsletter Sign-up

Email*



**Services**
- Cybersecurity
- Cloud
- Disaster Recovery
- Productivity
- Network Management

**Industries**
- Financial Services
- Government
- Healthcare
- Legal
- Life Sciences

**About Us**
- Locations
- Team
- Resources
- Newsroom
- Careers
- Contact Us

© 2025   Privacy Policy   Acceptable Use   GSA Contract

# EXHIBIT 2



Partners   Blog   Contact   🔍   Log In

Cybersecurity   Cloud   Managed Services   Compliance   Industries   About

# Thrive Acquires SouthTech to Continue Florida Expansion



**PRESS RELEASE**

*Acquisition of Sarasota, Florida-based technology provider will continue to propel NextGen Cloud & Cybersecurity Managed Services in the Florida market*

**FOXBOROUGH, Mass. – March 9, 2022** – Thrive, a premier provider of NextGen Managed Services, announces today that it has acquired SouthTech, a managed technology solutions leader on the Florida West Coast. The acquisition will provide businesses throughout the region with enhanced IT support along with Thrive's next-generation managed cybersecurity, collaboration, and Cloud services to help drive digital transformation efficiencies.

For almost three decades, SouthTech has provided award-winning IT support to over 275 companies in southwest Florida. The Company offers a complete suite of tailored IT solutions, including managed services, Cloud and hosting solutions, backup and disaster recovery services, unified communications, compliance auditing, and data security. SouthTech has a seasoned team of certified IT experts that are dedicated to becoming clients' trusted IT Navigators that align technological strategies with business outcomes.

"SouthTech's team provides unique services for complex client technology issues which aligns very closely with our customer-centric approach," said Rob Stephenson, Thrive's CEO. "The Florida market is red-hot, and we wanted to find the best MSP partner on the West Coast to promote the Thrive cybersecurity, Cloud & digital transformation platform into the region. SouthTech's talented group of employees deliver that."

"For over 25 years, SouthTech's mission is to be a trusted long-term partner to companies by delivering custom technology solutions and being a people-first managed service provider," said Nathan Bailey, CEO/COO of SouthTech. "We're excited to join the Thrive family as their overarching goal aligns with our values and IT service offerings as a technological guide for customer's path to success."

SouthTech marks the second acquisition by Thrive in Florida this year and continues the establishment of building a strong presence in this region. Thrive is a security-first MSP that delivers comprehensive managed services and unmatched expertise to drive secure digital transformation for small to mid-sized enterprises across multiple industries.

For more information on Thrive, visit thrivenextgen.com.

###

**About Thrive**

Thrive is a leading provider of NextGen managed services designed to drive business outcomes through application enablement and optimization. The company's Thrive5 Methodology utilizes a unique combination of its Application Performance Platform and strategic services to ensure each business application achieves peak performance, scale, uptime, and the highest level of security. For more information, thrivenextgen.com.

**Thrive:** LinkedIn, Twitter, Facebook, YouTube and Instagram

**MEDIA CONTACT:**

Patrick Reily

Zer0 to Sive for Thrive

732-687-4683 | patrick@0to5.com

**About SouthTech**

Since 1994, SouthTech has been southwest Florida's premier provider of managed technology solutions. Our highly experienced team of certified support technicians and network engineers are dedicated to delivering the highest level of service. SouthTech offers a complete suite of IT solutions, including managed services, cloud and hosting solutions, backup and disaster recovery services, unified communications, compliance auditing, and data security. We become our clients' trusted IT Navigators through a highly strategic approach that utilizes technology to guide them towards their desired business goals.

Follow Us   𝕏   f   in   ▶   ⓘ

Newsletter Sign-up

Email*   →



**Services**
- Cybersecurity
- Cloud
- Disaster Recovery
- Productivity
- Network Management

**Industries**
- Financial Services
- Government
- Healthcare
- Legal
- Life Sciences

**About Us**
- Locations
- Team
- Resources
- Newsroom
- Careers
- Contact Us

© 2025   Privacy Policy   Acceptable Use   GSA Contract

# EXHIBIT 3



# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT is dated as of  March 31, 2023 by and between the client listed below on this cover page ("Client") and Thrive Operations, LLC ("Thrive") (Client and Thrive are each referred to as a "Party" and collectively as the "Parties").

**CONTENTS OF AGREEMENT.**  This Master Services Agreement (this "Agreement") is comprised of and includes the terms and conditions set forth in this cover sheet, the General Terms and Conditions set forth below, the terms and conditions of any Service Orders as may hereafter be made part hereof as provided herein and any exhibits, appendixes or addenda to any of the foregoing.

Each Party has caused this Agreement to be executed by its duly authorized representative as of the day and year first written above.

**CLIENT: National Boat Owners Association**

By: _Patrick Farrell_

Name: Patrick Farrell

Title: VP

**Thrive Operations LLC**

By: _____

Name: _____

Title: _____

| Address for Notices | |
|---|---|
| National Boat Owners Association<br>4404 N Tamiami Trail<br>Sarasota, Florida 34234-3864<br><br>ATTN: Patrick Farrell<br>Email: pfarrell@nboat.com | Thrive Operations, LLC<br>25 Forbes Blvd, Suite 3<br>Foxborough, MA  02035<br><br>ATTN:  Contract Operations<br>Email:  contract.operations@thrivenetworks.com |



**GENERAL TERMS AND CONDITIONS**

Part of
**Master Services Agreement**
**Between Thrive Operations, LLC and National Boat Owners Association**


**Definitions**:  The following capitalized terms are used with the meaning set forth below:

Products: means products and other goods, including hardware, software and other tangible and intangible items, and other deliverables provided to Client by Thrive as contemplated by this Agreement.

Service(s): means, services (including maintenance, support, security, hosting, procurement, development, integration, administrative and other services), including those to be provided on a one-time basis and those to be provided on a recurring basis.

Service Order: means a "Service Order" signed by the Parties referencing this Agreement and describing the Products and Services to be provided to Client by Thrive and setting forth the price and other terms and conditions on which Thrive is to provide such Products and Services.

"Service Provisioning Date" means for each recurring Service to be provided under a Service Order the date as of which Thrive makes such Service available for use by Client.

"Service Provisioning Completion Date" means for each Service Order the Service Provisioning Date for the last of the recurring Services to be provisioned and made available for use by Client under such Service Order.


1.       **SERVICES.**

(a) General. This Agreement governs Products and Services Thrive or its affiliates may provide or sell to Client. Products and Services will only be delivered to Client pursuant to one or more Service Orders. Once executed by both Parties, a Service Order becomes part of this Agreement, although the terms of a Service Order will govern only the Services described in that Service Order. The terms and conditions set forth in a Service Order will control any discrepancy between that Service Order and these General Terms and Conditions.

(b) Procurement of Products.

(i) All purchases of Products by Client from Thrive under a Service Order will be final at the time the order therefor is placed by Thrive with a third-party supplier. Each purchase of Products from Thrive will be considered an independent and separate transaction from the purchase of Services from Thrive, even if both Products and Services are included in the same Service Order.

(ii) Thrive shall not be liable for any damages, costs, or delays in the provision of Services by Thrive under any Service Order arising in connection with Client's procurement of Products from a party other than Thrive (such procurement by Client referred to as a "Client Third Party Procurement"). Client will reimburse Thrive for the out-of-pocket expenses Thrive incurs and will pay Thrive (at the hourly rates specified in the applicable Service Order) for the additional time Thrive devotes to the provision of Services as a result of or arising in connection with any Client Third Party Procurement.

(c) Price Changes. Pricing for Services are subject to change as follows:

(i)      Thrive may increase prices for Services under any Service Order on 30 days' notice to Client, provided that such prices may not be increased more than once in any 12 month period and such increases shall not exceed the percentage increase (if any) in the Consumer Price Index for All Urban Consumers (US City Average, All Items, 1982-84=100, not seasonally adjusted) as published by the US Bureau of Labor Statistics over the then most recent twelve month period for which such data is published. In addition, Thrive may pass on to Client the actual price increases imposed on Thrive by Third-Party Providers (as referenced in Section 4 below) for goods and services included in or among the Products and Services provided to Client pursuant to one or more Service Orders. Thrive will notify Client at least 30 days in advance of any such increases and provide Client supporting



documentation of all Third-Party Provider price increases.

(ii) All prices for Services in effect as of the end of the Term of the Service Order providing for such Services will increase by three percent (3%) upon each renewal of the Term of such Service Order in accordance with the terms thereof.

(d) <u>Minimum Hardware, Operating System and Software Standards</u>.
Client agrees to maintain the minimum hardware, operating system and software standards (and licenses therefor) set forth in each Service Order or otherwise necessary to receive the Services, which may include, among other matters, versions of operating systems and hardware, security, data protection and environmental (HVAC, and electrical power) controls and network bandwidth requirements (such minimum standards, as the same may be changed or supplemented by Thrive from time-to-time being referred to as "Minimum Standards"). Unless otherwise contemplated by a Service Order, Thrive has no duty to assure or assess whether or not Client's network meets Minimum Standards and disclaims responsibility for any loss, damages, costs or delays Client incurs or realizes as a result of or in connection with the failure or malfunction of any part of Client's network or systems that do not meet Minimum Standards. Client will reimburse Thrive for the out-of-pocket expenses Thrive incurs and will pay Thrive (at the hourly rates specified in the applicable Service Order) for the additional time Thrive devotes to the provision of Services as a result of or arising in connection with Client's network components managed by Thrive not adhering to the Minimum Standards. Client will also adhere to any Acceptable Use Policies that may be in effect from time to time and applicable to all Thrive customers, which will be communicated or made available by Thrive on its website, and which will be deemed incorporated by reference herein.

(e) <u>Access to Client Facilities</u>. Client will provide Thrive access to and right to use all Client's facilities, including all hardware and software owned, leased or licensed by Client, to the extent reasonably necessary to enable Thrive to provide Services to Client in accordance with these General Terms and Conditions and any Service Order.

(f) <u>Service Reduction</u>. Client will have the right to reduce recurring end-user and subscription based Services (excluding Services on account of which Thrive has purchased equipment, licenses (including Microsoft subscriptions) or other property that is dedicated to its provisioning) delivered pursuant to one or more of the Service Orders upon not less than 30 days' prior written notice to Thrive; provided that the resulting reduction in the recurring charges payable by Client as a result of all such reductions of Services effected in accordance with this Section 1(f) shall in no event exceed ten percent (10%) of the recurring charges for Services as originally set forth in the Service Orders in accordance with which such Services are provided.

(g) <u>Thrive Equipment</u>. Client will maintain and protect the equipment and other hardware and tangible goods placed by Thrive in the Client's possession or control (and that is not Client's property) in connection with the provision of Services (collectively, "Thrive Hardware") in good working condition, reasonable wear and tear excepted, and will not modify, disassemble, decompile, reverse engineer, rent, lease, loan, transfer, or copy such Thrive Hardware (including any software or firmware that is part of, incorporated into or running on the same). Client assumes all risk of compliance with any government regulation relating to the operation of Thrive Hardware, as well as the loss, damage, theft, or destruction thereof, while it is in the Client's possession or control or that of its agents, including any carrier (except any carrier transporting Thrive Hardware from Thrive to Client), and Client will reimburse Thrive for any costs of necessary repair or replacement (including shipping costs). Client will keep Thrive Hardware free of all security interests, liens, and other encumbrances.

## 2.    <u>TERM</u>.

This Agreement is effective as of the date hereof and, unless earlier terminated as permitted herein, will continue in effect during the Term or continuation of any Service Order (as defined therein) entered in connection herewith and thereafter in accordance with Section 9(e) below.

## 3.    <u>PAYMENTS</u>.

(a) <u>Fees and Charges</u>. Client agrees to pay Thrive the fees, charges, expenses and other amounts for the Products and each Service specified in a Service Order during the Term of and as provided in such Service Order and in these General Terms and Conditions. In addition, Client will be responsible for payment of all applicable sales and



other taxes, and all surcharges and handling fees levied by third party suppliers, on Products and Services provided by Thrive

( b) <u>Commencement of Billing</u>. Thrive will, subject to Section 3(f) below, bill Client for Products included in a Service Order five (5) business days after Thrive notifies Client that the same is ready for shipment to Client's site (without regard to delays in Client's acceptance thereof). Thrive will begin billing for one-time Services included in a Service Order upon commencement of such one-time Services. Thrive will begin billing for each recurring Service included in a Service Order beginning (60) sixty days from the date of Client's execution of such Service Order or, if earlier, beginning on the Service Provisioning Date of such Service, and continuing through the end of the Term of such Service Order as set forth therein.

(c) <u>Payment of Invoices</u>. Invoices for fees, charges and other amounts charged hereunder, whether for Products, Services or otherwise, will be due and payable in full within thirty (30) days of the date of invoice therefor. Thrive may charge Client a finance charge of one and one-half percent (1.50%) per month on balances (other than those disputed pursuant to Section 3(d) below) for which payment has not been received within thirty (30) days of the date of such invoice.

(d) <u>Disputes</u>. If Client in good faith disputes any portion of an invoice, Client will promptly pay the undisputed portion of the invoice and submit to Thrive a written claim within thirty (30) days of the due date thereof as provided in Section 3(c) above describing in reasonable detail the basis of the dispute and including any relevant supporting documentation. After receipt of such claim, Thrive will undertake an investigation of the disputed charges, and, subject to Thrive's rights under Section 9 below, both Parties agree to make a good faith attempt to resolve the dispute promptly. Any failure by Client to submit a written dispute of charges with the information specified above within such thirty-day period will be deemed final agreement by Client without defense or counterclaim with all charges on the invoice for all purposes. Client will be liable to Thrive for all reasonable fees and expenses, including reasonable attorney's fees and litigation costs, that Thrive incurs to collect amounts due to Thrive from Client under or in connection with this Agreement or any Service Order.

(e) <u>Expenses</u>. Client agrees to reimburse Thrive for all reasonable and ordinary out-of-pocket expenses incurred by Thrive in delivering Products and Services to Client, such as parking, out-of-area travel expenses, international phone calls, and pay-per-incident third party support calls. Thrive will itemize such expenses on Client's invoices and will not incur any single expense greater than $250 without Client's prior written approval.

(f) <u>Timing of Products Orders</u>. Thrive reserves the right to delay procuring Products from third party suppliers pending Thrive's receipt from Client of payment of all or any portion (as determined by Thrive in its discretion) of the price therefor set forth in the Service Order providing for such Products. Thrive will notify Client of any requirement that Thrive receive payment for Products in advance of Thrive's ordering the same from third party suppliers and Thrive will not be responsible thereafter for any damages, costs or delays Client experiences as a result of the timing of the delivery of such Products to Client under any Service Order.

**4.    <u>THIRD PARTY GOODS & SERVICES</u>.**

(a) <u>Third Party Providers</u>. Client acknowledges that Services may include or incorporate goods or services manufactured, produced and/or delivered by third parties ("Third-Party Providers"). Thrive hereby assigns to Client any warranties provided by Third Party Providers of goods and services that are resold by Thrive (to the extent permitted to be so assigned or passed through) and Client agrees to pursue all defective product, quality, breach of warranty and other claims directly against such Third-Party Providers and not against Thrive. Thrive will not be responsible for any such claims; however, Thrive will reasonably assist Client in resolving any performance, quality, breach of warranty or other claims of Client with the applicable Third-Party Providers of such goods or services. Client acknowledges that some Products cannot be returned or cancelled once ordered. At the request of Client, Thrive will make a reasonable attempt to return Products to the Third-Party Provider and Client agrees to reimburse Thrive for any restocking fees and other out-of-pocket expenses Thrive may incur in connection therewith. However, Client agrees that Thrive is under no obligation to take back from Client any Products ordered from Thrive if Thrive is unable to return those same Products to the Third-Party Provider. Risk of loss or damage for Products purchased from Third-Party Providers will pass to Client when such Products are delivered to Client, unless otherwise agreed in advance in writing by Client and Thrive.



(b) <u>Software Licensing</u>. Thrive may use its own third-party software licenses in provisioning Services under a Service Order, including among others, antivirus, antispyware and monitoring software (the "Software"). Thrive's licenses to use such Software are and will remain Thrive's property exclusively, and except as provided herein, Client will obtain no right to such licenses or the source code of the Software licensed thereby. Thrive hereby grants to Client a non-exclusive, worldwide, royalty-free, non-assignable and non-sublicensable license to use the Software solely in connection with Services for which such Software is utilized (a "License"), which License will terminate immediately upon termination of such Services. Thrive may terminate such License and any Services for which such License is utilized if it determines that Client has breached the terms of the License. Upon termination of the License, Client will immediately cease to use the Software and related documentation and certify to Thrive within ten (10) days after termination that Client has, at Thrive's option, either destroyed or returned to Thrive the Software and all documentation and related information, and all copies thereof, whether or not modified or merged into other materials.

5.    <u>**WARRANTIES, DISCLAIMER, LIMITATION OF LIABILITY AND INDEMNIFICATION.**</u>

(a) <u>Services</u>. Thrive warrants that Services, including without limitation, those provided by Third-Party Providers, will be performed in a professional manner conforming in all material respects to prevailing industry standards and practices, applicable law, and the specifications set forth in the Service Orders relating thereto. Client acknowledges that no network, system, device, hardware, software, or component can be made fully secure and, accordingly, agrees that Thrive shall not be liable for damages arising from or in connection with loss of data or breach of privacy of information technology systems except to the extent that Thrive's gross negligence or fraud (and not, e.g., equipment failure, software failure, "phishing" attacks or other fraudulent acts of third parties, or Client's failure to follow Thrive's advice) is the direct and primary cause of such loss or breach.

(b) <u>Warranty Disclaimer</u>.
OTHER THAN THE WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 5, THRIVE MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING PRODUCTS OR SERVICES AND EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING BUT NOT LIMITED TO ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

(c) <u>Limitation of Liability</u>.

(i) IN NO EVENT SHALL THRIVE BE LIABLE FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT OR ANY BREACH HEREOF, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EVEN IF THRIVE HAS BEEN ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.

(ii) EXCEPT IN THE CASE OF THRIVE'S GROSS NEGLIGENCE OR FRAUD THRIVE SHALL IN NO EVENT BE LIABLE FOR DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE PROVISION OF SERVICES HEREUNDER IN AN AMOUNT EXCEEDING THE AMOUNT OF FEES FOR SERVICES PAID OR PAYABLE BY CLIENT TO THRIVE IN RESPECT OF THE THREE (3) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH THE EVENT GIVING RISE TO SUCH LIABILITY OCCURED.

(d) <u>Mutual Indemnification</u>**.** Subject to the terms and conditions hereof, each Party (an "Indemnifying Party") shall defend at its own expense the other Party, including the other Party's directors, officers, employees, agents and affiliates (collectively, the "Indemnified Party"), from and against any and all third-party claims, demands, suits or actions to the extent resulting from or arising out of the Indemnifying Party's (i) grossly negligent acts or omissions or fraud in connection with this Agreement, (ii) violation of any statute, law, ordinance or regulation, or (iii) infringement of any patent, copyright, trademark, trade secret or other intellectual property or other rights of a third party (each, an "Indemnifiable Claim"). Without limitation of the foregoing, the Indemnifying Party shall indemnify and hold harmless the Indemnified Party from and against any and all damages, judgments, awards, expenses, and costs (including without limitation those of the type described in Section 5(c)(i) above) that are awarded and payable to the third party by a court of competent jurisdiction with respect to an Indemnifiable Claim or that are



payable pursuant to a settlement thereof made or approved by the Indemnifying Party.  The Indemnifying Party shall have right to defend any Indemnifiable Claim with counsel of its choosing.


**6.**    **INTELLECTUAL PROPERTY RIGHTS.**

(a) <u>Thrive Intellectual Property</u>. Thrive retains right, title and interest in and to the Services, all intellectual property rights contained therein, and all modifications, alterations, derivative works and enhancements made thereto (collectively, "<u>Thrive IP</u>"). Client may not modify or create derivative works from or copy any ideas, Features, functions or graphics of the Services or Thrive IP or modify or make derivative works based thereon, or offer the Services on a timeshare or service bureau (including software-as-a-service) basis. Client may use Thrive IP in accordance herewith and any Service Order solely as necessary to utilize Services for its own account and otherwise will not disclose or use Thrive IP for any purpose.

(b) <u>Client Intellectual Property</u>. Client retains all right, title and interest in and to all of Client's intellectual property rights transmitted by or on behalf of Client to Thrive in connection with the Services (collectively, "<u>Client IP</u>"). Thrive may not modify or create derivative works from or copy any ideas, features, functions or graphics of the Client IP or modify or make derivative works based thereon. Thrive may use Client IP in accordance herewith and any Service Order in connection with providing Services to Client and otherwise will not disclose or use Client IP for any purpose.


**7.**    **CONFIDENTIALITY.**

The Parties acknowledge that in connection with this Agreement each may receive from the other certain non-public information regarding the other Party's financial condition, suppliers, clients, business plans and other information not generally known to the public, including, without limitation, the terms and conditions of this Agreement ("Confidential Information"). The Party receiving Confidential Information of the other Party will not except as is required by law or legal process disclose such Confidential Information (i) to any person known by the receiving Party to be competitor of the other Party or (ii) to other third parties other than the receiving Party's employees, representatives and contractors who are bound by confidentiality obligations comparable to those set forth herein and who need to know such Confidential Information for purposes of the receiving Party's performance or receipt of the benefits of this Agreement, and will not use Confidential Information except in connection therewith. A Party that has received tangible embodiments of Confidential Information shall promptly return to the disclosing Party or destroy such Confidential Information upon the disclosing Party's request; provided that the receiving Party is not obligated to delete, purge or expunge Confidential Information maintained on its backup servers and similar devices in the ordinary course of its business (but nevertheless remains obligated under this Section 7 with respect to any such retained Confidential Information). The obligation to maintain the confidentiality of Confidential Information shall continue for so long as this Agreement shall remain in effect and for a period of two (2) years after the termination hereof, except that the obligation to maintain the confidentiality of trade secrets shall continue in perpetuity. If the Parties have entered into a separate non-disclosure or other agreement regulating the use or disclosure of the Parties' respective information, then the terms of such separate agreement will control in the event of a conflict between such separate agreement and this Section 7.


**8.**    **HIRING OF REPRESENTATIVES.**

For so long as this Agreement remains in effect and for a period of one (1) year thereafter, neither Party will employ, hire, contract with, or otherwise engage, or seek to employ, hire, contract with, or otherwise engage, any individual who at any time in the preceding twelve (12) months was an employee of the other Party involved in the provisioning or receiving of Services under any Service Order. The Parties agree that any breach of this Section 8 will result in irreparable injury to the other Party for which monetary damages alone would not be an adequate remedy. Therefore, the Parties agree that in the event of a breach or threatened breach of this Section 8 by the other Party, the non-breaching Party will be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach without the necessity proving the inadequacy of money damages or of posting a bond or other security.



**9.** **TERMINATION.**

(a) Termination of Agreement and Service Orders for Breach of Terms.
(i) Breach of terms of General Terms & Conditions. Each Party may notify the other Party if the other Party breaches the terms of these General Terms and Conditions, which notice will describe in reasonable detail the nature of such breach and including relevant supporting documentation. Unless the breaching Party within thirty (30) days of its receipt of such notice either cures or remedies the breach described in such notice in all material respects or provides the other Party with a reasonable written plan for doing so, the other Party may, without limitation of its other rights and remedies under applicable law, terminate this Agreement by providing written notice of termination to the breaching Party.

(ii) Breach of terms of a Service Order. Each Party may notify the other Party if the other Party breaches the terms of any Service Order, which notice will describe in reasonable detail the nature of such breach and including relevant supporting documentation. Unless the breaching Party within thirty (30) days of its receipt of such notice either cures or remedies the breach described in such notice in all material respects or provides the other Party with a reasonable written plan for doing so, the other Party may, without limitation of its other rights and remedies under applicable law, terminate those Services under such Service Order as to which such breach relates (and not this Agreement, other Services provided under such Service Order or any other Service Order as may then be in effect) by providing written notice of termination to the breaching Party.

(b) Suspension or Termination of Services by Thrive for Failure to Pay. Notwithstanding the provisions of Section 9(a) above, in the event Client does not timely make payments under this Agreement (other than amounts timely disputed in accordance with Section 3(d) above, pending the resolution of such disputes) and such payment(s) is (are) not made by Client within ten (10) days of receiving written notice thereof from Thrive (which notice may be delivered to Client in the same manner as Thrive sends invoices to Client in the ordinary course), Thrive may, without limitation of its other rights and remedies under applicable law, suspend or terminate providing Services to Client under any or all Service Orders as may then be in effect, and Thrive will have no liability for any damages incurred or realized by Client as a result of such suspension or termination of any such Services. No such suspension or termination of Service under a Service Order due to Client's non-payment will relieve Client of its obligations to pay all charges and other amounts and otherwise comply with and fulfill its obligations under this Agreement, including under that or any other Service Order as may be in effect. If Services are suspended for non-payment, lapse in service will not count towards completion of the Term of such Services.

(c) Suspension. Notwithstanding the provisions of Section 9(a) above, Thrive may suspend the Services immediately upon notice to Client if: (i) Client materially violates (or Thrive believes in good faith that Client has materially violated) any provision of this Agreement or any provision of the applicable Thrive Acceptable Use Policy (https://thrivenextgen.com/acceptable-use-policy/); (ii) there is an unusual and material spike or increase in Client's use of the Services and Thrive believes, in good faith, that such traffic or use is fraudulent or materially and negatively impacting the operating capability of the Services; or (iii) Thrive determines in good faith that its provision of the Services is prohibited by applicable Law; or (iv) Thrive determines in good faith that Client is using the Products or Services in violation of applicable law or for an otherwise unlawful purpose. Notwithstanding the foregoing, Thrive will use commercially reasonable efforts to (x) provide Client as much prior notice as possible of any situation that it is aware of that could lead to a right to suspend described in this subsection, and (y) work with Client to remedy any situation that could lead to a right to suspend described in this subsection if such situation can be remedied.

(d) Duties Upon Termination or Expiration.

(i) Payment of Obligations/Return of Property. Upon the expiration or termination of this Agreement or any Service Order, Client will pay the full amount of all unpaid invoices issued under any outstanding Service Order and any other payment obligations specified in each outstanding Service Order (other than amounts timely disputed in accordance with Section 3(d) above, pending the resolution of such disputes). In addition, excluding any software and hardware that is the Client's property, Client will return all software and hardware provided to Client by Thrive in good working condition (ordinary wear and tear excepted) and free from all liens, charges and encumbrances within thirty days of termination of this Agreement or the applicable Service Order(s).



(ii) Termination Status Reporting; Further Services. Thrive will upon expiration or termination of any Service under any Service Order and receipt of all amounts then due and payable to Thrive under this Agreement as relates to such expired or terminated Service (other than amounts timely disputed in accordance with Section 3(d) above, pending the resolution of such disputes) (i) report to Client on the status of the Service as reasonably requested by Client and, if requested by Client, (ii) assist Client in winding down or transferring the terminated or expired Service to Client or its designee (such assistance being referred to as "Migration Services") in accordance with a mutually agreed separate Service Order signed by the Parties setting forth the terms and conditions thereof, which will include, among other terms to which Parties may agree, Client agreeing to pay Thrive for such Migration Services, if applicable, at the hourly rates set forth in the Service Order under which such Service was provided (and if no such rates are set forth in such Service Order, then at hourly rates agreed to by the Parties). Except as set forth above in this Section 9(d)(ii) and, if applicable, any Service Order providing for the provision of Migration Services, Thrive will have no duty or obligation to provide any Products or Service or any other service or assistance to Client following the expiration or termination of a Service in accordance herewith.

(e) Survival. The following provisions will survive any expiration or termination of this Agreement: Section 3 (Payments), Section 4 (Third Party Products & Services), Section 5 (Warranties, Disclaimer and Limitation of Liability), Section 6 (Intellectual Property Rights), Section 7 (Confidentiality), Section 8 (Hiring of Representatives), this Section 9 (Termination), Section 10 (Force Majeure), and Section 12 (General Terms).


10.      **FORCE MAJEURE.**

Except for payment obligations, neither Party will be liable for any failure or delay in performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances or causes beyond its reasonable control , including, without limitation, fire, pandemics or other casualty, acts of God, fiber cuts or Internet delays, delay or failure of Third-Party Providers, war, terrorism, or other violence or criminal acts, any law, order, requirement or act of any government or governmental agency or authority or other causes beyond the reasonable control of such Party. A Party affected by such a force majeure event shall inform the other Party promptly upon the occurrence thereof (including a reasonable estimate of the additional time required for resumed performance to the extent determinable) and such Party shall use reasonable commercial efforts to resume performance hereunder as soon as reasonably practicable.


11.      **INSURANCE.**

Thrive will maintain insurance providing at least $1,000,000 commercial general liability coverage, as well as statutory workers compensation coverage. Upon Client's request, Thrive will deliver to Client promptly a certificate of insurance made out by the applicable insurer(s) or their authorized agents as evidence of the insurance required under this Section and for any material policy amendments thereto. At Client's request, Client will be identified as an additional insured ATIMA (as their interests may appear) on such certificate of insurance.


12.      **GENERAL TERMS.**

(a) Governing Law; Jurisdiction; Venue. This Agreement will be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without regard to the conflicts or choice of law provisions thereof that would give rise to the application of the domestic substantive laws of any other jurisdiction. The Parties agree that any proceeding arising out of or relating to this Agreement will be brought only in, and hereby submit irrevocably to the jurisdiction of, the state or federal courts sitting in the Commonwealth of Massachusetts and hereby waive any objections to the jurisdiction, venue or convenience of any such courts. EACH PARTY WAIVES TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

(b) Assignment. Neither Party may assign its rights or delegate its duties hereunder without the prior written consent of the other Party; provided that either Party may assign its rights hereunder to, and cause its obligations hereunder to be assumed by, a successor to substantially all of the assets or business of such Party. If there is any



assignment or delegation in violation of any of the foregoing restrictions, the non-breaching Party may terminate this Agreement and all Service Orders as may then be in effect upon written notice within ninety (90) days after notice or discovery of such assignment.

(c) Headings. The section headings herein are for ease of reference and convenience only and are not to be considered in the interpretation of this Agreement.

(d) Interpretation. Neither Party shall be considered the drafter of this Agreement or any schedule, addendum or exhibit as may be made part thereof so as to give rise to any presumption or convention regarding construction hereof or any such other writing.

(e) Integration; Severability. Except as provided in Section 7 above with respect to separate nondisclosure or confidentiality agreements between the Parties, this Agreement, including any Service Orders, sets forth the entire agreement and understandings between the Parties hereto with respect to the subject matter hereof, and merges all previous and contemporaneous discussions and negotiations between the Parties and supersedes and replaces any other agreement that may be in effect as of the date hereof between the Parties or their respective subsidiaries or other affiliates with respect to the subject matter hereof. Without limitation of the foregoing, this Agreement supersedes and replaces in its entirety any "Master Services Agreement" or similar document as may be in effect as of the date hereof between the Parties or their respective subsidiaries, predecessors-in-interest, or other affiliates (any such agreement being referred to as the "Original Agreement"). The parties agree that any "statements of work", "service orders" and similar writings as may be outstanding and in effect under the Original Agreement (the "Outstanding SOs") are, from and after the date hereof, Service Orders for all purposes of these General Terms and Conditions and the "Master Service Agreement" or similar agreement referenced in the Outstanding SOs shall from and after the date hereof be a reference instead to this Agreement. Notwithstanding the foregoing, all amounts due to Thrive under the terms of the Original Agreement or Outstanding SOs remain due in accordance with the terms of the Original Agreement or Outstanding SOs, and unless otherwise specified herein, no such amounts are settled, released or compromised hereby. This Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof will be prohibited or invalid under any such law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions of this Agreement is for any reason held to be excessively broad as to duration, geographical scope, activity or subject, such provisions will be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

(f) No Third-Party Beneficiaries. There are no third-party beneficiaries of this Agreement or any schedule, addendum or exhibit as may be made part hereof.

(g) Residual Knowledge. Nothing herein shall be construed to prevent or in any way limit Thrive from using general knowledge, skill and expertise acquired in the performance of this Agreement in any current or subsequent engagement or business. Client shall have no interest in such engagements or business.

(h) Signatures, Amendments and Waivers and Exercise of Rights.

(i) Signatures. This Agreement and amendments or modifications hereof and consents and waivers relating hereto may be executed, issued and accepted electronically (via authenticated digital or similar electronic means) and will be effective when transmitted bearing a copy of a manual, digital or electronic signature.

(ii) Amendments and Waivers. Amendments to and waivers of the provisions of this Agreement must be in writing (including in a digital format) and signed as provided in Section 12(h)(i) above.

(iii) Exercise of Rights. Except as otherwise provided herein, no failure to exercise or delay in exercising any right, power or remedy will operate as a waiver thereof; nor will any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(i) Notices. Notices required or permitted to be provided hereunder will be in writing and, except as otherwise provided herein, will be valid and sufficient if delivered in person or sent by nationally recognized overnight courier or by email addressed to the Parties at the addresses listed on the cover page of this Agreement. Notices will be deemed received by the Party to whom notice is addressed on the date delivered, if delivered in person or by email,



or on the next business day after being provided to a nationally recognized overnight courier service, delivery charges prepaid, for next day delivery.

(j) <u>Publicity</u>. Each Party may use the other Party's name and logo on its website and printed materials to identify Thrive as a service provider to Client.

(k) <u>Independent Contractor</u>. Each of the Parties is an independent contractor and neither Party is, nor will be considered to be, an agent, distributor or representative of the other. All personnel supplied or used by each Party will be its employees or subcontractors and each Party assumes full responsibility for the actions of such personnel and for the payment of their compensation (including, if applicable, withholding of income taxes and the payment and withholding of social security and other payroll taxes), workers' compensation, disability benefits and the like to the extent applicable.

*END OF GENERAL TERMS AND CONDITIONS*



## MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT is dated as of March 31, 2023 by and between the client listed below on this cover page ("Client") and Thrive Operations, LLC ("Thrive") (Client and Thrive are each referred to as a "Party" and collectively as the "Parties").

**CONTENTS OF AGREEMENT.** This Master Services Agreement (this "Agreement") is comprised of and includes the terms and conditions set forth in this cover sheet, the General Terms and Conditions set forth below, the terms and conditions of any Service Orders as may hereafter be made part hereof as provided herein and any exhibits, appendixes or addenda to any of the foregoing.

Each Party has caused this Agreement to be executed by its duly authorized representative as of the day and year first written above.

**CLIENT: Compass Marine Services**　　　　**Thrive Operations LLC**

By: _Patrick Farrell_　　　　　　　　　　By: _Leonard Q. Slap_

Name: Patrick Farrell　　　　　　　　　　Name: Leonard Q. Slap

Title: COO　　　　　　　　　　　　　　　Title: Executive Vice President

| Address for Notices | |
|---|---|
| Compass Marine Services<br>4404 N Tamiami Trail<br>Sarasota, Florida 34234<br><br>ATTN: Patrick Farrell<br>Email: patrick@compassmarineservices.com | Thrive Operations, LLC<br>25 Forbes Blvd, Suite 3<br>Foxborough, MA  02035<br><br>ATTN:  Contract Operations<br>Email:  contract.operations@thrivenetworks.com |



**GENERAL TERMS AND CONDITIONS**

Part of
**Master Services Agreement
Between Thrive Operations, LLC and Compass Marine Services**

**Definitions**:  The following capitalized terms are used with the meaning set forth below:

Products: means products and other goods, including hardware, software and other tangible and intangible items, and other deliverables provided to Client by Thrive as contemplated by this Agreement.

Service(s): means, services (including maintenance, support, security, hosting, procurement, development, integration, administrative and other services), including those to be provided on a one-time basis and those to be provided on a recurring basis.

Service Order: means a "Service Order" signed by the Parties referencing this Agreement and describing the Products and Services to be provided to Client by Thrive and setting forth the price and other terms and conditions on which Thrive is to provide such Products and Services.

"Service Provisioning Date" means for each recurring Service to be provided under a Service Order the date as of which Thrive makes such Service available for use by Client.

"Service Provisioning Completion Date" means for each Service Order the Service Provisioning Date for the last of the recurring Services to be provisioned and made available for use by Client under such Service Order.

## 1.        SERVICES.

(a) General. This Agreement governs Products and Services Thrive or its affiliates may provide or sell to Client. Products and Services will only be delivered to Client pursuant to one or more Service Orders. Once executed by both Parties, a Service Order becomes part of this Agreement, although the terms of a Service Order will govern only the Services described in that Service Order. The terms and conditions set forth in a Service Order will control any discrepancy between that Service Order and these General Terms and Conditions.

(b) Procurement of Products.

(i) All purchases of Products by Client from Thrive under a Service Order will be final at the time the order therefor is placed by Thrive with a third-party supplier. Each purchase of Products from Thrive will be considered an independent and separate transaction from the purchase of Services from Thrive, even if both Products and Services are included in the same Service Order.

(ii) Thrive shall not be liable for any damages, costs, or delays in the provision of Services by Thrive under any Service Order arising in connection with Client's procurement of Products from a party other than Thrive (such procurement by Client referred to as a "Client Third Party Procurement"). Client will reimburse Thrive for the out-of-pocket expenses Thrive incurs and will pay Thrive (at the hourly rates specified in the applicable Service Order) for the additional time Thrive devotes to the provision of Services as a result of or arising in connection with any Client Third Party Procurement.

(c) Price Changes. Pricing for Services are subject to change as follows:

(i)      Thrive may increase prices for Services under any Service Order on 30 days' notice to Client, provided that such prices may not be increased more than once in any 12 month period and such increases shall not exceed the percentage increase (if any) in the Consumer Price Index for All Urban Consumers (US City Average, All Items, 1982-84=100, not seasonally adjusted) as published by the US Bureau of Labor Statistics over the then most recent twelve month period for which such data is published. In addition, Thrive may pass on to Client the actual price increases imposed on Thrive by Third-Party Providers (as referenced in Section 4 below) for goods and services included in or among the Products and Services provided to Client pursuant to one or more Service Orders. Thrive will notify Client at least 30 days in advance of any such increases and provide Client supporting



documentation of all Third-Party Provider price increases.

(ii) All prices for Services in effect as of the end of the Term of the Service Order providing for such Services will increase by three percent (3%) upon each renewal of the Term of such Service Order in accordance with the terms thereof.

(d) Minimum Hardware, Operating System and Software Standards.
Client agrees to maintain the minimum hardware, operating system and software standards (and licenses therefor) set forth in each Service Order or otherwise necessary to receive the Services, which may include, among other matters, versions of operating systems and hardware, security, data protection and environmental (HVAC, and electrical power) controls and network bandwidth requirements (such minimum standards, as the same may be changed or supplemented by Thrive from time-to-time being referred to as "Minimum Standards"). Unless otherwise contemplated by a Service Order, Thrive has no duty to assure or assess whether or not Client's network meets Minimum Standards and disclaims responsibility for any loss, damages, costs or delays Client incurs or realizes as a result of or in connection with the failure or malfunction of any part of Client's network or systems that do not meet Minimum Standards. Client will reimburse Thrive for the out-of-pocket expenses Thrive incurs and will pay Thrive (at the hourly rates specified in the applicable Service Order) for the additional time Thrive devotes to the provision of Services as a result of or arising in connection with Client's network components managed by Thrive not adhering to the Minimum Standards. Client will also adhere to any Acceptable Use Policies that may be in effect from time to time and applicable to all Thrive customers, which will be communicated or made available by Thrive on its website, and which will be deemed incorporated by reference herein.

(e) Access to Client Facilities. Client will provide Thrive access to and right to use all Client's facilities, including all hardware and software owned, leased or licensed by Client, to the extent reasonably necessary to enable Thrive to provide Services to Client in accordance with these General Terms and Conditions and any Service Order.

(f) Service Reduction. Client will have the right to reduce recurring end-user and subscription based Services (excluding Services on account of which Thrive has purchased equipment, licenses (including Microsoft subscriptions) or other property that is dedicated to its provisioning) delivered pursuant to one or more of the Service Orders upon not less than 30 days' prior written notice to Thrive; provided that the resulting reduction in the recurring charges payable by Client as a result of all such reductions of Services effected in accordance with this Section 1(f) shall in no event exceed ten percent (10%) of the recurring charges for Services as originally set forth in the Service Orders in accordance with which such Services are provided.

(g) Thrive Equipment. Client will maintain and protect the equipment and other hardware and tangible goods placed by Thrive in the Client's possession or control (and that is not Client's property) in connection with the provision of Services (collectively, "Thrive Hardware") in good working condition, reasonable wear and tear excepted, and will not modify, disassemble, decompile, reverse engineer, rent, lease, loan, transfer, or copy such Thrive Hardware (including any software or firmware that is part of, incorporated into or running on the same). Client assumes all risk of compliance with any government regulation relating to the operation of Thrive Hardware, as well as the loss, damage, theft, or destruction thereof, while it is in the Client's possession or control or that of its agents, including any carrier (except any carrier transporting Thrive Hardware from Thrive to Client), and Client will reimburse Thrive for any costs of necessary repair or replacement (including shipping costs). Client will keep Thrive Hardware free of all security interests, liens, and other encumbrances.

## 2.    TERM.

This Agreement is effective as of the date hereof and, unless earlier terminated as permitted herein, will continue in effect during the Term or continuation of any Service Order (as defined therein) entered in connection herewith and thereafter in accordance with Section 9(e) below.

## 3.    PAYMENTS.

(a) Fees and Charges. Client agrees to pay Thrive the fees, charges, expenses and other amounts for the Products and each Service specified in a Service Order during the Term of and as provided in such Service Order and in these General Terms and Conditions. In addition, Client will be responsible for payment of all applicable sales and



other taxes, and all surcharges and handling fees levied by third party suppliers, on Products and Services provided by Thrive

( b) Commencement of Billing. Thrive will, subject to Section 3(f) below, bill Client for Products included in a Service Order five (5) business days after Thrive notifies Client that the same is ready for shipment to Client's site (without regard to delays in Client's acceptance thereof). Thrive will begin billing for one-time Services included in a Service Order upon commencement of such one-time Services. Thrive will begin billing for each recurring Service included in a Service Order beginning (60) sixty days from the date of Client's execution of such Service Order or, if earlier, beginning on the Service Provisioning Date of such Service, and continuing through the end of the Term of such Service Order as set forth therein.

(c) Payment of Invoices. Invoices for fees, charges and other amounts charged hereunder, whether for Products, Services or otherwise, will be due and payable in full within thirty (30) days of the date of invoice therefor. Thrive may charge Client a finance charge of one and one-half percent (1.50%) per month on balances (other than those disputed pursuant to Section 3(d) below) for which payment has not been received within thirty (30) days of the date of such invoice.

(d) Disputes. If Client in good faith disputes any portion of an invoice, Client will promptly pay the undisputed portion of the invoice and submit to Thrive a written claim within thirty (30) days of the due date thereof as provided in Section 3(c) above describing in reasonable detail the basis of the dispute and including any relevant supporting documentation. After receipt of such claim, Thrive will undertake an investigation of the disputed charges, and, subject to Thrive's rights under Section 9 below, both Parties agree to make a good faith attempt to resolve the dispute promptly. Any failure by Client to submit a written dispute of charges with the information specified above within such thirty-day period will be deemed final agreement by Client without defense or counterclaim with all charges on the invoice for all purposes. Client will be liable to Thrive for all reasonable fees and expenses, including reasonable attorney's fees and litigation costs, that Thrive incurs to collect amounts due to Thrive from Client under or in connection with this Agreement or any Service Order.

(e) Expenses. Client agrees to reimburse Thrive for all reasonable and ordinary out-of-pocket expenses incurred by Thrive in delivering Products and Services to Client, such as parking, out-of-area travel expenses, international phone calls, and pay-per-incident third party support calls. Thrive will itemize such expenses on Client's invoices and will not incur any single expense greater than $250 without Client's prior written approval.

(f) Timing of Products Orders. Thrive reserves the right to delay procuring Products from third party suppliers pending Thrive's receipt from Client of payment of all or any portion (as determined by Thrive in its discretion) of the price therefor set forth in the Service Order providing for such Products. Thrive will notify Client of any requirement that Thrive receive payment for Products in advance of Thrive's ordering the same from third party suppliers and Thrive will not be responsible thereafter for any damages, costs or delays Client experiences as a result of the timing of the delivery of such Products to Client under any Service Order.

## 4.    THIRD PARTY GOODS & SERVICES.

(a) Third Party Providers. Client acknowledges that Services may include or incorporate goods or services manufactured, produced and/or delivered by third parties ("Third-Party Providers"). Thrive hereby assigns to Client any warranties provided by Third Party Providers of goods and services that are resold by Thrive (to the extent permitted to be so assigned or passed through) and Client agrees to pursue all defective product, quality, breach of warranty and other claims directly against such Third-Party Providers and not against Thrive. Thrive will not be responsible for any such claims; however, Thrive will reasonably assist Client in resolving any performance, quality, breach of warranty or other claims of Client with the applicable Third-Party Providers of such goods or services. Client acknowledges that some Products cannot be returned or cancelled once ordered. At the request of Client, Thrive will make a reasonable attempt to return Products to the Third-Party Provider and Client agrees to reimburse Thrive for any restocking fees and other out-of-pocket expenses Thrive may incur in connection therewith. However, Client agrees that Thrive is under no obligation to take back from Client any Products ordered from Thrive if Thrive is unable to return those same Products to the Third-Party Provider. Risk of loss or damage for Products purchased from Third-Party Providers will pass to Client when such Products are delivered to Client, unless otherwise agreed in advance in writing by Client and Thrive.



(b) <u>Software Licensing</u>. Thrive may use its own third-party software licenses in provisioning Services under a Service Order, including among others, antivirus, antispyware and monitoring software (the "Software"). Thrive's licenses to use such Software are and will remain Thrive's property exclusively, and except as provided herein, Client will obtain no right to such licenses or the source code of the Software licensed thereby. Thrive hereby grants to Client a non-exclusive, worldwide, royalty-free, non-assignable and non-sublicensable license to use the Software solely in connection with Services for which such Software is utilized (a "License"), which License will terminate immediately upon termination of such Services. Thrive may terminate such License and any Services for which such License is utilized if it determines that Client has breached the terms of the License. Upon termination of the License, Client will immediately cease to use the Software and related documentation and certify to Thrive within ten (10) days after termination that Client has, at Thrive's option, either destroyed or returned to Thrive the Software and all documentation and related information, and all copies thereof, whether or not modified or merged into other materials.

5.    <u>WARRANTIES, DISCLAIMER, LIMITATION OF LIABILITY AND INDEMNIFICATION.</u>

(a) <u>Services</u>. Thrive warrants that Services, including without limitation, those provided by Third-Party Providers, will be performed in a professional manner conforming in all material respects to prevailing industry standards and practices, applicable law, and the specifications set forth in the Service Orders relating thereto. Client acknowledges that no network, system, device, hardware, software, or component can be made fully secure and, accordingly, agrees that Thrive shall not be liable for damages arising from or in connection with loss of data or breach of privacy of information technology systems except to the extent that Thrive's gross negligence or fraud (and not, e.g., equipment failure, software failure, "phishing" attacks or other fraudulent acts of third parties, or Client's failure to follow Thrive's advice) is the direct and primary cause of such loss or breach.

(b) <u>Warranty Disclaimer</u>.
OTHER THAN THE WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 5, THRIVE MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING PRODUCTS OR SERVICES AND EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING BUT NOT LIMITED TO ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

(c) <u>Limitation of Liability</u>.

(i) IN NO EVENT SHALL THRIVE BE LIABLE FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT OR ANY BREACH HEREOF, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EVEN IF THRIVE HAS BEEN ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.

(ii) EXCEPT IN THE CASE OF THRIVE'S GROSS NEGLIGENCE OR FRAUD THRIVE SHALL IN NO EVENT BE LIABLE FOR DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE PROVISION OF SERVICES HEREUNDER IN AN AMOUNT EXCEEDING THE AMOUNT OF FEES FOR SERVICES PAID OR PAYABLE BY CLIENT TO THRIVE IN RESPECT OF THE THREE (3) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH THE EVENT GIVING RISE TO SUCH LIABILITY OCCURED.

(d) <u>Mutual Indemnification</u>. Subject to the terms and conditions hereof, each Party (an "Indemnifying Party") shall defend at its own expense the other Party, including the other Party's directors, officers, employees, agents and affiliates (collectively, the "Indemnified Party"), from and against any and all third-party claims, demands, suits or actions to the extent resulting from or arising out of the Indemnifying Party's (i) grossly negligent acts or omissions or fraud in connection with this Agreement, (ii) violation of any statute, law, ordinance or regulation, or (iii) infringement of any patent, copyright, trademark, trade secret or other intellectual property or other rights of a third party (each, an "Indemnifiable Claim"). Without limitation of the foregoing, the Indemnifying Party shall indemnify and hold harmless the Indemnified Party from and against any and all damages, judgments, awards, expenses, and costs (including without limitation those of the type described in Section 5(c)(i) above) that are awarded and payable to the third party by a court of competent jurisdiction with respect to an Indemnifiable Claim or that are



payable pursuant to a settlement thereof made or approved by the Indemnifying Party.  The Indemnifying Party shall have right to defend any Indemnifiable Claim with counsel of its choosing.


6.      **INTELLECTUAL PROPERTY RIGHTS.**

(a) <u>Thrive Intellectual Property</u>. Thrive retains right, title and interest in and to the Services, all intellectual property rights contained therein, and all modifications, alterations, derivative works and enhancements made thereto (collectively, "<u>Thrive IP</u>"). Client may not modify or create derivative works from or copy any ideas, Features, functions or graphics of the Services or Thrive IP or modify or make derivative works based thereon, or offer the Services on a timeshare or service bureau (including software-as-a-service) basis. Client may use Thrive IP in accordance herewith and any Service Order solely as necessary to utilize Services for its own account and otherwise will not disclose or use Thrive IP for any purpose.

(b) <u>Client Intellectual Property</u>. Client retains all right, title and interest in and to all of Client's intellectual property rights transmitted by or on behalf of Client to Thrive in connection with the Services (collectively, "<u>Client IP</u>"). Thrive may not modify or create derivative works from or copy any ideas, features, functions or graphics of the Client IP or modify or make derivative works based thereon. Thrive may use Client IP in accordance herewith and any Service Order in connection with providing Services to Client and otherwise will not disclose or use Client IP for any purpose.


7.      **CONFIDENTIALITY.**

The Parties acknowledge that in connection with this Agreement each may receive from the other certain non-public information regarding the other Party's financial condition, suppliers, clients, business plans and other information not generally known to the public, including, without limitation, the terms and conditions of this Agreement ("Confidential Information"). The Party receiving Confidential Information of the other Party will not except as is required by law or legal process disclose such Confidential Information (i) to any person known by the receiving Party to be competitor of the other Party or (ii) to other third parties other than the receiving Party's employees, representatives and contractors who are bound by confidentiality obligations comparable to those set forth herein and who need to know such Confidential Information for purposes of the receiving Party's performance or receipt of the benefits of this Agreement, and will not use Confidential Information except in connection therewith. A Party that has received tangible embodiments of Confidential Information shall promptly return to the disclosing Party or destroy such Confidential Information upon the disclosing Party's request; provided that the receiving Party is not obligated to delete, purge or expunge Confidential Information maintained on its backup servers and similar devices in the ordinary course of its business (but nevertheless remains obligated under this Section 7 with respect to any such retained Confidential Information). The obligation to maintain the confidentiality of Confidential Information shall continue for so long as this Agreement shall remain in effect and for a period of two (2) years after the termination hereof, except that the obligation to maintain the confidentiality of trade secrets shall continue in perpetuity. If the Parties have entered into a separate non-disclosure or other agreement regulating the use or disclosure of the Parties' respective information, then the terms of such separate agreement will control in the event of a conflict between such separate agreement and this Section 7.


8.      **HIRING OF REPRESENTATIVES.**

For so long as this Agreement remains in effect and for a period of one (1) year thereafter, neither Party will employ, hire, contract with, or otherwise engage, or seek to employ, hire, contract with, or otherwise engage, any individual who at any time in the preceding twelve (12) months was an employee of the other Party involved in the provisioning or receiving of Services under any Service Order. The Parties agree that any breach of this Section 8 will result in irreparable injury to the other Party for which monetary damages alone would not be an adequate remedy. Therefore, the Parties agree that in the event of a breach or threatened breach of this Section 8 by the other Party, the non-breaching Party will be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach without the necessity proving the inadequacy of money damages or of posting a bond or other security.



**9.**     **TERMINATION.**

(a) Termination of Agreement and Service Orders for Breach of Terms.
(i) Breach of terms of General Terms & Conditions. Each Party may notify the other Party if the other Party breaches the terms of these General Terms and Conditions, which notice will describe in reasonable detail the nature of such breach and including relevant supporting documentation. Unless the breaching Party within thirty (30) days of its receipt of such notice either cures or remedies the breach described in such notice in all material respects or provides the other Party with a reasonable written plan for doing so, the other Party may, without limitation of its other rights and remedies under applicable law, terminate this Agreement by providing written notice of termination to the breaching Party.

(ii) Breach of terms of a Service Order. Each Party may notify the other Party if the other Party breaches the terms of any Service Order, which notice will describe in reasonable detail the nature of such breach and including relevant supporting documentation. Unless the breaching Party within thirty (30) days of its receipt of such notice either cures or remedies the breach described in such notice in all material respects or provides the other Party with a reasonable written plan for doing so, the other Party may, without limitation of its other rights and remedies under applicable law, terminate those Services under such Service Order as to which such breach relates (and not this Agreement, other Services provided under such Service Order or any other Service Order as may then be in effect) by providing written notice of termination to the breaching Party.

(b) Suspension or Termination of Services by Thrive for Failure to Pay. Notwithstanding the provisions of Section 9(a) above, in the event Client does not timely make payments under this Agreement (other than amounts timely disputed in accordance with Section 3(d) above, pending the resolution of such disputes) and such payment(s) is (are) not made by Client within ten (10) days of receiving written notice thereof from Thrive (which notice may be delivered to Client in the same manner as Thrive sends invoices to Client in the ordinary course), Thrive may, without limitation of its other rights and remedies under applicable law, suspend or terminate providing Services to Client under any or all Service Orders as may then be in effect, and Thrive will have no liability for any damages incurred or realized by Client as a result of such suspension or termination of any such Services. No such suspension or termination of Service under a Service Order due to Client's non-payment will relieve Client of its obligations to pay all charges and other amounts and otherwise comply with and fulfill its obligations under this Agreement, including under that or any other Service Order as may be in effect. If Services are suspended for non-payment, lapse in service will not count towards completion of the Term of such Services.

(c) Suspension. Notwithstanding the provisions of Section 9(a) above, Thrive may suspend the Services immediately upon notice to Client if: (i) Client materially violates (or Thrive believes in good faith that Client has materially violated) any provision of this Agreement or any provision of the applicable Thrive Acceptable Use Policy (https://thrivenextgen.com/acceptable-use-policy/); (ii) there is an unusual and material spike or increase in Client's use of the Services and Thrive believes, in good faith, that such traffic or use is fraudulent or materially and negatively impacting the operating capability of the Services; or (iii) Thrive determines in good faith that its provision of the Services is prohibited by applicable Law; or (iv) Thrive determines in good faith that Client is using the Products or Services in violation of applicable law or for an otherwise unlawful purpose. Notwithstanding the foregoing, Thrive will use commercially reasonable efforts to (x) provide Client as much prior notice as possible of any situation that it is aware of that could lead to a right to suspend described in this subsection, and (y) work with Client to remedy any situation that could lead to a right to suspend described in this subsection if such situation can be remedied.

(d) Duties Upon Termination or Expiration.

(i) Payment of Obligations/Return of Property. Upon the expiration or termination of this Agreement or any Service Order, Client will pay the full amount of all unpaid invoices issued under any outstanding Service Order and any other payment obligations specified in each outstanding Service Order (other than amounts timely disputed in accordance with Section 3(d) above, pending the resolution of such disputes). In addition, excluding any software and hardware that is the Client's property, Client will return all software and hardware provided to Client by Thrive in good working condition (ordinary wear and tear excepted) and free from all liens, charges and encumbrances within thirty days of termination of this Agreement or the applicable Service Order(s).



(ii) Termination Status Reporting; Further Services. Thrive will upon expiration or termination of any Service under any Service Order and receipt of all amounts then due and payable to Thrive under this Agreement as relates to such expired or terminated Service (other than amounts timely disputed in accordance with Section 3(d) above, pending the resolution of such disputes) (i) report to Client on the status of the Service as reasonably requested by Client and, if requested by Client, (ii) assist Client in winding down or transferring the terminated or expired Service to Client or its designee (such assistance being referred to as "Migration Services") in accordance with a mutually agreed separate Service Order signed by the Parties setting forth the terms and conditions thereof, which will include, among other terms to which Parties may agree, Client agreeing to pay Thrive for such Migration Services, if applicable, at the hourly rates set forth in the Service Order under which such Service was provided (and if no such rates are set forth in such Service Order, then at hourly rates agreed to by the Parties). Except as set forth above in this Section 9(d)(ii) and, if applicable, any Service Order providing for the provision of Migration Services, Thrive will have no duty or obligation to provide any Products or Service or any other service or assistance to Client following the expiration or termination of a Service in accordance herewith.

(e) Survival. The following provisions will survive any expiration or termination of this Agreement: Section 3 (Payments), Section 4 (Third Party Products & Services), Section 5 (Warranties, Disclaimer and Limitation of Liability), Section 6 (Intellectual Property Rights), Section 7 (Confidentiality), Section 8 (Hiring of Representatives), this Section 9 (Termination), Section 10 (Force Majeure), and Section 12 (General Terms).

## 10.    FORCE MAJEURE.

Except for payment obligations, neither Party will be liable for any failure or delay in performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances or causes beyond its reasonable control , including, without limitation, fire, pandemics or other casualty, acts of God, fiber cuts or Internet delays, delay or failure of Third-Party Providers, war, terrorism, or other violence or criminal acts, any law, order, requirement or act of any government or governmental agency or authority or other causes beyond the reasonable control of such Party. A Party affected by such a force majeure event shall inform the other Party promptly upon the occurrence thereof (including a reasonable estimate of the additional time required for resumed performance to the extent determinable) and such Party shall use reasonable commercial efforts to resume performance hereunder as soon as reasonably practicable.

## 11.    INSURANCE.

Thrive will maintain insurance providing at least $1,000,000 commercial general liability coverage, as well as statutory workers compensation coverage. Upon Client's request, Thrive will deliver to Client promptly a certificate of insurance made out by the applicable insurer(s) or their authorized agents as evidence of the insurance required under this Section and for any material policy amendments thereto. At Client's request, Client will be identified as an additional insured ATIMA (as their interests may appear) on such certificate of insurance.

## 12.    GENERAL TERMS.

(a) Governing Law; Jurisdiction; Venue. This Agreement will be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without regard to the conflicts or choice of law provisions thereof that would give rise to the application of the domestic substantive laws of any other jurisdiction. The Parties agree that any proceeding arising out of or relating to this Agreement will be brought only in, and hereby submit irrevocably to the jurisdiction of, the state or federal courts sitting in the Commonwealth of Massachusetts and hereby waive any objections to the jurisdiction, venue or convenience of any such courts. EACH PARTY WAIVES TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.

(b) Assignment. Neither Party may assign its rights or delegate its duties hereunder without the prior written consent of the other Party; provided that either Party may assign its rights hereunder to, and cause its obligations hereunder to be assumed by, a successor to substantially all of the assets or business of such Party. If there is any



assignment or delegation in violation of any of the foregoing restrictions, the non-breaching Party may terminate this Agreement and all Service Orders as may then be in effect upon written notice within ninety (90) days after notice or discovery of such assignment.

(c) Headings. The section headings herein are for ease of reference and convenience only and are not to be considered in the interpretation of this Agreement.

(d) Interpretation. Neither Party shall be considered the drafter of this Agreement or any schedule, addendum or exhibit as may be made part thereof so as to give rise to any presumption or convention regarding construction hereof or any such other writing.

(e) Integration; Severability. Except as provided in Section 7 above with respect to separate nondisclosure or confidentiality agreements between the Parties, this Agreement, including any Service Orders, sets forth the entire agreement and understandings between the Parties hereto with respect to the subject matter hereof, and merges all previous and contemporaneous discussions and negotiations between the Parties and supersedes and replaces any other agreement that may be in effect as of the date hereof between the Parties or their respective subsidiaries or other affiliates with respect to the subject matter hereof. Without limitation of the foregoing, this Agreement supersedes and replaces in its entirety any "Master Services Agreement" or similar document as may be in effect as of the date hereof between the Parties or their respective subsidiaries, predecessors-in-interest, or other affiliates (any such agreement being referred to as the "Original Agreement"). The parties agree that any "statements of work", "service orders" and similar writings as may be outstanding and in effect under the Original Agreement (the "Outstanding SOs") are, from and after the date hereof, Service Orders for all purposes of these General Terms and Conditions and the "Master Service Agreement" or similar agreement referenced in the Outstanding SOs shall from and after the date hereof be a reference instead to this Agreement. Notwithstanding the foregoing, all amounts due to Thrive under the terms of the Original Agreement or Outstanding SOs remain due in accordance with the terms of the Original Agreement or Outstanding SOs, and unless otherwise specified herein, no such amounts are settled, released or compromised hereby.  This Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof will be prohibited or invalid under any such law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions of this Agreement is for any reason held to be excessively broad as to duration, geographical scope, activity or subject, such provisions will be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

(f) No Third-Party Beneficiaries. There are no third-party beneficiaries of this Agreement or any schedule, addendum or exhibit as may be made part hereof.

(g) Residual Knowledge. Nothing herein shall be construed to prevent or in any way limit Thrive from using general knowledge, skill and expertise acquired in the performance of this Agreement in any current or subsequent engagement or business. Client shall have no interest in such engagements or business.

(h) Signatures, Amendments and Waivers and Exercise of Rights.

(i) Signatures. This Agreement and amendments or modifications hereof and consents and waivers relating hereto may be executed, issued and accepted electronically (via authenticated digital or similar electronic means) and will be effective when transmitted bearing a copy of a manual, digital or electronic signature.

(ii) Amendments and Waivers. Amendments to and waivers of the provisions of this Agreement must be in writing (including in a digital format) and signed as provided in Section 12(h)(i) above.

(iii) Exercise of Rights. Except as otherwise provided herein, no failure to exercise or delay in exercising any right, power or remedy will operate as a waiver thereof; nor will any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(i) Notices. Notices required or permitted to be provided hereunder will be in writing and, except as otherwise provided herein, will be valid and sufficient if delivered in person or sent by nationally recognized overnight courier or by email addressed to the Parties at the addresses listed on the cover page of this Agreement. Notices will be deemed received by the Party to whom notice is addressed on the date delivered, if delivered in person or by email,



or on the next business day after being provided to a nationally recognized overnight courier service, delivery charges prepaid, for next day delivery.

(j) <u>Publicity</u>. Each Party may use the other Party's name and logo on its website and printed materials to identify Thrive as a service provider to Client.

(k) <u>Independent Contractor</u>. Each of the Parties is an independent contractor and neither Party is, nor will be considered to be, an agent, distributor or representative of the other. All personnel supplied or used by each Party will be its employees or subcontractors and each Party assumes full responsibility for the actions of such personnel and for the payment of their compensation (including, if applicable, withholding of income taxes and the payment and withholding of social security and other payroll taxes), workers' compensation, disability benefits and the like to the extent applicable.

*END OF GENERAL TERMS AND CONDITIONS*

# EXHIBIT 4

 THRIVE™

April 28, 2023
Service Order: CON-025187
Q-15633 USD

**Prepared For**
National Boat Owners Association
Patrick Farrell
4404 N Tamiami Trail
Sarasota, Florida 34234-3864
United States

**Ship To**
National Boat Owners Association
Patrick Farrell
4404 N Tamiami Trail
Sarasota, Florida 34234-3864
United States

**Bill To**
National Boat Owners Association
Patrick Farrell
4404 N Tamiami Trail
Sarasota, Florida 34234-3864
United States

| **Service Order** |
|---|
| This Service Order (including the appendices, if any, attached hereto, the "Service Order) is made by and between the Client named above and Thrive Operations, LLC, ("Thrive"). This Service Order describes and sets forth terms and conditions under which Thrive will provide Services to Client as described below. Such terms and conditions include the General Terms and Conditions set forth and are more fully described on Thrive's website, [www.thrivenextgen.com/MasterServicesAgreementv4c] (the "Master Services Agreement"), which General Terms and Conditions are hereby incorporated into this Service Order and are an integral part hereof. Client and Thrive acknowledge and agree that the General Terms and Conditions set forth in the Master Services Agreement govern and apply to Thrive's provision of Services and Products as contemplated by this Service Order. **Client acknowledges that Client has reviewed the terms and conditions set forth in this Service Order and the Master Services Agreement and agrees to and accepts the same.** <br><br> Capitalized terms used herein and not defined are used with the respective meanings ascribed to such terms in the Master Services Agreement. <br><br> Thrive's offer to provide Services as described below in this Service Order expires after 30 days from the date hereof unless it is accepted by Client as evidenced by Client's signing this Service Order as indicated below and returning it to Thrive. Once accepted by Client, this Service Order becomes part of the Agreement and binding on the Parties in accordance with the terms hereof and the Agreement with respect to the Services set forth below. <br><br> In consideration of the mutual promises contained herein and in the Master Services Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Thrive agrees to provide to Client, and Client agrees to accept from Thrive, Services as described and on the terms and conditions set forth below: |

# Services Breakdown

## Project Overview

Client is recontracting existing services and we are adding the following services:
- New Firewall
- Office 365 security alerts
- M365 tenant backup
- End user security bundle

## Project Goals

Client is recontracting existing services and we are adding the following services:
- New Firewall
- Office 365 security alerts
- M365 tenant backup
- End user security bundle



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Project Impact

Client is recontracting existing services and we are adding the following services:
- New Firewall
- Office 365 security alerts
- M365 tenant backup
- End user security bundle

## Project Considerations

Client is recontracting existing services and we are adding the following services:
- New Firewall
- Office 365 security alerts
- M365 tenant backup
- End user security bundle

## Project Plan

Client is recontracting existing services and we are adding the following services:
- New Firewall
- Office 365 security alerts
- M365 tenant backup
- End user security bundle

## Recurring Monthly Services

### Project Services

| Qty | SKU # | Long Description | Price | Extended Price |
|-----|-------|-----------------|------:|---------------:|
| 1 | MSINST001 | Thrive Service Fulfillment Monthly Fee | $ 100.00 | $ 100.00 |
| | | | **TOTAL** | **$100.00** |

## Recurring Monthly Services

### Managed Servers

| Qty | SKU # | Long Description | Price | Extended Price |
|-----|-------|-----------------|------:|---------------:|
| 1 | VSM011 | Off-Platform, Supported, Client-Owned Host with Virtual Server | $ 504.00 | $ 504.00 |
| 2 | VSM012 | Off-Platform, Supported, Client-Owned Virtual Server | $ 189.00 | $ 378.00 |



April 28, 2023
Service Order: CON-025187
Q-15633 USD

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 1 | SM100 | Managed Server Patching Base Service | $ 157.50 | $ 157.50 |
| 3 | SM010 | Managed Server Patching Enterprise | $ 19.00 | $ 57.00 |
| 3 | EPP010B | Endpoint Security and Response (per device) | $ 8.00 | $ 24.00 |
| | | | **TOTAL** | **$1,120.50** |

## Recurring Monthly Services

### Managed Backup

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 1 | STBDRS3B3000U | PowerView BDR Model S3B 3 TB Onsite Storage, Infinite Retention | $ 726.00 | $ 726.00 |
| | | | **TOTAL** | **$726.00** |

## Recurring Monthly Services

### Managed Infrastructure

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 2 | MFS0011BB | Fortinet Managed Firewall - Base 60F 24x7 | $ 299.00 | $ 598.00 |
| 1 | MFS0001IPS | Managed Firewall Based Intrusion Prevention System Service | $ 50.00 | $ 50.00 |
| 1 | MFS0001W | Managed Firewall Web Filtering Service | $ 40.00 | $ 40.00 |
| 1 | MFS0001AV | Managed Firewall Protection Service (Antivirus/Anti-Spyware) | $ 35.00 | $ 35.00 |
| 1 | NM001SC | Managed ISP Services (per site) | $ 79.00 | $ 79.00 |
| 2 | STMNI060 | Managed Access Point UAP-AC-LR | $ 25.00 | $ 50.00 |
| 1 | STWIRE0L2 | PowerView Wireless - Indoor - Level 2 | $ 44.00 | $ 44.00 |



| | | | | |
|---|---|---|---|---|
| 1 | MFS0001HA | **Managed Firewall High Availability Service** | $ 25.00 | $ 25.00 |
| | | | **TOTAL** | **$921.00** |

## Recurring Monthly Services

### Technical Advisory Services

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 1 | TCSR0016 | **Technical Advisory Services**<br>* Strategic Technical Road Mapping* Technology Business Review (TBR)* Lead for Technical Business Conversations* Advisement on new technology/solution environment readiness* Assistance with Account technical due diligence services* Assistance with cyber insurance compliance * Assistance with vendor selection | $ 500.00 | $ 500.00 |
| | | | **TOTAL** | **$500.00** |

## Recurring Monthly Services

### End User Support

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 1 | SECBD002-SE | **End User Security Bundle Base Service SE** | $ 250.00 | $ 250.00 |
| 25 | SECBD002A | **End User Security Bundle (per user)**<br>Endpoint Security And Response. Advanced Email Threat Security with Remediation & Continuity Subscription. Managed AntiPhishing and End User Security Training. Secure Internet Gateway. 1 device per user. Additional devices can be licensed separately. | $ 27.00 | $ 675.00 |
| 24 | TPU1000P-SE | **End User Support 24x7 Platinum SE** | $ 100.00 | $ 2,400.00 |
| 1 | DM100 | **Managed Workstation Patching Base Service** | $ 157.50 | $ 157.50 |
| 28 | DM001 | **Managed Workstation Patching Essentials** | $ 6.50 | $ 182.00 |
| | | | **TOTAL** | **$3,664.50** |

## Recurring Monthly Services

### Recurring Discount

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|

THRIVE™

April 28, 2023
Service Order: CON-025187
Q-15633 USD

| 1 | TCD0001 | Sales Managed Services Recurring Discount | -$ 2,750.00 | -$ 2,750.00 |
| | | | **TOTAL** | **($2,750.00)** |



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Services Summary Breakdown

### Recurring Monthly Services

| Service Description | Ext Price |
|---|---|
| Project Services | $ 100.00 |
| Managed Servers | $ 1,120.50 |
| Managed Backup | $ 726.00 |
| Managed Infrastructure | $ 921.00 |
| Technical Advisory Services | $ 500.00 |
| End User Support | $ 3,664.50 |
| Recurring Discount | -$ 2,750.00 |
| **Recurring Monthly Services Total:** | **$ 4,282.00** |



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Service Order - 36 Months

SCOPE OF SERVICES
Client acknowledges that technology is inherently complicated and that if unforeseen circumstances exist within Client's environment that prevent or delay Services from being installed or delivered, then such prevention or delay will not be considered a breach of this Service Order. Thrive will work with Client to correct such circumstances and may suggest alternative products or additional services to correct the circumstance(s). All work delivered outside the scope of this Service Order must be agreed to by both parties in writing prior to work being performed.

TERM & TERMINATION
The term of this Service Order (the "Term") will begin on the date hereof and, with respect to recurring monthly Services provided for herein, subject to the terms of the Agreement, will continue through the last day of the thirty-sixth (36th) month following the Service Provisioning Completion Date for this Service Order; provided that the Term will automatically renew for successive terms of the same duration as the initial Term unless either party provides the other party notice of its intention not to renew this Service Order at least ninety (90) days before the end of the then current Term.

If Client cancels prepaid Services not yet delivered then Client is entitled to the delivery of those Services but not a refund. All discounts provided for herein will automatically expire at the end of the initial Term.

Termination of this Service Order prior to the end of the Term either by Client, other than as permitted by and in accordance with the terms and conditions of the Agreement following Thrive's breach hereof, or by Thrive as permitted by and in accordance with the terms and conditions of the Agreement following Client's breach hereof shall, obligate Client to pay Thrive immediately upon demand, (i) all sums then due and unpaid under the Agreement and this Service Order plus (ii) an amount equal to the fees for Recurring Monthly Services specified above in this Service Order (as such fees for Recurring Monthly Services may subsequently be changed pursuant to a change order or other amendment signed by the parties specifically referencing this Service Order) over the period commencing on the date of such termination and ending on the last day of the then current Term hereof.

Service Level Commitment
Except to the extent otherwise specified in the Service Order, in the event that Thrive fails to meet the SLA commitments (as reported by Client to Thrive within five days of such failure) three (3) times with respect to any single Service during a rolling three (3) month period, Client may, at Client's option exercisable not later than thirty (30) days following its reporting to Thrive the third such incident, immediately terminate the Service Order with respect to the affected Service upon written notice to Thrive.

BILLING
Thrive will invoice Client for one-half (50%) of the price set forth herein for the One-Time Service(s) when Thrive initiates providing such One-Time Service(s) and will invoice the remaining balance upon completion thereof; provided, however, in the case of those One-Time Service(s) the price for which is less than $2,500, Thrive will invoice Client for the entirety of such price when Thrive initiates providing such One-Time Service(s).

HOURS OF IMPLEMENTATION
If Client prefers that Thrive provide some or all of the Services outside of Thrive's Business Hours, generally Monday through Friday from 9:00AM to 5:30PM EST unless otherwise specified, to reduce downtime during working hours, off-hours rates will be billed and will result in an increase to the cost estimate.

CLIENT CREDIT STATUS
Client and the authorized representative signing on behalf of Client hereby represent and warrant to Thrive that the authorized representative understands Client's financial condition and that, to the best of his/her knowledge, Client is financially solvent and is currently paying, and expects to continue to pay, its debts and obligations as they become due.

IN WITNESS WHEREOF, the parties have caused this Service Order to be executed by their duly authorized representatives as of the date hereof.

**CLIENT: National Boat Owners Association**          **Thrive Operations LLC**

By: _Patrick Farrell_                                By: _Leonard Q. Slap_

Name: Patrick Farrell                                Name: Leonard Q. Slap

April 28, 2023
Service Order: CON-025187
Q-15633 USD

THRIVE™

| | | |
|---|---|---|
| Title | VP | Title: Executive Vice President |
| Date | 4/28/2023 | Date: May 3, 2023 |
| Customer PO | | |



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Thrive Technical Advisory Services Scope of Service

**Thrive Technical Advisory Services Definition**

Technical Advisory Services are subscribed at the client level contingent upon client's service composition and strategic needs. The general scope of technical advisory services include a combination of consultation, advisory, and strategic group sessions/meetings. These one-on-one sessions, phone inquiries, and a technical assistance program create a "tailored" curriculum-based approach as described below . Thrive will provide strategic recommendations and deliver technology roadmaps in alignment with Thrive NextGen Platform Services.

The service shall include:

- Discover
    - o Develop and maintain a deep functional knowledge of client's business operations, goals, technical challenges, and critical infrastructure
    - o Provide guidance and technology recommendations for planned business needs (growth, relocation, new initiatives)

- Assess
    - o Schedule & conduct technical business conversations in alignment with client's business technology drivers
    - o Review current business & technology trends and offer solutions to address and remediate
    - o Assess business risk and potential opportunities within their IT environment and provide technical solutions and mitigation recommendations
    - o Coordinate with Thrive's project team, for scope of work, assist with project and services implementation and participate in project meetings/calls
    - o Assistance with account technical due diligence services
    - o Assistance with cyber insurance compliance
    - o Assistance with vendor selection

- Strategy
    - o Perform strategic technical road mapping and Technology Business Review (TBR) encompassing client's specific technology needs
    - o Mitigate risk, and provide solutions in alignment with Client's unique business challenges and requirements
    - o Advisement on new technology/solution environment readiness
    - o Assist with budget forecasting and financial cost analysis reports and documentation

**Thrive Scope of Work and Deliverables**

- Strategic Technical Road Mapping

- Technology Business Review (TBR)

- Lead for Technical Business Conversations

- Advisement on new technology/solution environment readiness

- Assistance with Account technical due diligence services

- Assistance with cyber insurance compliance

- Assistance with vendor selection

**Client Responsibilities**



- Client agrees to provide appropriate resources for ad-hoc and regularly scheduled business conversations

- Client agrees to provide sufficient notification related to project scoping, compliance, and due diligence documentation. Examples on sufficient timeframes below based on submittal of request via client portal:

  o Typical Office move (30 employees or less) - 60 days

  o Typical Office move (30 employees or more)– 120 days

  o Third-party vendor call – 7 days

  o Compliance or insurance diligence inquiry/call - 14 days

**Service Limitations**

- Advisory services and support from client's dedicated resources are limited to the client's current services rendered by Thrive with the exception of future services being scoped and discussed for client

**Service Exclusions**

- Any service not explicitly included in the Technical Advisory Services Definition above is considered optional and may be provided under separate agreement for an additional fee.


## Thrive Enterprise Server Patching Scope of Service

**Thrive Enterprise Server Patching Service Definition**
Thrive Enterprise Server Patching service provides automated software updates for servers running supported versions of Microsoft Windows operating systems. The service is designed to reduce software vulnerabilities through regularly scheduled security and critical patches to meet security and compliance requirements.

The service shall include:

- Installation of Critical and Security Microsoft Windows software updates via automated patching procedures

- If requested, fixed Server OS Patching schedules

- Immediate deployment of workstation OS patches once released by the Operating System vendor and approved for install by Thrive

- Optional quarterly meetings with Thrive to review OS patching success

- Automated remediation of failed patch installations via patch re-deployments

- Manual remediation of customer identified failed patches limited to the following efforts:

  o Scheduled Server Reboot

  o Manual Patch Installation

- Optional Alpha and Beta test groups patched before production servers.

- Patch Approval Change Control

- Standard OS Patching reports available through the Thrive Client Portal

  o Installed patches by device

  o Failed patches by device

  o Missing patches by device

  o Summary Patch Health Score



April 28, 2023
Service Order: CON-025187
Q-15633 USD

- **OPTIONAL 3rd Party Application Patching *Requires Thrive 3rd Party Application Patching Service**
  - Deployment of supported 3rd party application patches to Windows OS servers.

**Thrive Scope of Work and Deliverables**

- Thrive shall license and install a Remote Monitoring and Management (RMM) software agent on all contracted devices. Any discrepancy between the quantities indicated on the attached Service Order and the network management tool will result in a billing adjustment to remediate the discrepancy.

- Thrive shall work with the Client to determine and configure the fixed patching schedule.

- Thrive shall perform automated Operating System patching and approved applications (if subscribed to Thrive 3rd Party Patching service) for all contracted servers.

- Thrive shall provide Client with access to to the Thrive Client Portal to view patch status reports.

**Client Responsibilities**

- Client shall provide Thrive with sufficient access to IT environment to install required software agent. Client shall assist Thrive with deployment of software agent to all operating systems as required

- Client servers shall be up to date on all OS updates. If the client is more than two months behind at time of onboarding to Thrive management an additional scope of work will be quoted (not part of the service) for a one-time service to bring all devices to current OS Patching levels before regular monthly patching can be scheduled.

- Client shall be responsible for ensuring ongoing network connectivity between agent and Thrive Management Server. Agents must be able to communicate outbound to Thrive datacenters on TCP/UDP port 5721, TCP port 443, and TCP/UDP port 3478 and to all Microsoft Windows Update servers.

- Client shall provide administrative access to operating systems for automated patch installation and patch remediation. Thrive requires a domain administrator account be made available for patch deployment.

- All client devices must have access to the Internet to download OS Updates from Microsoft servers

- Client shall make available a time window for lightweight patch scanning.

- Client shall communicate to Thrive via a service request of any adds and removals of systems in the scope of the patching service.

- If desired, client shall make available test groups and allow Thrive to complete testing procedures before patch deployment. Beyond security updates, software publishers may also introduce new features. New features and their impact will not be included as part of testing procedures.

- Client is responsible for the licensing and day to day management of 3rd party applications (if subscribed to Thrive 3rd Party Patching service).

**Service Limitations**

- The Operating System version must be within the manufacturer's active lifecycle.

- If a Client has Active Directory Group Policies which control Windows Updates, Thrive will need to review the policies prior to any OS patching as it could conflict with a particular module in our Patching Tool

- Thrive will attempt to remediate patches that failed to apply with a secondary Software Management Module. Manual patch remediation is the responsibility of the Client and is not included with the service unless the server is contracted for management with Thrive.

- This service includes patching for out of cycle critical patches. Thrive will work with the Client as these updates are released to apply on a mutually agreed upon window.

- SQL and Exchange Service Pack updates:



- o Thrive will deploy Exchange and SQL updates offered from Windows Update only. Thrive will not deploy Exchange and SQL updates not offered by Windows Update.

- o Hot fixes not offered from Windows Update are out of scope of the patching service are handled as a billable project.

- o Thrive will deploy service packs as part of automated patching windows but the oversight and remediation of these service packs will require an additional project plan or services.

- If subscribed to the optional Thrive 3rd Party Patching Service, patching of third-party applications is limited by the software publishers as to what applications can be patched. If the software publisher removes support for automated patching or requires additional vendor specific licensing, the completion of those deployment will not be included in this service.

**Service Exclusions.** Any service not explicitly included in the Managed Server Patching Enterprise Service Definition above is considered optional and may be provided under separate agreement for an additional fee.

- Operating System Upgrades (i.e., Windows Server 2016 to Windows Server 2019) are not included in the service

- Windows drivers and BIOS updates are not included in the service

**Service Level Agreement (SLA)**
Thrive commits to application of Windows Operating System security updates within 30 days of patch release for the approved Operating Systems defined in the Scope of Services.

If the percentage of managed systems under contract are missing security patches approved for installation within 30 days exceeds 5%, Client is eligible to receive a service prorated credit for the Patching Service MRC as follows:

**Percentage of Managed Systems Unpatched - Amount of Credit**
Less than 5%: - None
5%-10% - 3 days prorated MRC
Greater than 10% - 5 days prorated MRC

**Client SLA Requirements**

- Client must provide appropriate maintenance windows for installation of approved patches.

- Client devices must be powered on during patching windows or have wake on LAN and enabled.

- Client must allow for reboots of servers during scheduled patching window

- Client must not be running any security software that may interfere with patch deployment

- Client must allow Thrive to troubleshoot patch installation if machine is problematic. During the troubleshooting process that machine will be exempt from the percentage count until patching resumes normally through the Thrive Remote Management and Monitoring platform.

**General SLA Requirements**

- Operating System must be within vendor support lifecycle and capable of receiving updates

- Operating System must be supported by Kaseya agents.

- Client Change Control and Patch Freeze windows are excluded from the 30 day SLA commitment.

- Client must request credit via a Case through the Client Portal within 30 days of SLA violation.

- All credits issued will be applied to future service billing.

**Exclusions from SLA**

- Managed Workstation Patching Essentials Service

- 3rd Party Application Patching



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Thrive Endpoint Security and Response

**Thrive Endpoint Security and Response Service Description**

Thrive Endpoint Security and Response service provides Next Generation detection & protection for servers and workstations. With the advent of sophisticated malware such as fileless attacks and zero-day executables, a feature rich signature-less endpoint solution is needed in many organizations. Our solution offers all of the necessary features to combat advanced endpoint attacks while meeting multiple compliance guidelines that typically require traditional antivirus protection.

The service shall include:

- Workstation and server endpoint software security agent

- Cloud-based aggregation and processing of security events

- One (1) Client administrator login for reporting and visibility

- Management of whitelist exclusions for common applications

- Device Isolation in the event of attack or theft

- USB Blocking Functionality (requires implementation plan)

- Alerting to Thrive Security Operations Center (SOC) for all Malicious and Suspicious level events

**Thrive Scope of Work and Deliverables**

- Thrive shall provide all license subscriptions for the endpoint security agents.

- Thrive shall perform initial configuration of Client console and develop ongoing support strategy including Client communication and general steps on response handling for threats generated by the Thrive endpoint security platform.

- Thrive shall perform investigation and analysis of all Malicious and Suspicious level alerts and determine response actions, if required. Thrive shall provide notification to the Client of events that require action with remediation instructions. If the affected endpoint is under management by Thrive under separate Managed Server or End User managed services, Thrive shall remediate the endpoint provided it can be accessed remotely by Thrive.

**Client Responsibilities**

- Client shall be responsible for deployment of the software security on subscribed servers and workstations. If Client subscribes to Thrive Managed Server and/or Thrive End User managed services, Thrive shall perform security agent installation utilizing existing Remote Monitoring and Management (RMM) tools in the agent deployment.

- Client shall ensure all required server, workstation and firewall ports are open to all the endpoint security agents to communicate to the Thrive security platform.

- Client must notify Thrive of any new servers or workstations requiring an endpoint security agent subscription and deployment and of workstations and servers that are removed or decommissioned.

- If Client requires integration with a 3rd party Security Information and Event Management platform, Thrive shall assist with consultation related to the Thrive endpoint security platform configuration.

**Service Limitations**

- If the endpoint security agent is reported in the management console as "Degraded", Thrive will not investigate end user workstations or servers for compatibility or insufficient resource issues that prevent the security agent from operating (unless subscribed to Thrive End User support)

- The security agent does not provide scheduled or on-demand scans.

**Service Exclusions.** Any service not explicitly defined in the Endpoint Security and Response Service Description definition above is considered out of scope and may be provided under separate agreement for an additional fee.



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Thrive EBMS Managed FortiGate Firewall Scope of Service

**Service Definition**

Thrive EBMS Managed FortiGate Firewall Service provides fully managed edge security utilizing the Fortinet FortiGate Unified Threat Management platform. The service includes the physical or virtual FortiGate firewall with full monitoring and management of the firewall configuration, policies and rules.

The service shall include:

- Fortinet FortiGate firewall device(s) as indicated in the Thrive Service Order including subscriptions for optional services below where applicable

- Stateful packet filtering

- Network Address and Port Address Translation

- 10 configuration changes per month per device

- 1 DMZ

- 3 VLAN's

- FortiOS firmware updates

- Regularly scheduled review of firewall firmware and base configuration to confirm compliance with Thrive standards

- OPTIONAL add-on services

  o Intrusion Prevention Service

  o Web Filtering

  o Gateway Anti-Virus/Anti-Spyware

  o VPN Service

    ▪ FortiClient VPN Connectivity Only

    ▪ Split-tunnel VPN Routing Policy with networks local to FortiGate Firewall to be included by default within VPN policy

    ▪ VPN connectivity to multiple sites supported if there is established connectivity between those sites and the site hosting the Thrive Managed FortiGate

    ▪ SSLVPN Portal configured with default self-signed SSL certificate or Let's Encrypt SSL certificate unless certificate provided by customer

    ▪ FortiGate will be configured to assign IP addresses to VPN clients

    ▪ SSO and MFA (multi-factor authentication) requires Azure Active Directory integration with appropriate Azure licensing; other identity providers may require a separate change order at additional cost

**Thrive Scope of Work & Deliverables**

- Thrive shall configure the Managed Firewall in accordance with Client's defined requirements. Upon activation of the Managed Firewall Service, Client is responsible for confirming that the configured firewall is in accordance with Client's preferences and all appropriate and potentially impacted services are functioning as expected.

- Upon completion of installation and upon Client request, Thrive will administer all changes and modifications to the firewall rule sets and configurations. Basic configuration changes include such actions as:

  o Firewall rule set modification



April 28, 2023
Service Order: CON-025187
Q-15633 USD

- o  Device firmware upgrades, configuration backup and recovery as needed

- o  Problem, Incident, and Change Management

- Thrive shall perform a regularly scheduled review to confirm firewall is in accordance with Thrive's documented firmware and base configuration standards

- Thrive shall be responsible for the ongoing hardware and firmware maintenance of the firewall service.

- OPTIONAL Firewall Web Filtering Service Add-on

  - o  If included in the Thrive Service Order, Thrive shall provide client documented Thrive standards for Web Filtering configuration. An additional one-time cost may be incurred by client if customizations to Web Filtering configurations are required.

- OPTIONAL Firewall Protection Service (Antivirus/Anti-Spyware) Add-on

  - o  If included in the Thrive Service Order, Thrive shall configure firewall antivirus/anti-spyware policies according to Thrive standards and cybersecurity best practices. An additional one-time cost may be incurred by client if customizations to Antivirus/Anti-Spyware configurations are required.

- OPTIONAL Firewall Based Intrusion Prevention System Add-on

  - o  If included in the Thrive Service Order, Thrive shall configure firewall Intrusion Prevention System policies according to Thrive standards and cybersecurity best practices. An additional one-time cost may be incurred by client if customizations to Intrusion Prevention System configurations are required.

- OPTIONAL VPN Service Add-on

  - o  Thrive shall configure the FortiGate SSLVPN in accordance with specifications defined within the Service Definition. Customization may require a separate change order at additional cost

  - o  Thrive is responsible for troubleshooting and resolving issues specifically related to the FortiGate SSLVPN configuration or its availability

**Client Responsibilities**

- Client shall provide Thrive with sufficient information and documentation necessary to properly setup, configure, install & manage the Managed Firewall Service. If Client is unable to provide information, Client may elect to have a Thrive engineer review any existing firewall configurations to gather required information for an additional fee.

- Client shall provide the Thrive Deployment Engineer with all LAN/WAN IP Schemes.

- Client shall provide Client escalation contacts to Thrive for service event notification.

- Client shall provide the appropriate space, power, and cooling for the firewall as specified by the equipment manufacturer.

- Client shall allow Thrive to install firmware upgrades, critical updates and patches based on the Thrive provided maintenance window, or provide Thrive with scheduled and emergency maintenance windows as needed to install firmware upgrades, critical updates and patches.

- OPTIONAL VPN Service Add-on

  - o  Client is responsible for providing Thrive with a Fully Qualified Domain Name (FQDN) to be used as the SSLVPN portal address. If client is unable to provide a FQDN Thrive will configure SSLVPN portal address with a self-signed SSL certificate

  - o  Client is responsible for requesting SSL certificate renewal requests within 30 days of the expiration of any SSL certificates not provided by Thrive

  - o  Client shall be responsible for distribution and installation of the FortiClient VPN Only client to user endpoints unless endpoints managed by Thrive



- Client shall be responsible for configuring and managing 3rd party identity or authentication providers unless provider is managed by Thrive

- Client shall be responsible for troubleshooting and/or resolving issues related to 3rd party identity or authentication providers not managed by Thrive

- Client shall be responsible for troubleshooting and resolving network connectivity issues to destinations not supported by Thrive

**Service Limitations**

- Client acknowledges and agrees that the Managed Firewall Service constitutes only one component of an overall security program and is not a complete and comprehensive security solution.

- Firewall hardware and software platforms have vendor specified bandwidth throughput and connection limitations which are impacted by the security features selected for activation by the Client. Thrive will consult with the Client to select the appropriate firewall platform based on information provided during the initial consultation to review security requirements. Security services that are activated at the request of the Client after the initial consultation or firewall configuration that negatively impact the performance of the hardware and software are the responsibility of the Client. Thrive will work with the Client to select another firewall platform that may result in additional monthly fees.

- Service does not include the vendor management of the Internet Service Provider (ISP) or Wide Area Network (WAN) carrier.

**Equipment Return.** Upon termination or expiration of the Managed Firewall Service, Client shall return all hardware and software components of the firewall system provided by Thrive to Thrive at Client's expense. If Client fails to return all components of the firewall system to Thrive within 10 days after termination or expiration, Client will continue to be liable for and obligated to pay monthly recurring charges for the Managed Firewall Service.

**Service Exclusions.** Any service not explicitly included in the Thrive Service Order or EBMS Managed FortiGate Firewall Service Definition above is considered optional and may be provided under separate agreement for an additional fee.


## Thrive Managed Microsoft 365 Backup Scope of Service

Thrive's Managed Microsoft 365 Backup Service provides data protection for Microsoft 365 services against accidental deletion and security threats, including Exchange, OneDrive for Business, and SharePoint data.

**Service Definition**

The service shall include:

- Daily data backup of:

    - Exchange Online

    - SharePoint Online

    - OneDrive for Business

    - Microsoft Teams

    - Microsoft 365 Groups

    - Project Online (Requires MS Project subscription)

    - Planner

    - Public Folders (Requires M365/O365 service with Exchange Online subscription)

- Unlimited data retention and storage to a single central cloud storage repository

- Optional backup of Salesforce data for an additional monthly service fee



- Optional Multi-Geo backup to regional cloud storage repositories to meet data residency requirements

**Thrive Scope of Work and Deliverables**

- Thrive shall configure the Microsoft 365 backup jobs to be performed daily. All Client data will be stored in Microsoft Azure storage.

- Thrive shall monitor the status of backup jobs to ensure scheduled completion and remediate any failed backups.

- Thrive shall upon Client request provide restoration of Microsoft 365 data including Exchange items, OneDrive accounts, files and folders, SharePoint sites, documents, lists or libraries and Teams sites and channels.

- If Client subscribes to the optional Salesforce backup service:

    o Thrive will perform daily backup of the Client Salesforce data

    o Thrive will restore Salesforce data upon request from Client

- If Client subscribes to the Thrive Microsoft 365 Multi-Geo Tenant Backup service, Thrive will configure data backup to cloud storage repositories within the geographical region of the users.

**Client Responsibilities**

- Provide Thrive with the valid Microsoft 365 credentials to connect the backup service to the Client's Microsoft 365 Tenant.

- If Client subscribes to the optional Salesforce backup service, provide Thrive with the Salesforce organization valid login credentials

- If Client subscribes to the Thrive Microsoft 365 Multi-Geo Tenant Backup service, Client must also have a Microsoft 365 subscription that supports Multi-Geo tenancy and the add-on subscription for Multi-Geo service.

**Service Exclusions.** Any service not explicitly included in the Service Definition above or defined in the Service Order is considered optional and may be provided under separate agreement for an additional fee.

## Thrive Managed Advanced Email Threat Security Scope of Service

**Service Definition**

Thrive Managed Advanced Email Threat Security service provides cloud-based spam protection and security against email borne threats including malicious attachments and URL's, malware, phishing and spear-phishing, and social engineering attacks such as impersonation fraud. The service routes email through a Secure Email Gateway where it is inspected prior to delivery to the end user mailbox where spam and malicious attachments are blocked, and suspicious emails are quarantined for user review.

The service shall include:

- Managed Advanced Email Security

- Advanced Email Security subscriptions (per mailbox)

- See Appendix A for specific service plan features

**Thrive Scope of Work and Deliverables**

- Thrive shall configure a dedicated tenant in the Advanced Email Threat Security platform

- Thrive shall configure Client tenant with appropriate user subscriptions based on Thrive Service Order.

- Thrive shall configure user sync for Office/Microsoft 365 or Exchange Online. Users will be added manually when user sync is not an available option.

- Thrive shall provide information to Client for Domain Name Service (DNS) changes required to redirect email flow to the Secure Email Gateway. If Thrive is managing the DNS, Thrive will make the MX record change.



- Thrive shall configure Single Sign On (SSO) for user access. (Requires subscription to Client provided or Thrive provided SSO platform).

- Thrive shall update the Sender Policy Framework (SPF) record to allow email to be sent from the email security platform domain.

- Thrive shall create Spam policies based on Client completed Spam Discovery Form.

- Thrive shall configure the global accepted/blocked email domains per Client specifications.

**Client Responsibilities**

- Client shall complete the Spam Discovery Form prior to service implementation.

- Client shall make required MX record changes in DNS for Client managed DNS.

- Client shall provide administrative access to the email tenant if Client managed.

- Client shall provide a primary point of contact for any administrative changes.

**Service Limitations**

- Migration of existing email archive is not included but can be provided for an additional service fee.

**Service Exclusions**

- Any service not explicitly included in the Managed Advanced Email Threat Security Service Definition and Thrive Scope of Work and Deliverables sections above is considered optional and may be provided under separate agreement for an additional fee.

## Appendix A

**TMEF0020 - Advanced Email Threat Security Basic**

- Email spam and virus filtering

- Targeted Threat Protection against spear-phishing, ransomware, impersonation, and other targeted email attacks.

- Multi-layered malware protection against known and zero-day threats

- Protection against malicious URLs and attachments

- Email spooling during email platform outages

- 30 day email retention

**TMEF0021 - Advanced Email Threat Security Premium**

- Email spam and virus filtering

- Targeted Threat Protection against spear-phishing, ransomware, impersonation, and other targeted email attacks.

- Multi-layered malware protection against known and zero-day threats

- Protection against malicious URLs and attachments

- Email spooling and continuity during email platform outages

- 58 day email retention

**TMEF0022 - Advanced Email Threat Security Enterprise**

- Email spam filtering



April 28, 2023
Service Order: CON-025187
Q-15633 USD

- Targeted Threat Protection against spear-phishing, ransomware, impersonation, and other targeted email attacks.

- Multi-layered malware protection against known and zero-day threats

- Protection against malicious URLs and attachments

- Email spooling and continuity during email platform outages

- 99 year email Archiving

**TMEF0025 - Advanced Email Threat Security with Remediation & Continuity**

- Email spam filtering

- Targeted Threat Protection against spear-phishing, ransomware, impersonation, and other targeted email attacks.

- Multi-layered malware protection against known and zero-day threats

- Protection against malicious URLs and attachments

- Email spooling and continuity during email platform outages

- Remediation of malicious or undesirable mail

- Internal Email Threat Protection

- Sync & Recover for Exchange and Office 365

- 1 year email retention

**TMEF0026 & SECBD002A - Advanced Email Threat Security with Remediation, Continuity and Archiving**

- Email spam filtering

- Targeted Threat Protection against spear-phishing, ransomware, impersonation, and other targeted email attacks.

- Multi-layered malware protection against known and zero-day threats

- Protection against malicious URLs and attachments

- Email spooling and continuity during email platform outages

- Remediation of malicious or undesirable mail

- Internal Email Threat Protection

- Sync & Recover for Exchange and Office 365

- 99 year email Archiving

## Thrive O365/M365 Management and Security Monitoring Scope of Service

Thrive's O365/M365 Management and Security Monitoring Service provides administrative management of the Client's Microsoft 365 tenant and user accounts and proactive monitoring and alerting for security events within the Microsoft Office 365 tenant. The service monitors for potentially malicious activity within the Client's Microsoft tenant and alerts Thrive's Security Operations Center for review, investigation, and response.

**Service Definition**
The service shall include:

- Microsoft 365 license procurement.



- Microsoft 365 tenant creation and ongoing administration.

- Microsoft 365 User account and Security Group creation and ongoing administration.

- Microsoft 365 User account license assignment and reassignment within tenant.

- Administrative moves/adds/changes to tenant and user accounts

- Configuration of monitoring of Client O365/M365 tenant

- Review and investigation of critical O365/M365 security alerts by Thrive Security Operations

- Remediation guidance on actionable alerts

**Scope of Work & Deliverables**

- Creation of the Microsoft 365 tenant for new deployments. If Client has an existing Microsoft 365 tenant, Thrive shall coordinate with the Client to have the tenant associated with Thrive as a Partner of Record.

- Thrive shall create new user accounts within the Client tenant and provide ongoing license administration of those accounts.

- Thrive shall procure new product licensing and subscriptions based on Client requirements as defined in the Service Order. Licensing and subscription fees are not included in the Thrive Microsoft 365 Management Service fee.

- Thrive shall assign and reassign available licenses to user accounts within the customer tenant.

- Thrive shall administer requested moves/adds/changes to Microsoft 365 tenant and user permissions, policies, and configurations

- Microsoft 365 migration services can be provided by Thrive under a separate project and fee.

- Thrive shall configure monitoring platform to receive alerts from Microsoft Office 365/Microsoft 365 tenant

- Thrive shall monitor, investigate, and respond to critical O365/M365 security alerts. See appendix below for monitored critical alerts. Specific monitored alerts may be adjusted from the list below based on availability and severity level.

- Thrive shall provide notification to the Client primary contact of identified potential malicious activity with guidance on recommended actions.

- Thrive shall provide ongoing reporting on alerts through the Thrive Client Portal

**Client Responsibilities**
Client acknowledges that services and fees set forth in the Sales Order is based upon information that Client has provided to Thrive. In addition, the Client is responsible for the following:

- Client shall provide email domain name to be used for Microsoft 365 tenant.

- Client shall provide list of users and passwords for the Microsoft 365 accounts.

- Client shall provide access to public DNS services or provide access to an escalation point who can perform any necessary public DNS changes.

- If Thrive is assuming existing Microsoft 365 tenant, Client shall provide administrative access to the Microsoft 365 tenant and associate thrive as a Partner of Record.

- Client is responsible for all external systems that might relay mail through Microsoft 365 unless explicitly covered under a separately contracted service with Thrive.

- Client shall provide escalation contacts to Thrive for critical event notification.

- Client shall provide end user support for all Microsoft 365 software and applications unless Client is contracted for Thrive End User Support.

- If contracted for migration services, Client shall provide Thrive with administrator access to existing Exchange servers.



- In order to receive security monitoring, all client users must be configured for multi-factor authentication

- Client shall provide escalation contacts to Thrive for critical event notification

- Client shall provide Microsoft tenant admin credentials for tenants not managed by Thrive.

**Service Limitations**

- Thrive Microsoft 365 Management does not include creation or modification of Sites within Microsoft 365 applications (Teams, SharePoint, etc.)

- Requests for support should be initiated by the Client's named contact(s) or client centralized end user Help Desk. Microsoft 365 Management does not provide direct end user support.

- Security monitoring included with this service provides a baseline of threat alerting but this service is only one control that is needed to properly secure your tenant

**Service Exclusions.** Any service not explicitly included in the Service Definition above or Sales Order is considered optional and may be provided under separate agreement for an additional fee.

**Appendix – Security Alerting**
Application Event - SaaS Integration
Custom Compliance Event - High
IAM Event - Conditional Access Violation
IAM Event - Multi-Factor Authentication Disabled
IAM Event - Multiple Account Locks
IAM Event - Multiple Password Reset
IAM Event - User Location - Outside approved location
Policy Event - Admin Access Granted
Policy Event - Security Policy Change
IAM Event - Conditional Access Violation
IAM Event - Multi-Factor Authentication Disabled
System Compliance Event - Confirmed Phishing
System Compliance Event - Domain Email Restriction
System Compliance Event - Email Flow Delay
System Compliance Event - Email Forwarding
System Compliance Event - Email Sending Restriction
System Compliance Event - Exchange Admin
System Compliance Event - Exchange Forwarding
System Compliance Event - Forms Phishing Risk
System Compliance Event - Sensitive Data Failure
System Compliance Event - User Restriction
System Compliance Event - User Restriction Email

## Thrive End User Support Platinum Scope of Service

**Service Definition**
Thrive End User Support Platinum is managed end user support, which is subscribed to on a per-user basis. The service will cover; one workstation, one mobile device and one tablet belonging to each end user entitled for support. Thrive support can be engaged directly by each user in accordance with Thrive support contact methods and response will be determined based on impact and urgency in accordance with Thrive's service level agreement (SLA's).
The service shall include:

- Incident triage remote support for one workstation, mobile device or tablet assigned to each entitled user.

- Remote request fulfillment for one workstation, mobile device or tablet assigned to each entitled user.

**Thrive Scope of Work and Deliverables**

- Thrive shall assist each end user entitled with service as it relates to incident triage and vendor escalation for device hardware or Windows software related support.

April 28, 2023
Service Order: CON-025187
Q-15633 USD

- Thrive shall assist each end user entitled with service as it relates to single user impacting request fulfillment in relation to the covered device(s) specified in the service description.

- Thrive shall license and install a Remote Monitoring and Management (RMM) software agent on all entitled Windows OS devices.

- If a hardware or Windows software component is to fail or display degraded performance, Thrive shall assist in triage and vendor support to remediate.

- Thrive will assist in fulfillment of a single user impacting request on the entitled user workstation (i.e., MS Office installation, adding network printer, etc.).

**Client Responsibilities**

- Client must maintain active vendor support agreement on any managed workstation, tablet or mobile device.

- Client shall provide Thrive proper access to IT environment to install required software agent. Client shall assist Thrive with deployment of software agent to all operating systems as required

- Client shall provide administrative access to operating systems for proper support and management. Thrive also requires a domain administrator account be made available for proper support and management.

- All managed client devices must:

- Belong/be joined to an enterprise level global management solution and managed via Active Directory Domain or Azure Active Directory with Microsoft 365 Intune.

- Have access to the Internet for proper remote management of any covered devices.

- Qualify as a commercial grade device. For purposes of defining commercial grade, the device is not marketed by the manufacturer for home or personal use.

- Have enterprise level operating system installed. i.e., no "home" or consumer OS version

- Be within manufacturer warranty with active vendor support.

- Client shall communicate to Thrive via a service request of any adds and removals of users and/or systems in the scope of the service and is responsible for maintenance of active user/device lists which will be held in Thrive's CMDB (configuration management database).

- Client is responsible for licensing and maintaining active vendor support as well as day to day management of 3rd party applications.

**Service Limitations**

- The Windows Operating System version must be within the manufacturer's active lifecycle.

- Third party vendor triage may be initially reviewed as best effort support. For vendor level support, client must maintain active vendor support and subscribe to Thrive SaaS management services. Thrive vendor level support would then be limited to vendor availability and response.

- Any request for change impacting multiple users or identified as requiring 8 or more total hours of time to complete may be handled as a professional services formal project to ensure proper communication, handling, risk mitigation, etc.

- Any discrepancy between the quantities indicated on the signed sales order and the network management tool will result in a billing adjustment to remediate the discrepancy.

- Thrive shall provide onsite dispatch for physical hands-on troubleshooting as part of escalation support once deemed necessary by Thrive. Thrive may dispatch a contracted resource based on requirements such as location, technical skillset, timing, etc.

April 28, 2023
Service Order: CON-025187
Q-15633 USD

- All new user onboarding/offboarding requests (setup of domain or equivalent user account, email, addition to existing security/distribution groups or application must be submitted through Thrive Client Portal and will be subject to a one-time provisioning fee per request.

**Service Exclusions**

- Any service not explicitly defined in the End User Support service definition above is considered out of scope and may be provided under separate agreement for an additional fee.

- Windows workstation system builds, setup and configuration are not included and would be covered under a Thrive imaging program.

- Windows drivers and BIOS updates are not included in the service.

- Network or system (hardware) support of any kind that is not within the corporate managed or hosted environment (i.e. home or mobile triage).

- Windows Operating System upgrades (i.e., Windows 7-10) are not included in the service.

- Operating System/Third-Party application patching, antivirus and antispyware software as well as email filtering are not included in Thrive User support although, can be provided by Thrive with the appropriate service offering for an additional fee.

**Service Level Agreement (SLA)**

Thrive commits to meeting the following service level agreement as defined below unless otherwise stated in signed Thrive service contract.

| Classification of Issues | Description | Severity | Acknowledge Time | MTTR | Preferred Submission Method |
|---|---|---|---|---|---|
| **Incident - High** (Single User) | Incident which impacts one user or computer within a single customer and has an impact on overall user function. | High | Automated acknowledgement upon record generation | 1 Hour | Portal/Chat/Phone |
| **Incident - Low** (Single User) | Incident which impacts one user or computer within a single customer and does not have an impact on overall user function. | Low | Automated acknowledgement upon record generation | 4 Hours | Portal/Chat |
| **Request** (Single User) | Request for move add or change related to a single user or device entitled for managed support. | Normal | Automated acknowledgement upon record generation | 24 Hours | Portal |

- Acknowledgement: Client to receive autogenerated e-mail to confirm the case was created with case number assigned and the assigned priority for an engineer to respond based on contracted service level target listed in this service scope.

- Response: Client to receive direct contact from Thrive aligned with priority level based on contracted service level agreement.

- MTTR (Mean Time to Respond): A target metric measured monthly as the average time between case generation and response as defined above.

**Client SLA Requirements**

- Client must inform of any incident or impacting events via Thrive Client Portal, chat or phone to ensure proper impact and urgency are defined for proper priority assignment.

- Client must provide appropriate maintenance windows for any moves, adds or changes to be performed.

- Client devices must be powered on and available during scheduled time of service.

- Client must allow Thrive to troubleshoot if managed device is problematic.



April 28, 2023
Service Order: CON-025187
Q-15633 USD

- Managed hardware must be under active vendor support contract for appropriate vendor level engagement if necessary.

- Operating System must be within vendor support lifecycle.

## Thrive Essentials Workstation Patching Scope of Service

### Thrive Essentials Workstation Patching Service Definition

Thrive Essentials Workstation Patching Service provides automated software updates on workstations running supported versions of Microsoft Windows and Apple MacOS operating systems. The service is designed to reduce software vulnerabilities through regularly scheduled security and critical patches to meet security and compliance requirements.

The service shall include:

- Installation of Critical and Security Microsoft Windows software updates via automated patching procedures

- Installation of Apple MacOS software updates via automated patching procedures

- Immediate deployment of patches once released by the Operating System vendor and approved for install by Thrive

- Prompts to end users requesting approval to reboot patched workstations

- Automated remediation of failed patch installations via patch re-deployments

- Manual remediation of customer identified failed patches limited to the following efforts:

  o Scheduled Workstation Reboot

  o Manual Patch Installation

- Annual Windows 10/11 Feature Update upon Client request limited to no more than two deployment phases: testing and full deployment

- Standard OS Patching reports available through the Thrive Client Portal

  o Installed patches by device

  o Failed patches by device

  o Missing patches by device

  o Summary Patch Health Score

- **OPTIONAL 3rd Party Application Patching * Requires Thrive 3rd Party Application Patching Service**

  o Deployment of supported 3rd party application patches to Windows OS workstations and servers.

### Thrive Scope of Work and Deliverables

- Thrive shall license and install a Remote Monitoring and Management (RMM) software agent on all contracted devices. Any discrepancy between the quantities indicated on the attached Sales Order and the network management tool will result in a billing adjustment to remediate the discrepancy.

- Thrive shall perform automated Operating System updates and approved applications (if subscribed to Thrive 3rd Party Patching service) for all contracted workstations.

- Thrive shall provide Client with access to the Thrive Client Portal to view patch status reports.

### Client Responsibilities

- Client shall provide Thrive with sufficient access to IT environment to install required software agent. Client shall assist Thrive with deployment of software agent to all operating systems as required

April 28, 2023
Service Order: CON-025187
Q-15633 USD

- Client is responsible for rebooting patched workstations when prompted to do so. Failure to respond to reboot prompts can prevent the successful installation of current and future patches

- Client workstations shall be up to date on all OS updates. If the client is more than two months behind at time of onboarding to Thrive management an additional scope of work will be quoted (not part of the service) for a one-time service to bring all devices to current OS Patching levels before regular monthly patching can be scheduled.

- Client shall be responsible for ensuring ongoing network connectivity between agent and Thrive Management Server. Agents must be able to communicate outbound to Thrive datacenters on TCP/UDP port 5721, TCP port 443, and TCP/UDP port 3478 and to all Microsoft Windows Update servers.

- Client shall provide administrative access to operating systems for automated patch installation and patch remediation. Thrive requires a domain administrator account be made available for patch deployment.

- All client devices must have access to the Internet to download OS Updates from Microsoft servers

- Client shall make available a time window for lightweight patch scanning.

- Client shall communicate to Thrive via a service request of any adds and removals of systems in the scope of the patching service.

- Client shall be responsible for requesting non-automated remediation of failed patches

- Client is responsible for the licensing and day to day management of 3rd party applications (if subscribed to Thrive 3rd Party Patching service).

- Client is responsible to request and schedule annual Windows 10/11 Feature Updates and is to be limited to no more than two deployment phases: testing and full deployment

**Service Limitations**

- The Operating System version must be within the manufacturer's active lifecycle.

- If a Client has Active Directory Group Policies which control Windows Updates, Thrive will need to review the policies prior to any OS patching as it could conflict with a particular module in our Patching Tool

- This service includes patching for out of cycle critical patches. Thrive will work with the Client as these updates are released to apply on a mutually agreed upon window.

- If subscribed to the optional Thrive 3rd Party Patching Service, patching of third-party applications is limited by the software publishers as to what applications can be patched. If the software publisher removes support for automated patching or requires additional vendor specific licensing, the completion of those deployments will not be included in this service.

**Service Exclusions.** Any service not explicitly included in the Thrive Essentials Workstation Patching Service Definition above is considered optional and may be provided under separate agreement for an additional fee or may be covered under other Thrive managed services.

- Operating System Upgrades (i.e., Windows 7 to Windows 10) are not included in the patching service

- Windows drivers and BIOS updates are not included in the patching service

## Thrive Managed Infrastructure Scope of Service

**Service Definition**

Thrive shall provide 7x24x365 monitoring, management and support for all devices and systems specified in this Service Order provided the device or system meet the Minimum Hardware, Operating System, and Software Standards defined below.
The service shall include:

- 7x24x365 monitoring of all subscribed devices



- Remote troubleshooting and remediation upon monitoring alert or Client reported issue

- Administration of changes and modifications to device configurations

**Minimum Hardware, Software and Operating System Standards**

- All devices must be a business or enterprise grade platform. These are defined as devices that are full featured, high quality, and not generally used by home consumers.

- All network devices, appliances, servers, storage arrays, hypervisors, software, and operating systems must be in the OEM's (Original Equipment Manufacturer) active product support lifecycle during the term of the contract.

- Client must maintain OEM or approved 3rd party support for all devices and software under management during the term of the contract.

- Any device or software not under an active OEM or 3rd party support contract will be supported on a 'best effort' basis.

- Support and management of virtualization hypervisor software is limited to VMware vSphere and Microsoft Hyper-V platforms.

- Thrive reserves the right to exclude monitoring, managing, or supporting any network device, server, storage array, hypervisor, software or operating system, or any other platform that does not meet the minimum requirements above and will recommend appropriate replacements. Thrive can provide recommended replacements for an additional monthly fee.

- For devices or software under contract for Managed Services that are noticed by the OEM as End of Support during the contract term:

- Client acknowledges and agrees that hardware and software utilized beyond the OEM lifecycle period poses a security risk and holds Thrive harmless for any security issues that arise from use of any such device or software that is no longer supported by the OEM.

**Thrive Scope of Work and Deliverables**

- Thrive shall monitor all devices listed in the Covered Equipment List above to identify potential performance or service impacting issues. In the event an issue is identified, Thrive Operations will be notified by the monitoring system to initiate remote diagnosis and troubleshooting the issue.

- Thrive shall administer all configuration changes and modifications to the devices and systems upon Client request. Firmware and/or Operating System upgrades or patches for Client owned non-Windows devices in the Covered Equipment List is not included as part of the monthly Managed Infrastructure service. Thrive can provide this service as a separate Project for an additional one-time fee per upgrade cycle.

- Thrive shall provide onsite dispatch for physical hands-on troubleshooting as part of escalation support once deemed necessary by Thrive. Thrive may dispatch a contracted resource based on requirements such as location, technical skillset, timing, etc.

**Client Responsibilities**

- Provide Thrive with Administrator level access to all devices and systems under management.

- Contract for and maintain support for all applicable devices and systems for the term of the agreement.

- Thrive may require Client to execute a letter of authorization in which Client authorizes Thrive to contact applicable vendors to request services from such vendors or to make inquiries. Client's failure to provide Thrive with a letter of authorization in a timely manner may result in the delay in the provisioning of vendor management services hereunder.

- Provide Thrive with scheduled and emergency maintenance windows as needed to install critical updates and patches.

- All Client provided software must be genuine and properly licensed. Client is solely responsible for ensuring all Client provided software licensing is compliant.

- Client shall subscribe to either Thrive Enterprise or Enterprise Plus Server Patching service for all Windows servers under Thrive management



April 28, 2023
Service Order: CON-025187
Q-15633 USD

- Client shall subscribe to either Thrive standard Managed AntiVirus or advanced Endpoint Protection and Response service for all servers under Thrive Management

**Service Level Agreement (SLA)**
Thrive commits to meeting the following service level agreements as defined below unless otherwise stated in signed Thrive service contract.

| Classification of Issues | Description | Severity | Priority | Acknowledge Time | Response Time |
|---|---|---|---|---|---|
| Major Incident | Business impacting event effecting multiple clients or entire customer where service(s) or system(s) are down causing significant impact. | 1 Emergency | P1 | Automated Acknowledgement upon record generation | 15 minutes |
| Critical Incident | Issue which impacts multiple users or departments within a single customer or single user down thus degrading overall business function. | 2 Critical | P2 | Automated Acknowledgement upon record generation | 30 minutes |
| Urgent Incident | Issue which impacts one user or computer within a single customer and has impact to overall user function. | 3 Urgent | P3 | Automated Acknowledgement upon record generation | 60 minutes |
| Normal Incident | Issue which impacts one user or computer within a single customer and does not have impact to overall user function. | 4 Normal | P4 | Automated Acknowledgement upon record generation | 4 Hours |
| Request | Client request to move, add or change service which would impact department(s), user(s), service(s) or system(s). | 5 Low | P5 | Automated Acknowledgement upon record generation | 24 hours |

**Acknowledgement:** Client to receive autogenerated e-mail to confirm the case was created with case number assigned and the time estimated for an engineer to respond based on contracted service level agreement.
**Response:** Client to receive direct contact by phone / email aligned with priority level based on contracted service level agreement.
*Major Incident: This priority can only be initiated via a phone call and carries a 15-minute response from the time the call is received by a technical resource. Portal, emails and voicemails are not accepted in this priority until the content of the request is received and acknowledged.*

**Client SLA Requirements**

- Client must inform of any incident or impacting events via phone or Thrive Client Portal to ensure proper impact and urgency are defined for proper priority assignment.

- Client must provide appropriate maintenance windows for any moves, adds or changes to be performed.

- Client devices must be powered on and available during scheduled time of service.

- Client must allow Thrive to troubleshoot if managed device is problematic.

- Managed devices must be under active vendor support contract for appropriate vendor level engagement if necessary.

- All devices and systems must be within vendor support lifecycle.



**Service Exclusions.** Any service not explicitly included in the Managed Infrastructure Service Definition or Thrive Scope of Work and Deliverables sections above is considered optional and may be provided under separate agreement for an additional fee.

## Thrive Anti-Phishing and Security Awareness Training Scope of Service

### Service Description

Thrive Anti-Phishing and Security Awareness Training service provides ongoing security testing and training for your users to increase awareness of risks associated with phishing, spear phishing, malware, ransomware and social engineering attacks with targeted user campaigns and responsive training aimed at improving awareness of and avoiding security threats. Improving user awareness of these threats reduces risk of human error resulting in security breaches and ransomware.

### Service Definition
The service shall include:

- Fully managed monthly email phishing campaigns

- Quarterly user security training campaigns

- Authentic simulated email phishing template library

- Comprehensive library of remedial training content

- Client dashboard for visibility into campaign details and user scores

- Custom email templates and training library available

- Automated user sync with Microsoft 365 tenant

- Executive Summary reporting via Client dashboard

### Thrive Scope of Work & Deliverables

- Thrive shall create a Client tenant within the Thrive Anti-Phishing and Security Awareness Training platform.

- Thrive shall import all users into the Thrive Anti-Phishing and Security Awareness Training platform via automated sync with Microsoft 365.

- Thrive shall send an initial email welcoming the end users to the platform and a link to the training.

- Thrive shall create and conduct monthly phishing tests to all subscribed end users after the initial phishing training completion.

- Thrive shall consult with the Client contact on a quarterly basis to setup new trainings. Training schedules can be modified as needed.

- Thrive shall send weekly email reminder notifications to end users that have not completed training.

### Client Responsibilities

- Client shall provide the Thrive security team with admin credentials to the Client Microsoft 365 tenant or a Microsoft Excel.csv file with use names and email addresses of those participating in the Anti-Phishing and Security Awareness Training program.

- Client shall provide Thrive with a list of any Microsoft 365 users that should be excluded from the service.

- Clients that are running Microsoft Exchange shall notify Thrive when new users need to be added to the Anti-Phishing and Security Awareness Training Platform.

- Client shall be responsible for user training program compliance.

- Client shall provide Thrive with a primary point of contact for the Anti-Phishing and Security Awareness Training service.

**Service Exclusions.** Any service not explicitly included in the Anti-Phishing and Security Awareness Training Definition above is considered optional and may be provided under separate agreement for an additional fee.



April 28, 2023
Service Order: CON-025187
Q-15633 USD

## Thrive Managed Internet Service Provider Scope of Service

**Thrive Managed Internet Service Provider (ISP) Service Definition**
Thrive Managed Internet Service Provider (ISP) service provides monitoring and vendor management for Client provided Internet bandwidth services.
The service shall include:

- 24x7x365 monitoring of Client provided Internet service for up/down status

- Initial triage of monitoring alerts by Thrive Network Operations Center

- Creation and escalation of trouble ticket with ISP vendor for service outages

- Verification of service restoral and vendor resolution

**Thrive Scope of Work and Deliverables**

- Thrive shall monitor all contracted Client provided ISP services. The Thrive monitoring system will detect ISP outages and create an alert in Thrive's service automation and ticketing platform.

- Thrive shall troubleshoot alerted events to isolate and attempt to resolve any internet connectivity issues within Thrive's direct control

- Thrive shall contact ISP vendor support and open a trouble ticket with the service provider for events related to the Client provided ISP service

- Thrive shall escalate trouble tickets/service issues with the ISP as required

- If requested, Thrive can create a response protocol to notify the Client of ISP service outages.

- Thrive shall verify service restoral after ISP resolution of service outage

**Client Responsibilities**

- Provide Thrive with accurate ISP vendor listing and associated vendor support contact information

- Thrive may require Client to execute a letter of authorization in which Client authorizes Thrive to contact applicable vendors to request services from such vendors or to make inquiries. Client's failure to provide Thrive with a letter of authorization in a timely manner may result in the delay in the provisioning of vendor management services hereunder.

**Service Exclusions.** Any service not explicitly included in the Managed ISP Service Definition or Thrive Scope of Work and Deliverables sections above is considered optional and may be provided under a separate agreement for an additional fee.

## Thrive Secure DNS Gateway Scope of Service

**Service Description**
Thrive Secure DNS Gateway provides the first line of defense against threats on the Internet. Utilizing the Cisco Umbrella platform, the service delivers visibility into Internet activity across corporate network locations and blocks threats before they ever reach end points. As a cloud-delivered, open platform, Umbrella integrates easily with existing security infrastructure and delivers live threat intelligence about current and emerging threats. By analyzing and learning from Internet activity patterns, Umbrella automatically uncovers attacker infrastructure staged for attacks, and proactively blocks requests to malicious destinations before a connection is even established — without adding any latency for users. With Umbrella, phishing and malware infections can be stopped earlier, infected devices identified faster, and data exfiltration prevented.

**Service Definition**
The service shall include:

- Cisco Umbrella roaming agents for all subscribed users

- Configuration of roaming agent DNS to direct end users to Cisco Umbrella for name resolution



- Blocking of malicious content

- Standard security policy

- 1 category-based web content filtering policy upon request

**Thrive Scope of Work & Deliverables**

- Thrive shall create a Client tenant within the Thrive Secure DNS Gateway platform.

- Thrive shall deploy the Cisco Umbrella roaming agent to end user devices. Clients that are not subscribed to Thrive End User Support will be responsible to deploy the agent using their own Remote Monitoring and Management (RMM) platform.

- Thrive shall apply a standard security policy for protection against the following:

  o Malware

  o Command and Control Callbacks

  o Phishing Attacks

  o Cryptomining

- Thrive shall, upon Client request, enable 1 category-based web content filtering policy to be applied unconditionally to all end user devices with the Cisco Umbrella roaming agent.

**Client Responsibilities**

- Client shall provide Thrive with a list of all subscribed users.

- Client shall notify Thrive of any new users or users that should be removed from the service.

- [OPTIONAL]If client chooses to deploy category-based web content filtering the client shall be responsible for the following:

  o Provide Thrive one list of categories to be blocked within a single web content filtering policy; Cisco Umbrella web content filtering categories and their descriptions are available at https://talosintelligence.com/categories

  o Distribution of Cisco Umbrella's Root Certificate to all end user devices with the Cisco Umbrella roaming agent

- Client shall provide Thrive with a primary point of contact for the Secure DNS Gateway service.

**Service Exclusions.** Any service not explicitly included in the Secure DNS Gateway Scope of Service above is considered optional and may be provided under separate agreement for an additional fee.

# NationalBoatOwners_Recontract_CON025187

Final Audit Report                                                2023-05-03

| | |
|---|---|
| Created: | 2023-05-02 |
| By: | Johnathon Frey (jfrey@thrivenetworks.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4JU5UXok2xntjdrmQL5vNSOp9yGWmoTN |

## "NationalBoatOwners_Recontract_CON025187" History

Document digitally presigned by Conga
2023-04-28 - 8:37:47 PM GMT

Document created by Johnathon Frey (jfrey@thrivenetworks.com)
2023-05-02 - 10:17:10 PM GMT

Document emailed to Leonard Q. Slap (lslap@thrivenetworks.com) for signature
2023-05-02 - 10:17:33 PM GMT

Email viewed by Leonard Q. Slap (lslap@thrivenetworks.com)
2023-05-03 - 1:16:14 PM GMT

Document e-signed by Leonard Q. Slap (lslap@thrivenetworks.com)
Signature Date: 2023-05-03 - 1:19:40 PM GMT - Time Source: server

Agreement completed.
2023-05-03 - 1:19:40 PM GMT

Adobe Acrobat Sign

# EXHIBIT 5



April 17, 2024
Service Order: CON-048875
Q-31821 USD

| Prepared For | Ship To | Bill To |
|---|---|---|
| National Boat Owners Association | National Boat Owners Association | National Boat Owners Association |
| Patrick Farrell | Patrick Farrell | Patrick Farrell |
| 4404 N Tamiami Trail | 4404 N Tamiami Trail | 4404 N Tamiami Trail |
| Sarasota, Florida 34234-3864 | Sarasota, Florida 34234-3864 | Sarasota, Florida 34234-3864 |
| United States | United States | United States |

### Service Order

National Boat Owners Association has requested changes to the original Service Order ("the Service Order") signed on 4/28/2023 (CON-025187). Additional resources and associated costs are outlined herein and these changes shall run coterminous with the original Service Order:

# Services Breakdown

## One-Time Services

### Project Services

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 1 | TIFF0010 | **Premium Implementation Services (Fixed Fee)** <br> Provisioning and implementation of the Thrive services defined in the Recurring Services section of this Service Order. Fixed fee. | $ 2,200.00 | $ 2,200.00 |
| 1 | TIFF0011 | **Premium Migration Services (Fixed Fee)** <br> Fixed fee. | $ 5,000.00 | $ 5,000.00 |
| | | | **TOTAL** | **$7,200.00** |

# Project Overview

Client needs to replace existing on-prem server infrastructure and has decided to migrate to Microsoft Azure. Microsoft Azure resources to be acquired under clients existing tenant and billed directly to the client.

# Project Goals

Client needs to replace existing on-prem server infrastructure and has decided to migrate to Microsoft Azure. Microsoft Azure resources to be acquired under clients existing tenant and billed directly to the client.

# Project Impact

Downtime is to be expected during cutover but will be minimized to the full extent possible.



April 17, 2024
Service Order: CON-048875
Q-31821 USD

# Project Considerations

**Project Assumptions**
- Fixed-fee SOW
- Work outside of this scope will require a change order
- Vendor support will be required for LOB apps
- Vendor support required for Web server migration and go live



April 17, 2024
Service Order: CON-048875
Q-31821 USD

# Project Plan

| machine id | cpu count | ram size | Disk1 GB | Disk2 GB | Disk3 GB |
|---|---|---|---|---|---|
| websrv | 2 | 4096 | 100 | 1000 | |
| dc1 | 8 | 16384 | 160 | 1000 | 1000 |

**Phase 1.0 - Project Management**
Task 1.0 - Project Management
 - Project kick-off with the customer
 - Create a project schedule
 - Post-implementation review
Task 2.0 - Target State Documentation
 - Create Target State Network Diagram
 - Pre-Populate ServiceNow
 - Engineer discovery
 - Review scope and create project plan

**Phase 2.0 - Hosted Azure - Deploy Hosted Servers**
Task 1.0 - Deploy tenant resources, configure security features and network connectivity
 - Configure Fortigate VDOM
 - Configure & Verify Internet Connectivity
 - Configure all Security Services (Gateway AV, IPS/IDS)
 - Create VPN Tunnel from client site to Azure Fortigate and Test connectivity
 - Configure SSL VPN with MFA (SSL Certificate required from client)
Task 2.0 - Deploy two (2) Servers to Azure
 - Create Windows 2022 VM's based on table above
 - Fully Patch and Join Domain
 - Add Thrive tools
Task 3.0 - Configure Domain Controller
 - Run DCPROMO
 - Configure DNS
 - Configure new AD site within the Domain
 - Configure Azure AD Connect
 - Confirm replication is healthy between DC and Azure AD
 - Migrate FSMO Roles
Task 4.0 - Configure Webserver
 - Discovery on existing web server
 - Deploy roles and services based on discovery
Task 5.0 -Azure Managed Backup Configuration
 - Configure Backups for VMs


**Phase 3.0 - Server Migration (Staging)**
Task 1.0 - DC1 Migration
 - Migrate roles and services
 - Migrate files
 - Migrate Legacy TAM application
Task 2.0 - Webserver Migration
 - Work with vendor support to plan web service migration
 - Migrate data and website(s) to new server
 - Test access to web sites in staging mode

**Phase 4.0 - Cutover to Azure**
Task 1.0 - Planning
 - Create cutover and rollback plan
Task 2.0 - Final data migration
 - Run final data migration to copy the latest data
Task 3.0 - Cutover DC



April 17, 2024
Service Order: CON-048875
Q-31821 USD

  - Change primary DNS on firewall to point to new DC (modify DHCP scope options if needed)
  - Turn off existing DC on prem
  - Test and verify logon and file/server access
Task 4.0 - Web cutover
 => Engage vendor support where needed
  - Verify internal DNS points to new servers
  - Power down old servers on prem
  - Test web (vendor support may be needed for testing)

**Phase 5.0 - Go Live**
Task 1.0 - Go Live support
  - Work with client to remediate any issues on day 1 (4hrs)

**Phase 6.0 - Cleanup**
Task 1.0 - Decom retired servers
  - Wait 1 week before deleting old servers
  - Remove VM's from domain
  - Remove Thrive tools if needed
  - Remove from monitoring
  - Power down old VM's and Host on prem

## Recurring Monthly Services

### Hosted Servers - Azure

| Qty | SKU # | Long Description | Price | Extended Price |
|-----|-------|-----------------|-------|----------------|
| 1 | MSAZ001VDC | **Managed Azure Virtual Datacenter (per region)** | **$ 522.00** | **$ 522.00** |
| 1 | MSAZ004F2V | **Managed FortiGate Firewall (2 vCPU) with IPS in Azure - Single Firewall** Azure virtual machine resources not included (2vCPU, 4GB RAM, 100GB disk VM's required per firewall billed to monthly Azure subscription). | **$ 647.00** | **$ 647.00** |
| 1 | MFS0001W | **Managed Firewall Web Filtering Service** | **$ 42.00** | **$ 42.00** |
| 1 | MFS0001AV | **Managed Firewall Protection Service (Antivirus/Anti-Spyware)** | **$ 37.00** | **$ 37.00** |
| 1 | MFS0001T | **Managed IPSEC Site to Site VPN Tunnel Service** | **$ 21.00** | **$ 21.00** |
| 1 | MFS0001RAV | **Managed Remote Access VPN Service (100 users)** | **$ 105.00** | **$ 105.00** |
| 2 | MSAZ002 | **Managed Azure Windows Server** | **$ 183.00** | **$ 366.00** |
| 2 | MSAZ003 | **Managed Azure Backup (per resource)** | **$ 42.00** | **$ 84.00** |



April 17, 2024
Service Order: CON-048875
Q-31821 USD

| | | | | |
|---|---|---|---|---|
| 2 | EPP020B | **Managed Enterprise Endpoint Security and Response - Complete (per server)** | $ 13.00 | $ 26.00 |
| 2 | SM010 | **Managed Server Patching Enterprise** | $ 20.00 | $ 40.00 |
| | | | **TOTAL** | **$1,890.00** |

## Recurring Monthly Services

### Service Removals

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| -3 | SM010 | **Managed Server Patching Enterprise** | $ 19.00 | -$ 57.00 |
| -1 | STPVBDRS3B3000U | **PowerView BDR Model S3B 3000 - Sarasota** | $ 726.00 | -$ 726.00 |
| -1 | VSM011 | **Off-Platform, Supported, Client-Owned Host with Virtual Server** | $ 504.00 | -$ 504.00 |
| -2 | VSM012 | **Off-Platform, Supported, Client-Owned Virtual Server** | $ 189.00 | -$ 378.00 |
| -3 | EPP020B | **Managed Enterprise Endpoint Security and Response - Complete (per server)** | $ 12.00 | -$ 36.00 |
| | | | **TOTAL** | **($1,701.00)** |

## Recurring Monthly Services

### Recurring Discount

| Qty | SKU # | Long Description | Price | Extended Price |
|---|---|---|---|---|
| 1 | TCD0001 | **Sales Managed Services Recurring Discount** | -$ 250.00 | -$ 250.00 |
| | | | **TOTAL** | **($250.00)** |



April 17, 2024
Service Order: CON-048875
Q-31821 USD

## Services Summary Breakdown

### One Time Services

| Service Description | Ext Price |
|---|---|
| Project Services | $ 7,200.00 |
| **One-Time Services Total:** | **$ 7,200.00** |

### Recurring Monthly Services

| Service Description | Ext Price |
|---|---|
| Hosted Servers - Azure | $ 1,890.00 |
| Service Removals | -$ 1,701.00 |
| Recurring Discount | -$ 250.00 |
| **Recurring Monthly Services Total:** | **-$ 61.00** |



**Service Order Addendum**

I have read and understand that all assumptions, provisions, terms and conditions as stated on the original Service Order (CON-025187) shall apply to this Change Order. These additions will be coterminous with the original agreement signed on 4/28/2023. Thrive will invoice Client for one-half (50%) of the price set forth herein for the One-Time Service(s) when Thrive initiates providing such One-Time Service(s) and will invoice the remaining balance upon completion thereof; provided, however, in the case of those One-Time Service(s) the price for which is less than $2,500, Thrive will invoice Client for the entirety of such price when Thrive initiates providing such One-Time Service(s).

I agree to have Thrive Operations LLC provide the services. I understand that all additions and deletions to this list must be done in writing prior to work being performed.

IN WITNESS WHEREOF, the parties have caused this Service Order to be executed by their duly authorized representatives as of the date hereof.

| **CLIENT: National Boat Owners Association** | | **Thrive Operations LLC** | |
|---|---|---|---|
| By: | *Patrick Farrell* | By: | |
| Name: | Patrick Farrell | Name: | Leonard Q. Slap |
| Title | VP | Title: | Executive Vice President |
| Date | 4/17/2024 | Date: | Apr 18, 2024 |
| Customer PO | | | |

April 17, 2024
Service Order: CON-048875
Q-31821 USD

## Project Assumptions

- Client agrees to designate a project point of contact that will be available throughout the implementation of the solution to communicate plans to the business, approve requests, review change orders, and commit to recurring meetings.

- Client agrees to provide or act as a proxy to obtain and provide all credentials required to onboard contracted Thrive products or services

- All work requested outside of the stated project scope will be assessed as a change order and may result in additional fees. Change orders will require approval before execution by the project engineering team.

- Documentation provided to the client as part of the project scope will be produced to Thrive standards; customization of documentation content, presentation, or scope will be considered a change order and may result in additional fees or expansion of the project timeline.

- Issues arising from tasks executed within the project scope may affect completion and timelines.

- Client agrees that procurement, fulfillment, and construction logistical issues or delays can impact project delivery dates and will result in modification of the project timeline.

- To improve the end user experience, client is responsible for understanding end-user personas and must work with Thrive's project and engineering teams to develop testing scenarios to assess the impact of all implemented solutions.

- Thrive will make best efforts to mitigate unscheduled downtime; client understands that unexpected interruptions including error messages, unexpected application behavior, performance impacts, and other undocumented issues may occur as a result of completion of the project scope

- Thrive is not responsible for providing physical connectivity of installed infrastructure if that connectivity is dependent upon the extension or addition of low voltage wiring between areas such as offices, closets, rooms, floors, cubicles, cabinets, etc. Client will be responsible for mounting wireless access points in designated locations and providing required physical connectivity, including all required low voltage wiring and power needs. Additionally, Thrive will not climb ladders

- Necessary onsite power and backup power will be provided by client

## Thrive EBMS Managed FortiGate Firewall Scope of Service

**Service Definition**

Thrive EBMS Managed FortiGate Firewall Service provides fully managed edge security utilizing the Fortinet FortiGate Unified Threat Management platform. The service includes the physical or virtual FortiGate firewall with full monitoring and management of the firewall configuration, policies and rules.

The service shall include:

- Fortinet FortiGate firewall device(s) as indicated in the Thrive Service Order including subscriptions for optional services below where applicable

- Stateful packet filtering

- Network Address and Port Address Translation

- 10 configuration changes per month per device

- 1 DMZ

- 3 VLAN's

- FortiOS firmware updates

April 17, 2024
Service Order: CON-048875
Q-31821 USD

- Regularly scheduled review of firewall firmware and base configuration to confirm compliance with Thrive standards

- OPTIONAL add-on services

  o Intrusion Prevention Service

  o Web Filtering

  o Gateway Anti-Virus/Anti-Spyware

  o Managed Firewall High Availability Service

  o VPN Service

    ▪ FortiClient VPN Connectivity Only

    ▪ Split-tunnel VPN Routing Policy with networks local to FortiGate Firewall to be included by default within VPN policy

    ▪ VPN connectivity to multiple sites supported if there is established connectivity between those sites and the site hosting the Thrive Managed FortiGate

    ▪ SSLVPN Portal configured with default self-signed SSL certificate or Let's Encrypt SSL certificate unless certificate provided by customer

    ▪ FortiGate will be configured to assign IP addresses to VPN clients

    ▪ SSO and MFA (multi-factor authentication) requires Azure Active Directory integration with appropriate Azure licensing; other identity providers may require a separate change order at additional cost

**Thrive Scope of Work & Deliverables**

- Thrive shall configure the Managed Firewall in accordance with Client's defined requirements. Upon activation of the Managed Firewall Service, Client is responsible for confirming that the configured firewall is in accordance with Client's preferences and all appropriate and potentially impacted services are functioning as expected.

- Upon completion of installation and upon Client request, Thrive will administer all changes and modifications to the firewall rule sets and configurations. Basic configuration changes include such actions as:

  o Firewall rule set modification

  o Device firmware upgrades, configuration backup and recovery as needed

  o Problem, Incident, and Change Management

- Thrive shall perform a regularly scheduled review to confirm firewall is in accordance with Thrive's documented firmware and base configuration standards

- Thrive shall be responsible for the ongoing hardware and firmware maintenance of the firewall service.

- OPTIONAL Firewall Web Filtering Service Add-on

  o If included in the Thrive Service Order, Thrive shall provide client documented Thrive standards for Web Filtering configuration. An additional one-time cost may be incurred by client if customizations to Web Filtering configurations are required.

- OPTIONAL Firewall Protection Service (Antivirus/Anti-Spyware) Add-on

  o If included in the Thrive Service Order, Thrive shall configure firewall antivirus/anti-spyware policies according to Thrive standards and cybersecurity best practices. An additional one-time cost may be incurred by client if customizations to Antivirus/Anti-Spyware configurations are required.

- OPTIONAL Firewall Based Intrusion Prevention System Add-on

April 17, 2024
Service Order: CON-048875
Q-31821 USD

- THRIVE™

      o   If included in the Thrive Service Order, Thrive shall configure firewall Intrusion Prevention System policies according to Thrive standards and cybersecurity best practices. An additional one-time cost may be incurred by client if customizations to Intrusion Prevention System configurations are required.

- OPTIONAL Managed Firewall High Availability Service

      o   If included in the Thrive Service Order, Thrive shall configure firewall high availability settings in accordance with Thrive standards as a means to prevent disruptions related to firewall hardware failures. If redundancy for events beyond firewall hardware failures are required additional equipment and internet connectivity may be required.

- OPTIONAL VPN Service Add-on

      o   Thrive shall configure the FortiGate SSLVPN in accordance with specifications defined within the Service Definition. Customization may require a separate change order at additional cost

- Thrive is responsible for troubleshooting and resolving issues specifically related to the FortiGate SSLVPN configuration or its availability

**Client Responsibilities**

- Client shall provide Thrive with sufficient information and documentation necessary to properly setup, configure, install & manage the Managed Firewall Service. If Client is unable to provide information, Client may elect to have a Thrive engineer review any existing firewall configurations to gather required information for an additional fee.

- Client shall provide the Thrive Deployment Engineer with all LAN/WAN IP Schemes.

- Client shall provide Client escalation contacts to Thrive for service event notification.

- Client shall provide the appropriate space, power, and cooling for the firewall as specified by the equipment manufacturer.

- Client shall allow Thrive to install firmware upgrades, critical updates and patches based on the Thrive provided maintenance window or provide Thrive with scheduled and emergency maintenance windows as needed to install firmware upgrades, critical updates and patches.

- OPTIONAL Managed Firewall High Availability Service

      o   Client is responsible for procuring any required additional network infrastructure and/or Internet connectivity to support full network redundancy

- OPTIONAL VPN Service Add-on

      o   Client is responsible for providing Thrive with a Fully Qualified Domain Name (FQDN) to be used as the SSLVPN portal address. If client is unable to provide a FQDN Thrive will configure SSLVPN portal address with a self-signed SSL certificate

      o   Client is responsible for requesting SSL certificate renewal requests within 30 days of the expiration of any SSL certificates not provided by Thrive

      o   Client shall be responsible for distribution and installation of the FortiClient VPN Only client to user endpoints unless endpoints managed by Thrive

      o   Client shall be responsible for configuring and managing 3rd party identity or authentication providers unless provider is managed by Thrive

      o   Client shall be responsible for troubleshooting and/or resolving issues related to 3rd party identity or authentication providers not managed by Thrive

      o   Client shall be responsible for troubleshooting and resolving network connectivity issues to destinations not supported by Thrive

**Service Limitations**



- Client acknowledges and agrees that the Managed Firewall Service constitutes only one component of an overall security program and is not a complete and comprehensive security solution.

- Firewall hardware and software platforms have vendor specified bandwidth throughput and connection limitations which are impacted by the security features selected for activation by the Client. Thrive will consult with the Client to select the appropriate firewall platform based on information provided during the initial consultation to review security requirements. Security services that are activated at the request of the Client after the initial consultation or firewall configuration that negatively impact the performance of the hardware and software are the responsibility of the Client. Thrive will work with the Client to select another firewall platform that may result in additional monthly fees.

- Service does not include the vendor management of the Internet Service Provider (ISP) or Wide Area Network (WAN) carrier.

**Equipment Return.** Upon termination or expiration of the Managed Firewall Service, Client shall return all hardware and software components of the firewall system provided by Thrive to Thrive at Client's expense. If Client fails to return all components of the firewall system to Thrive within 10 days after termination or expiration, Client will continue to be liable for and obligated to pay monthly recurring charges for the Managed Firewall Service.

**Service Exclusions.** Any service not explicitly included in the Thrive Service Order or EBMS Managed FortiGate Firewall Service Definition above is considered optional and may be provided under separate agreement for an additional fee.


## Managed Server Patching Enterprise Scope of Service

**Thrive Managed Server Patching Enterprise Service Definition**
Thrive Managed Server Patching Enterprise service provides automated software updates for servers running supported versions of Microsoft Windows operating systems. The service is designed to reduce software vulnerabilities through regularly scheduled security and critical patches to meet security and compliance requirements.

The service shall include:

- Installation of Critical and Security Microsoft Windows software updates via automated patching procedures

- If requested, fixed Server OS Patching schedules

- Immediate deployment of workstation OS patches once released by the Operating System vendor and approved for install by Thrive

- Optional quarterly meetings with Thrive to review OS patching success

- Automated remediation of failed patch installations via patch re-deployments

- Manual remediation of customer identified failed patches limited to the following efforts:

  o Scheduled Server Reboot

  o Manual Patch Installation

- Optional Alpha and Beta test groups patched before production servers.

- Patch Approval Change Control

- Standard OS Patching reports available through the Thrive Client Portal

  o Installed patches by device

  o Failed patches by device

  o Missing patches by device

- o  Summary Patch Health Score

- **OPTIONAL 3rd Party Application Patching *Requires Thrive 3rd Party Application Patching Service**

  - o  Deployment of supported 3rd party application patches to Windows OS servers.

**Thrive Scope of Work and Deliverables**

- Thrive shall license and install a Remote Monitoring and Management (RMM) software agent on all contracted devices. Any discrepancy between the quantities indicated on the attached Service Order and the network management tool will result in a billing adjustment to remediate the discrepancy.

- Thrive shall work with the Client to determine and configure the fixed patching schedule.

- Thrive shall perform automated Operating System patching and approved applications (if subscribed to Thrive 3rd Party Patching service) for all contracted servers.

- Thrive shall provide Client with access to to the Thrive Client Portal to view patch status reports.

**Client Responsibilities**

- Client shall provide Thrive with sufficient access to IT environment to install required software agent. Client shall assist Thrive with deployment of software agent to all operating systems as required

- Client servers shall be up to date on all OS updates. If the client is more than two months behind at time of onboarding to Thrive management an additional scope of work will be quoted (not part of the service) for a one-time service to bring all devices to current OS Patching levels before regular monthly patching can be scheduled.

- Client shall be responsible for ensuring ongoing network connectivity between agent and Thrive Management Server. Agents must be able to communicate outbound to Thrive datacenters on TCP/UDP port 5721, TCP port 443, and TCP/UDP port 3478 and to all Microsoft Windows Update servers.

- Client shall provide administrative access to operating systems for automated patch installation and patch remediation. Thrive requires a domain administrator account be made available for patch deployment.

- All client devices must have access to the Internet to download OS Updates from Microsoft servers

- Client shall make available a time window for lightweight patch scanning.

- Client shall communicate to Thrive via a service request of any adds and removals of systems in the scope of the patching service.

- If desired, client shall make available test groups and allow Thrive to complete testing procedures before patch deployment. Beyond security updates, software publishers may also introduce new features. New features and their impact will not be included as part of testing procedures.

- Client is responsible for the licensing and day to day management of 3rd party applications (if subscribed to Thrive 3rd Party Patching service).

**Service Limitations**

- The Operating System version must be within the manufacturer's active lifecycle.

- If a Client has Active Directory Group Policies which control Windows Updates, Thrive will need to review the policies prior to any OS patching as it could conflict with a particular module in our Patching Tool

- Thrive will attempt to remediate patches that failed to apply with a secondary Software Management Module. Manual patch remediation is the responsibility of the Client and is not included with the service unless the server is contracted for management with Thrive.

- This service includes patching for out of cycle critical patches. Thrive will work with the Client as these updates are released to apply on a mutually agreed upon window.



April 17, 2024
Service Order: CON-048875
Q-31821 USD

- SQL and Exchange Service Pack updates:

  o Thrive will deploy Exchange and SQL updates offered from Windows Update only. Thrive will not deploy Exchange and SQL updates not offered by Windows Update.

  o Hot fixes not offered from Windows Update are out of scope of the patching service are handled as a billable project.

  o Thrive will deploy service packs as part of automated patching windows but the oversight and remediation of these service packs will require an additional project plan or services.

- If subscribed to the optional Thrive 3rd Party Patching Service, patching of third-party applications is limited by the software publishers as to what applications can be patched. If the software publisher removes support for automated patching or requires additional vendor specific licensing, the completion of those deployment will not be included in this service.

**Service Exclusions.** Any service not explicitly included in the Managed Server Patching Enterprise Service Definition above is considered optional and may be provided under separate agreement for an additional fee.

- Operating System Upgrades (i.e., Windows Server 2016 to Windows Server 2019) are not included in the service

- Windows drivers and BIOS updates are not included in the service

**Service Level Agreement (SLA)**
Thrive commits to application of Windows Operating System security updates within 30 days of patch release for the approved Operating Systems defined in the Scope of Services.

If the percentage of managed systems under contract are missing security patches approved for installation within 30 days exceeds 5%, Client is eligible to receive a service prorated credit for the Patching Service MRC as follows:

**Percentage of Managed Systems Unpatched - Amount of Credit**
Less than 5%: - None
5%-10% - 3 days prorated MRC
Greater than 10% - 5 days prorated MRC

**Client SLA Requirements**

- Client must provide appropriate maintenance windows for installation of approved patches.

- Client devices must be powered on during patching windows or have wake on LAN and enabled.

- Client must allow for reboots of servers during scheduled patching window

- Client must not be running any security software that may interfere with patch deployment

- Client must allow Thrive to troubleshoot patch installation if machine is problematic. During the troubleshooting process that machine will be exempt from the percentage count until patching resumes normally through the Thrive Remote Management and Monitoring platform.

**General SLA Requirements**

- Operating System must be within vendor support lifecycle and capable of receiving updates

- Operating System must be supported by Kaseya agents.

- Client Change Control and Patch Freeze windows are excluded from the 30 day SLA commitment.

- Client must request credit via a Case through the Client Portal within 30 days of SLA violation.

- All credits issued will be applied to future service billing.

**Exclusions from SLA**

- Managed Workstation Patching Essentials Service



April 17, 2024
Service Order: CON-048875
Q-31821 USD

- 3rd Party Application Patching

**Thrive Managed Enterprise Endpoint Security and Response**

**Thrive Managed Enterprise Endpoint Security and Response Service Description**
Thrive Managed Enterprise Endpoint Security and Response service provides protection against malware, ransomware, and other fileless attacks utilizing machine learning, behavioral Artificial Intelligence and automated remediation. The service includes an Enterprise-grade endpoint security agent with monitoring and incident response by Thrive's 7x24x365 Security Operations Center. Malicious and Suspicious Incidents will be analyzed by a Thrive Security Analyst to identify threat risk and initiation of any required remediation actions.

The service shall include:

- One (1) endpoint security agent per contracted workstation or server

- One (1) Client administrator login for reporting and visibility

- 7x24x365 alerting to Thrive Security Operations Center (SOC) for all Malicious and Suspicious level events

- 14 day threat incident history

- Platform features include:

  o Behavioral artificial intelligence (AI) fileless attack detection

  o Deep Visibility threat hunt by MITRE ATT&CK ® technique

  o Automated remediation of infected devices

  o Device Isolation in the event of infection or attack

  o USB Device Control (requires implementation plan)

- Quarterly Security Control Validation

**Thrive Scope of Work and Deliverables**

- Thrive shall provide an endpoint security agent subscription for all contracted devices.

- Thrive shall perform initial configuration of Client console and develop ongoing support strategy including Client communication and general steps on response handling for threats generated by the Thrive endpoint security platform.

- Thrive shall perform investigation and analysis of Malicious and Suspicious level alerts and determine response actions, if required. Thrive shall provide notification to the Client of events that require action with remediation instructions. If the affected endpoint is under management by Thrive under separate Managed Server or End User Support managed services, Thrive shall remediate the endpoint provided it can be accessed remotely by Thrive.

- Thrive shall provide a Security Control Validation exercise on a quarterly basis demonstrating the endpoint security platform malware detection and protection controls.

**Client Responsibilities**

- Client shall be responsible for deployment of the security agent software on subscribed servers and workstations. If Client subscribes to Thrive Managed Server and/or Thrive End User managed services, Thrive shall perform security agent installation utilizing existing Remote Monitoring and Management (RMM) tools in the agent deployment.

- Client shall ensure all required server, workstation and firewall ports are open to all the endpoint security agent to communicate to the Thrive security platform. If Client subscribes to Thrive Managed Server and/or Thrive End User managed services, and Thrive Managed Firewall service, Thrive shall perform required modifications.



- Client shall notify Thrive of any new servers or workstations requiring an endpoint security agent subscription and deployment, and of workstations and servers that are to be removed from the service.

- If Client requires integration with a 3rd party Security Information and Event Management platform, Thrive shall assist with consultation related to the Thrive endpoint security platform configuration.

- Client shall submit a request for the quarterly Security Control Validation exercise and provide a test workstation or server for the test to be performed on.

**Service Exclusions**

Any service not explicitly defined in the Managed Enterprise Endpoint Security and Response Service Description above is considered out of scope and may be provided under separate agreement for an additional fee.

## Managed Azure Virtual Datacenter Scope of Service

**Service Definition**

Thrives Managed Azure Virtual Datacenter Service provides the configuration and management Azure Resource Manager core resources in the defined Azure region(s).

The service shall include:

- Configuration and management of Resource Groups

- Configuration and management of Virtual Networks
    - Address space
    - Subnets
    - DNS servers
    - Peering
    - Private endpoints

- Configuration and management of Route Tables

- Configuration and management of both public and private DNS zones

- Configuration and management of Storage Accounts, excluding Azure Files and NetApp Azure defined by the Client Files
    - Networking
    - Access key rotation
        - Customer-managed keys (requires Managed Azure Key Vault)
    - Encryption
        - Customer-managed keys (requires Managed Azure Key Vault)

- Management of existing NAT Gateways

**Thrive Scope of Work & Deliverables**

- Thrive shall provision an Azure subscription through the Microsoft Cloud Service Provider program in accordance with the requirements defined in the Azure Resource Specifications section above.

- Thrive shall configure the resources in accordance with Client's requirements and industry standards.

- Upon completion of installation and upon Client request, Thrive will administer all changes and modifications to the resources.

**Client Responsibilities**

April 17, 2024
Service Order: CON-048875
Q-31821 USD

- Client shall contract for required Azure service subscription to meet overall infrastructure requirements. Subscription overutilization will be billed by Thrive to the Client on a monthly prorated basis.

- Client shall provide the Thrive Project Manager with sufficient information and documentation necessary to properly setup, configure, install & manage the Managed Azure Virtual Datacenter service.

- Client shall provide Thrive with scheduled and emergency maintenance windows.

- Provide Client escalation contacts to Thrive for service event notification.

**Service Exclusions**

- Any service not explicitly included in the Managed Azure Virtual Datacenter definition above is considered optional and provided under separate agreement for an additional fee or unsupported.

- Services not covered under optional agreements for support are considered unsupported but, at the discretion of Thrive, support may be provided as a best effort. Thrive does not guarantee support SLAs for those services.

- Due to complexity both Azure Kubernetes and Azure Data Factory are unsupported.


## Managed Azure Windows Virtual Machine Scope of Service

**Service Definition**
Thrive shall configure and manage the following aspects of the Azure Windows Virtual Machine based on defined client requirements:

- Creation and configuration of virtual machine

- Management of access control (IAM) using built-in roles

- Management of virtual machine

    - Size changes

    - Add/Remove/Resize managed disks

    - Add/Remove network interfaces

- Management of disk encryption (customer-managed Keys requires Managed Azure Key Vault)

- Management of operating system patching (requires Managed Patching)

- Monitoring of virtual machine health

**Thrive Scope of Work & Deliverables**

- Thrive shall create the new virtual machine instance with standard configuration of disks, networking, and fault tolerance

- Thrive shall install management and monitoring tools

- Thrive shall configure operational health monitoring of virtual machine

- Thrive shall configure Azure security access controls to the virtual machine

- Thrive shall manage disk encryption

- Thrive shall manage operating system patching

- Thrive shall troubleshoot and remediate issues

- Thrive shall manage changes to VM size, disks, and networking

- Thrive shall apply Azure Hybrid Benefit (client owned Windows license)



**Client Responsibilities**

- Client shall contract for required Azure service subscription to meet overall infrastructure requirements. Subscription overutilization will be billed by Thrive to the Client on a monthly prorated basis.

- Client shall provide the Thrive Project Manager with sufficient information and documentation necessary to properly setup, configure, install & manage the Managed Azure service.

- Client shall provide Thrive with scheduled and emergency maintenance windows as needed to effect changes based on client request or Microsoft guidance.

- Provide Operating System licensing. Windows OS may be provided through Client owned licenses or procured through the Azure subscription.

- Management of all data and applications above the Operating System layer (unless contracted for Thrive Application Management Services)

- Provide Client escalation contacts to Thrive for service event notification.

**Service Exclusions**

- Any service not explicitly included in the Managed Azure Service Definition above is considered optional and may be provided under separate agreement for an additional fee.

# EXHIBIT 6

# Cybersecurity Services

Defend against cyber threats with confidence and peace of mind.

Home > Services > Cybersecurity

Is the rising tide to outsource your cybersecurity?

What business outcomes are you looking to achieve?

Thrive can help.

## Trusted Cybersecurity Partners

Thrive offers Best-in-class security solutions and services designed to meet the needs of your business.

### Threat Detection and Response

Learn More

### Attack Surface & Risk Management

Learn More

### End User and Workstation Security

Learn More

### Incident Response and Remediation

Learn More

### Security for Microsoft 365 & Azure

Learn More



### Security Advisory & Consulting

Learn More

## Driving Better Business Outcomes

See How Our Customers



## Managed Cybersecurity Services and Solutions for Your Business

## Thrive's Cybersecurity Mesh Architecture (CSMA)

Learn More

## What Is Your Security Risk Exposure?

Download Now

## Why Companies Outsource with Thrive

## Give Your Business the Thrive Cybersecurity Advantage

## Cybersecurity Resources

## Ready to Speak with Our Cybersecurity Experts?

# EXHIBIT 7



**STEVEN W. TEPPLER**
**Partner**
Mandelbaum Barrett PC
2385 NW Executive Center Drive, Suite 100
Boca Raton, FL 33431
T: (646) 946-5659
F: (973) 325-7467
E-mail: steppler@mblawfirm.com

June 17, 2025

By Overnight Mail and Email

Leonard Slapp, Esq.
General Counsel
Thrive Operations, LLC
25 Forbes Blvd, Suite 3
Foxborough, MA 02035

Re: National Boat Owners Association – Demand to Collect, Preserve, and Produce

Dear Mr. Slapp:

This firm represents National Boat Owners Association ("NBOA"). We write to you in connection with the cybersecurity incident experienced by NBOA on June 7, 2025 (the "Incident"). NBOA is required, under various statutes and regulations, to obtain, investigate, and preserve all documents, records, and audit logs generated by the various resources provided to or managed by Thrive on NBOA's behalf that are associated with the Incident. We understand that numerous requests have been made by NBOA staff to Thrive requesting such documents, records, audits, and event logs for these sources and/or the services provided by Thrive. To date, Thrive has not been forthcoming either in its asserted inability to produce or in its production in response NBOA's requests. NBOA has been advised by its cybersecurity expert that these documents, records, and logs are easily and currently obtainable. As NBOA's information technology and cybersecurity managed services provider, such non-transparency and non-responsiveness is unacceptable.

Accordingly, demand is hereby made that Thrive immediately acquire and preserve, for prompt disclosure to NBOA, all electronically stored information. This includes, but is not limited to, communications, logs, configurations, and other data related to Sentinel, Azure, Office 365, Kaseya agents, ServiceNow, FortiGate/FortiManager/FortiCloud, and any other systems or resources used to collect data or to interact, interface, or otherwise communicate with NBOA, its users, or its systems.

This demand further includes, without limitation, all data from SOC (Security Operations Center), NOC (Network Operations Center), and any service teams that had access to, connections with, or review capabilities over data associated with NBOA, particularly in connection with any incident investigation.

Demand is further made that all third-party managed services, including all cloud servers used by or on behalf of Thrive and NBOA, be promptly informed by Thrive to preserve and retain all logs, records, netflows, and related data.

Finally, we request that Thrive disclose to NBOA any cyber incidents experienced within the past calendar year that may have involved any first- or third-party systems—whether primary or supporting—used by Thrive to store, transact, communicate, monitor, or otherwise connect with NBOA's information systems.

Please feel free to contact me directly if you have any questions or would like to discuss.


Very truly yours,


Steven W. Teppler, Esq.
Mandelbaum Barrett PC


cc:     ckasten@thrivenextgen.com; mburkett@thrivenextgen.com;
        jmalvin@thrivenextgen.com; crothstein@mblawfirm.com;
        ifarrell@nboat.com; pfarrell@nboat.com; rdhanson@nboat.com

# EXHIBIT 8



**STEVEN W. TEPPLER**
**Partner**
Mandelbaum Barrett PC
2385 NW Executive Center Drive,
Suite 100
Boca Raton, FL 33431
T: (646) 946-5659
F: (973) 325-7467
E-mail: steppler@mblawfirm.com

June 20, 2025

<u>By Overnight Mail and Email</u>

Leonard Slapp, Esq.
General Counsel
Thrive Operations, LLC
25 Forbes Blvd, Suite 3
Foxborough, MA 02035

**Re:  Second Demand for Immediate Production and Preservation of
Cybersecurity-Related Data – NBOA Incident of June 7, 2025**

Dear Mr. Slapp:

This firm represents the National Boat Owners Association ("NBOA"). We write further
to our prior correspondence dated June 17, 2025, concerning the cybersecurity incident
experienced by NBOA on June 7, 2025 (the "Incident").

Despite repeated and reasonable requests by NBOA and its representatives, Thrive has
failed to produce—or even adequately respond to—demands for critical documents,
records, and logs and explanations necessary to investigate the Incident. Thrive's continued
failure to cooperate is unacceptable and is now actively obstructing NBOA's ability to
comply with its legal and regulatory obligations.

For the avoidance of doubt: Thrive's inaction is not merely uncooperative—it is impeding
a legally and contractually mandated investigation. Thrive is hereby placed on notice that
its conduct is interfering with NBOA's duties under applicable law, including but not
limited to obligations to investigate, report, and remediate cybersecurity incidents. Thrive
will be held fully accountable for any consequences arising from its obstruction, including
regulatory penalties, reputational harm, and any resulting damages.

Accordingly, we reiterate and expand our demand that Thrive immediately acquire, preserve, and produce all electronically stored information, including but not limited to:

- Logs, configurations, communications, and data related to Sentinel, Azure, Office 365, Kaseya agents, ServiceNow, FortiGate/FortiManager/FortiCloud, and any other systems or services used in connection with NBOA's infrastructure;
- All data from SOC, NOC, and any service teams with access to or oversight of NBOA systems;
- All records, logs, and netflows from third-party managed services and cloud environments used by or on behalf of Thrive and NBOA;
- A full disclosure of any cyber incidents within the past calendar year involving systems used to store, transmit, or interact with NBOA's data.

Thrive's continued delay is unjustifiable. If we do not receive full compliance with this demand within five (5) days of the date of this letter, NBOA will consider all available remedies without further notice. Please contact me at your earliest convenience.

All rights and remedies of NBOA are hereby expressly reserved at law and in equity.


Very truly yours,


Steven W. Teppler, Esq.
Mandelbaum Barrett PC


cc: dferrante@thrivenextgen.com; bswift@thrivenextgen.com

4908-1102-3951, v. 1

# EXHIBIT 9

**Carly Rothstein**

| | |
|---|---|
| **From:** | Brittany Swift <bswift@thrivenextgen.com> |
| **Sent:** | Tuesday, June 24, 2025 11:19 AM |
| **To:** | Carly Rothstein; Domenic Ferrante |
| **Cc:** | Steven W. Teppler; Contract.Operations; Lee Slap |
| **Subject:** | RE: Second Notice to Thrive |

> **[CAUTION: External Email]** Be wary of links and attachments. If the sender is unfamiliar or the content seems suspicious, do not engage. Report suspected fraud via the "Phish Alert Report" in Outlook.

Dear Carly Rothstein,

Mandelbaum Barrett's letter sent via email to two members of Thrive's legal team right before close of business on Friday June 20, 2025 and then received via overnight mail to Thrive's Foxborough office on June 23, 2025 is the first notice that Thrive's legal and contracts team received regarding NBOA's request. Once we received your notice, we began working on your request.

Please kindly note that per Section 12(i) of the MSA, proper and sufficient notice must be sent by a nationally recognized overnight courier or by email addressed to Thrive at the address listed on the cover page of the MSA. Notice sent by mail must be sent to Thrive's Foxborough address and notice sent by email must be sent to contract.operations@thrivenetworks.com. Emails sent to Thrive's employees, including the account management team or any technical teams, do not constitute effective notice under the MSA. Please ensure that going forward, you direct any legal or contract related requests to the contract.operations@thrivenetworks.com address or to Domenic Ferrante and myself directly.

We are currently working through your requested documentation and will comply with the requests in accordance with contractual obligations set out in the MSA and each Service Order as well as in compliance with applicable law. We are working in good faith to respond to your requests, but please note that the requested documentation takes time to gather. For example, if the request for "Sentinel" data is referring to SentinelOne (as NBOA does not have Microsoft Sentinel), SentinelOne has a staggering amount of data. Within a single hour, there are approximately 15 million events in SentinelOne that are collected in data. We are working with our technical teams to discuss how we can obtain and share the requested data, which will take time given the vast amount of data embedded in your requests. We will revert on the requests as soon as we are able to complete them to the extent possible and in accordance with the contract and applicable law.

Also, as a note, Thrive is reviewing the current retention policies in place for each of the applications and agents for which you requested data. To comply with your request on behalf of NBOA, we have extended data retention policies for certain applications/agents and will look to see if any other data retention policies need to be updated to comply with NBOA's request. Extending these data retention policies incurs additional fees from the applicable vendor. In accordance with the MSA and each Service Order, we will pass-through the third-party fees that Thrive incurs to comply with NBOA's request. These costs will be invoiced accordingly.

I will circle back to you once I have any updates to share regarding the requested documentation. In the meantime, please direct any further questions or requests relating to contractual obligations to me or the above contracts email so that Thrive can properly receive and respond to any such questions/requests.

Regards,
Brittany Swift



**Brittany Swift**
Commercial Counsel

bswift@thrivenextgen.com

   



*This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.*

This message is the property of Thrive and the information contained herein may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or

copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to this message and delete all copies from your computer. Thank you.TNI2016

Links contained in this email have been replaced for YOUR security. If you click on a link in the email above, the link will be analyzed for known threats.

# EXHIBIT 10

**Carly Rothstein**

---

| | |
|---|---|
| **From:** | Steven W. Teppler |
| **Sent:** | Wednesday, June 25, 2025 11:19 AM |
| **To:** | Brittany Swift; Carly Rothstein; Domenic Ferrante |
| **Cc:** | Contract.Operations; Lee Slap |
| **Subject:** | Thrive/NBOA |

Good morning, Ms. Swift:

In response to your email of June 24:

As you may or may not be aware, NBOA is still undertaking incident response, and accordingly, timely access to all logs, configurations, backups is essential to ensure that the we can thoroughly identify, analyze, contain and remediate our client's security posture, provide adequate and thorough required reporting to government entities, and fulfill applicable notification obligations, whether to our affected consumers or to state regulators.

We are more than capable of handling the data from SentinelOne and all other logs generated. Now, with passage of nearly two weeks, it is even more imperative for NBOA's cybersecurity and compliance efforts to have Thrive provide all data we've requested as soon as possible. We are more than happy to provide a secure cloud location to upload the information. We also have engaged an incident response team in place that is very familiar with SentinelOne and all other systems you use to expedite the process of accessing and exporting the information.

As NBOA's current MSP/MSSP, and one that advertises a specialty in cyber security and incident response, Thrive must surely be aware that timely access **and retention** of all logging, monitoring, alerting, and configurations are critical as soon as an adverse incident is known. As you are no doubt also aware, these actions, including retention, are also essential to any incident response. While you may be reviewing your retention policies, it is nonetheless clear that information (especially where such information, such as event logs, are subject to rollover) must collected, preserved and made available for timely analysis, containment, remediation and eradication.

Refusing or delaying access to data due so that your team can *review the current retention policies in place for each of the applications and agents* requested is not acceptable and leaves NBOA's business and its employees, customers, and third parties at  continued risk, adds to NBOA's cost and clearly displays that Thrive is either woefully unprepared, unable or unwilling to provide the basic services of an MSP nor capable of performing defensible cyber incident activities on your managed platform.

NBOA's request is fully consistent with its legal requirements.  Further, it should be a normal course of business for a company who claims to provide cyber incident response services, to make the data available in the systems you maintain. This should not take weeks to provide.

I suggest that we coordinate a meeting to coordinate the facilitation of the above.

Very truly yours,
Steven Teppler

**Steven W. Teppler | Partner**
Chief Cybersecurity Legal Officer
(646) 946-5659
steppler@mblawfirm.com

**Mandelbaum Barrett PC**
3 Becker Farm Road, Suite 105
Roseland, NJ 07068
www.mblawfirm.com

*This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.*



# EXHIBIT 11

**Carly Rothstein**

| | |
|---|---|
| **From:** | Brittany Swift <bswift@thrivenextgen.com> |
| **Sent:** | Friday, June 27, 2025 1:38 PM |
| **To:** | Steven W. Teppler; Carly Rothstein |
| **Cc:** | Contract.Operations; Lee Slap; Domenic Ferrante |
| **Subject:** | RE: Thrive/NBOA |

> **[CAUTION: External Email]** Be wary of links and attachments. If the sender is unfamiliar or the content seems suspicious, do not engage. Report suspected fraud via the "Phish Alert Report" in Outlook.

Steven,

Kindly following-up on my bolded question below. Please confirm whether NBOA's request for "Sentinel" information meant "SentinelOne" information. If NBOA would like access to SentinelOne data, please send us the email address that NBOA would like Thrive to use to configure the SentinelOne read-only account. Once received, one of Thrive's engineers will configure the account and send instructions regarding how to access the account.

As a reminder, Thrive's platform-wide retention policy for SentinelOne is now 30 days. For example, if NBOA logged into such an account today, it would be able to see SentinelOne data from May 27, 2025 – June 27, 2025.

Also, as a reminder, SentinelOne has approximately 15 million events collected in data every hour. As such, there is a large amount of data available in SentinelOne to go through. Because the data is on a 30-day retention policy, every day the data from 31 days ago is purged by SentinelOne and the data from the current date is added.

Regards,
Brittany



**Brittany Swift**
Commercial Counsel
**bswift@thrivenextgen.com**

  

---

**From:** Brittany Swift
**Sent:** Thursday, June 26, 2025 5:32 PM
**To:** Steven W. Teppler <steppler@mblawfirm.com>; Carly Rothstein <CRothstein@mblawfirm.com>
**Cc:** Contract.Operations <Contract.Operations@thrivenetworks.com>; Lee Slap <lslap@thrivenextgen.com>; Domenic

Ferrante <dferrante@thrivenextgen.com>
**Subject:** RE: Thrive/NBOA

Dear Steven,

I have been coordinating with a variety of Thrive departments to gather the requested information to the extent possible and to respond to your requests.

With respect to NBOA's request for "Sentinel" information, please note that NBOA does not have Microsoft Sentinel, so this is not applicable. However, when we received your informal notice of the requests on Friday June 20, 2025, Thrive believed it was possible that one of your requests incorrectly referred to "Sentinel" and you may have meant "SentinelOne". In the spirit of partnership and good faith, Thrive acted proactively and at a cost to contact the applicable third-party vendor for SentinelOne to extend the retention period for SentinelOne data. SentinelOne has a platform-wide data retention policy that cannot be configured at the individual site level. In case NBOA was requesting access to SentinelOne logs, Thrive went ahead and extended the standard platform-wide retention policy to 30 days to assist with NBOA's request. SentinelOne made this update for Thrive immediately to preserve the current data for a longer period, and Thrive does not yet know what this change will cost.

I have connected with Thrive's Security Engineering team regarding how to get NBOA access to such SentinelOne data, and they advised that exporting the data is not possible given the vast amount of data, but they can configure a read-only access account for NBOA so that NBOA can view its associated SentinelOne data for the past 30 days. **Please let me know what email address NBOA would like Thrive to use to configure the SentinelOne read-only account.** Once provided, a member of Thrive's Security Engineering team will configure the account and provide any further instructions for accessing the data in that account.

With respect to Azure and Office 365 data, Thrive's engineering team has advised me that we already provided NBOA with global administrator access accounts for Azure and Office 365. An individual named Randy Stitch and another individual named Bryan Haoui were already granted such access rights and have access to that data. Please let me know if they are having any trouble accessing those accounts or if NBOA wants to submit a request for a different individual to obtain a global administrator account.

With respect to NBOA's infrastructure, a member of Thrive's Service Delivery confirmed that Thrive has already sent NBOA copies of the discs of the servers as they were when compromised. An individual named Bryan Haoui confirmed receipt of these discs.

I also confirmed that Thrive has already provided the VPN logs exported out of the firewalls for the period of June 4, 2025 – June 7, 2025.

For NBOA's other requests, please let us know more specifically what it is NBOA is looking for, if anything, as it is not clear to Thrive from the letter. For example, ServiceNow is the ticketing system that Thrive uses to track incidents and time worked for its clients. NBOA has access to the communications between itself and Thrive in ServiceNow. If NBOA is not sure how to access these communications, feel free to let me know and I can connect NBOA with a member of our technical team. We are happy to assist you further with respect to this request and other requests to the extent able if you provide us with sufficient details to understand the nature of the request.

Please note that while we are happy to assist with your requests, NBOA does not have incident response services with Thrive, as you noted below given a separate team is handling NBOA's incident response investigation. Our responsibilities are limited to those defined in the contracts between NBOA and Thrive as well as applicable legal requirements. We are acting in good faith to not only meet our contractual obligations but go above and beyond to assist NBOA here.

Finally, I want to take a moment to address your tone and approach to this matter. Based on our view, there is no indication of any failure or breach on Thrive's part. We categorically reject any implication that Thrive is at fault either for the underlying incident or for any potential failures on NBOA's part to comply with its own legal or regulatory obligations. Again, Thrive has gone above and beyond to collaborate with NBOA and provide assistance, even assistance beyond our contractual obligations. Thrive is here to help NBOA. Hostility is both unconstructive and unwarranted.

I respectfully request that future communications remain professional and constructive. Thrive is here to support NBOA. Mutual respect is essential for any successful collaboration.

Regards,
Brittany

# EXHIBIT 12

**Carly Rothstein**

---

| | |
|---|---|
| **From:** | Steven W. Teppler |
| **Sent:** | Saturday, June 28, 2025 11:58 AM |
| **To:** | Brittany Swift; Carly Rothstein |
| **Cc:** | Contract.Operations; Lee Slap; Domenic Ferrante |
| **Subject:** | Re: Thrive/NBOA |

Hello Brittany:

Please be advised that our first (as well as our second) letter to Thrive was, and remains, a litigation hold and preservation notice, as well as a demand that Thrive also put third parties on to similar notice to preserve all NBOA related documents, records and logs.

Very truly yours,
Steven TEppler

**Steven W. Teppler** | Partner
Chief Cybersecurity Legal Officer
(646) 946-5659
steppler@mblawfirm.com

**Mandelbaum Barrett PC**
3 Becker Farm Road, Suite 105
Roseland, NJ 07068
www.mblawfirm.com

*This email and any attachments are intended solely for the recipient to whom it is addressed. It may also be an attorney-client communication, and as such is privileged and confidential. Any unauthorized review, use, disclosure or copying of this message is strictly prohibited. If you are not the intended recipient or have received this email in error, delete it immediately and notify the sender.*